RICHARD DRURY (Cal. Bar No. 163559)
CHRISTINA M. CARO (Cal. Bar. No. 250797)
LOZEAU | DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel:  (510) 836-4200; Fax: (510) 836-4205
E-mail:  richard@lozeaudrury.com; christina@lozeaudrury.com
*Attorneys for all Plaintiffs*

SARA HEDGPETH-HARRIS (Cal. Bar No. 124114)
LAW OFFICE OF SARA HEDGPETH-HARRIS
1204 West Shaw Ave., Suite 102
Fresno, CA  93711
Tel: (559) 283-8780; Fax: (559) 478-5073
Email: sara.hedgpethharris@shh-law.com
*Attorney for all Plaintiffs*

BRENT NEWELL (Cal. Bar No. 210312)
LAURA BAKER (Cal. Bar No. 276410)
CENTER ON RACE, POVERTY & THE ENVIRONMENT
1302 Jefferson Street, Suite 2
Delano, CA 93215
Tel (661) 720-9140; Fax (661) 720-9483
E-mail: bnewell@crpe-ej.org
*Attorneys for Plaintiffs Association of Irritated Residents*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION FOR CLEAN AIR, a California nonprofit corporation; CENTER FOR ENVIRONMENTAL HEALTH, a California nonprofit corporation; ASSOCIATION OF IRRITATED RESIDENTS, a California nonprofit corporation; TEAMSTERS JOINT COUNCIL 7, an organized labor union; KEVIN LONG, an individual,<br><br>        Plaintiffs,<br><br>        vs.<br><br>VWR INTERNATIONAL, LLC, a Delaware corporation; and DOES I – X, inclusive,<br><br>        Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>[Clean Air Act, 42 U.S.C. §7604(a)] |

COALITION FOR CLEAN AIR; CENTER FOR ENVIRONMENTAL HEALTH; ASSOCIATION OF IRRITATED RESIDENTS; TEAMSTERS JOINT COUNCIL 7; and KEVIN LONG, by and through their counsel, hereby allege:

## **INTRODUCTION**

1.      This lawsuit seeks to remedy violations of the federal Clean Air Act ("Act") and San Joaquin Valley Air Pollution Control District Rule 9510, known as the Indirect Source Rule ("ISR" or "Rule 9510") by Defendant VWR International, LLC ("VWR"), associated with the recent opening of a massive new 500,000 to 750,000 square foot hazardous chemical truck distribution facility in Visalia, California, proposed to be located at 8711 W. Riggin Avenue, APN 077-360-010 ("VWR Project" or "Project").  The Project will generate approximately 2,670 vehicles trips per day, including approximately 540 multi-axle diesel truck trips, many carrying highly toxic chemicals through the nearby residential community.

2.      Rule 9510 requires development projects for heavy industrial facilities of 100,000 square feet or larger in size to apply for an indirect source review ("ISR") permit prior to receiving final discretionary approval for a project. The VWR Project, at 500,000 to 750,000 square feet, is five to seven times larger than the 100,000 square feet Rule 9510 threshold. Nevertheless, VWR failed  to apply for an ISR permit and has not received an ISR permit.

3.      A development project is defined as "any project, or portion thereof, that is subject to a discretionary approval by a public agency, and will ultimately result in the construction of a new building, facility, or structure, or reconstruction of a building, facility, or structure for the purpose of increasing capacity or activity." See Rule 9510, Sect. 3.13. All applicants subject to the Rule must submit an Air Impact Assessment ("AIA") application "no later than" the time of applying for a final discretionary approval with the public agency. Id. at Sect. 5.0.

4.      Under Rule 9510, a facility is required to reduce its air pollution emissions by almost half.  Rule 9510 requires the San Joaquin Valley Air Pollution Control District ("Air District") to formulate a list of site-specific discretionary pollution reduction measures to reduce

construction emissions by 20% for nitrogen oxides ("NOx") and 45% for particulate matter under 10 microns in diameter ("PM10").  (Rule 9510, Sect. 6.1).  It also requires the Air District to formulate a list of site-specific discretionary measures to reduce operational emissions by 33% for NOx and 50% for PM10. (Id. at Sect. 6.2).

5.      VWR failed entirely to comply with Rule 9510, and did not apply for a Rule 9510 permit.  Therefore, the Air District did not impose Rule 9510 pollution control measures.

6.      As a result of VWR's violations of the federal Clean Air Act, VWR's proposed new massive hazardous chemical truck distribution facility will generate almost twice as much air pollution as allowed by federal law.

7.      VWR began operations at the Visalia facility on or about September 10, 2012, and the air pollution from 2,670 vehicles trips per day will have dramatic adverse impacts on the environment, and on the nearby residential community – including many members of the Plaintiff organizations.

8.      Plaintiffs Coalition for Clean Air ("CCA"), Center for Environmental Health ("CEH"), Association of Irritated Residents ("AIR"), Teamsters Joint Council 7 ("Plaintiffs") are non-profit organizations with members who live near the proposed VWR Project, and who will be adversely affected by traffic and air pollution from the Project.

9.      This Court has jurisdiction over this action pursuant to section 304(a) and (c) of the Clean Air Act, 42 U.S.C. §7604(a) and (c), and pursuant to federal question jurisdiction under 28 U.S.C. §1331.

10.     On September 1, 2011, Plaintiffs mailed a Notice of Intent to Sue letter to VWR, the United States Environmental Protection Agency ("EPA"), and the State of California, informing VWR that Plaintiffs intended to sue VWR unless it came into compliance with the Clean Air Act within 60-days.  ("NOI").  (Attached hereto as Exhibit 1).

11.     VWR did not come into compliance with Rule 9510 and did not respond to the NOI.

12.     Neither US EPA, nor any State or federal agency has commenced enforcement

against VWR.

13.   This suit seeks declaratory and injunctive relief, civil penalties, and an award of the costs of this litigation against VWR to ensure that the VWR fully complies with the requirements of the Clean Air Act.

14. VWR has violated, and continues to violate San Joaquin Valley Unified Air District ("Air District") Rule 9510 by operating the facility without a permit and without complying with Rule 9510's requirements.  VWR has violated, and continues to violate Rule 9510 by constructing the facility without a permit and without complying with Rule 9510's requirements.  Rules 9510 has been approved by the U.S. Environmental Protection Agency ("EPA") as part of the State Implementation Plan ("SIP").  Pursuant to § 304(a)(1) of the Clean Air Act, 42 U.S.C. § 7604(a)(1), Plaintiffs may enforce the State Implementation Plan.

## PARTIES

15.   Plaintiff COALITION FOR CLEAN AIR ("CCA") is a California non-profit corporation with a membership of over 300 individuals throughout the state, including members who live very close to the VWR Project.  CCA is the only statewide organization exclusively advocating for air quality in California, and has actively participated in proceedings related to the local, state and federal regulatory activities affecting air quality in the region.  CCA's mission is to restore clean, healthy air to all of California and strengthen the environmental movement by promoting broad-based community involvement, advocating responsible public policy and providing technical expertise.  The CCA has actively participated in proceedings related to the local, state and federal regulatory activities affecting air quality in the region, including advocating for the adoption of San Joaquin Valley Air Pollution Control District Rule 9510 (Indirect Source Rule), which is at issue in this action.

16.   Members of CCA regularly breathe the excessively polluted air of the San Joaquin Valley Air Basin and have a direct interest in the outcome of this action.  CCA maintains offices in Fresno, Sacramento and Los Angeles.  CCA members Ronny Jungk and Doreen Caetano live approximately two miles from the VWR Project.  They can see VWR from

the windows of their home.  The Jungk/Caetano home is approximately one-half mile from

Betty Drive, the main road that will carry diesel truck traffic from the Project.  The

Jungk/Caetano's breathe air that will be polluted by VWR's trucks at levels twice as high as

allowed by federal law, and drive on roads that will be congested by VWR's truck traffic.

Doreen Caetano suffers from asthma and related irregular heart beat that is triggered by air

pollution, and so will be particularly severely affected by air pollution from the Project and its

associated diesel truck traffic.  CCA has several other members and one staff member who

regularly breathe the excessively polluted air of Tulare County and surrounding areas, and have

a direct interest in the outcome of this action.  Members of CCA will suffer injury in fact and

economic harm as a result of the violations of law related to the VWR Project at issue in this

action, including, but not limited to, diminution of property value due to excess air pollution and

truck traffic, being forced to breathe heavily polluted air and suffer excess traffic congestion,

being exposed to significant risks from the handling, transportation and storage of highly toxic

chemicals without proper safeguards.

   17. Plaintiff CENTER FOR ENVIRONMENTAL HEALTH ("CEH") is a California

non-profit corporation dedicated to protecting the public from environmental health hazards and

toxic exposures.  CEH is based in Oakland, California and incorporated under the laws of the

State of California.  CEH is a nationally recognized non-profit environmental advocacy group.

CEH has brought numerous cases that have resulted in significant public benefit, including

reformulation of thousands of products to remove toxic chemicals and to make them safer, and

reduction in air pollution risks from facilities.  CEH also provides information to Californians

about the health risks associated with exposure to hazardous substances, where manufacturers

and other responsible parties fail to do so.  CEH has thousands of supporters throughout

California, including many in Tulare County.   Supporters of CEH live near the proposed VWR

Project.  These supporters will suffer injury in fact and economic harm as a result of the

violations of law related to the VWR Project at issue in this action, including, but not limited to,

diminution of property value due to excess air pollution and truck traffic, being forced to

breathe heavily polluted air and suffer excess traffic congestion, being exposed to significant risks from the handling, transportation and storage of highly toxic chemicals without proper safeguards.

18.     Plaintiff ASSOCIATION OF IRRITATED RESIDENTS, ("AIR") is California nonprofit corporation that advocates for air quality and environmental health in the San Joaquin Valley.  Members of AIR reside in Kern, Tulare, Kings, Fresno, and Stanislaus counties.  AIR provides comments and testimony to local and regional decisionmakers and enforces important measures to protect and improve San Joaquin Valley air quality. The VWR Project will introduce large amounts of pollution to the already heavily polluted San Joaquin Valley, which fails to meet federal National Ambient Air Quality Standards for Ozone and PM2.5, to which emissions from VWR contribute.  These members will suffer injury in fact and economic harm by being forced to breathe ozone and PM2.5 polluted air, to which the VWR facility contributes.

19.     Petitioner and Plaintiff TEAMSTERS JOINT COUNCIL 7 ("Teamsters") is a labor organization based in Oakland, California that advocates for the health and well-being of workers throughout northern California and the Central Valley.  Teamsters has over 700 members who live, work and recreate in Visalia, California.  Members of Teamsters live near the proposed VWR Project.  These members will suffer injury in fact and economic harm as a result of the violations of law related to the VWR Project at issue in this action, including, but not limited to, diminution of property value due to excess air pollution and truck traffic, being forced to breathe heavily polluted air and suffer excess traffic congestion, being exposed to significant risks from the handling, transportation and storage of highly toxic chemicals without proper safeguards. Hundreds of members of Teamsters pay property taxes, sales taxes and other taxes in the City of Visalia.

20.     Plaintiff KEVIN LONG is a resident of the City of Visalia.  Mr. Long resides in the vicinity of the proposed VWR Project and is and will continue to be directly and adversely affected by air pollution and traffic from the VWR Project.  Mr. Long pays taxes in the City of

Visalia including property taxes, sales taxes and other taxes.  Mr. Long lives near the proposed VWR Project.  Mr. Long will suffer injury in fact and economic harm as a result of the violations of law related to the VWR Project at issue in this action, including, but not limited to, diminution of property value due to excess air pollution and truck traffic, being forced to breathe heavily polluted air and suffer excess traffic congestion, being exposed to significant risks from the handling, transportation and storage of highly toxic chemicals without proper safeguards.

21. Plaintiffs are persons within the meaning of section 302(e) of the Act, 42 U.S.C. § 7602(e), and may commence a civil action under section 304(a) of the Act, 42 U.S.C. § 7604(a).

22.     Defendant VWR INTERNATIONAL, LLC, is a limited liability corporation organized under the laws of the State of Delaware.  Petitioners are informed and believe, and hereby allege, that VWR owns APN 077-360--010.  VWR began construction of a 500,000 to 750,000 square foot distribution center on that parcel beginning in January 2011.  VWR commenced operations at the Project on or about September 10, 2012.  As the owner and applicant for the proposed facility, VWR is responsible for applying for all necessary permits and approvals required for the Project, including air emission permits and hazardous waste control permits. VWR is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. §7602(e).

23.     Plaintiffs do not know the true names or capacities of the persons or entities sued as Respondents DOES I through X, inclusive, and therefore sue these respondents and real parties by their fictitious names. Plaintiffs will amend the Complaint to set forth the names and capacities of the Doe defendants along with appropriate charging allegations when such information has been ascertained.

24.     As a result of VWR's failure to comply with Rule 9510, Plaintiffs' members will be exposed to harmful air pollution that will cause acute and chronic respiratory health impacts. This pollution would be controlled if VWR were required to comply with the Clean Air Act. An injunction from this Court requiring VWR to comply with Rule 9510 will help to remedy the

harm faced by Plaintiffs and their members.

25.     VWR is subject to the assessment of civil penalties for its violations of the Clean Air Act pursuant to Clean Air Act §304(a), 42 U.S.C. §7604(a).  An assessment of civil penalties would help remedy Defendants past and present violations of the Clean Air Act, would help remove the economic benefit of non-compliance, would have a punitive and retributive effect on Defendants, and would have a general and specific deterrent effect in preventing future violations by VWR and other major sources of pollution.

26.     This lawsuit seeks civil penalties against VWR in each cause of action under the Clean Air Act, up to and including $37,500 per day, per violation.

27.     Section 304(g) of the federal Clean Air Act authorizes the award of $100,000 for beneficial mitigation projects to enhance the public health or environment.  Such an award would mitigate, to some extent, the harm to Plaintiffs' members living, working, and recreating near the Project caused by Defendants' ongoing violations of the Clean Air Act.

28.     When, in this Complaint, reference is made to any act of VWR, such reference shall be deemed to include the officers, directors, agents, employees, or representatives of VWR who committed or authorized such acts, or failed and omitted adequately to supervise or properly to control or direct their employees while engaged in the management, direction, operation, or control of the affairs of VWR, and did so while acting within the course and scope of their employment or agency.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to section 304(a) and (c) of the Clean Air Act, 42 U.S.C. § 7604(a) and (c), and pursuant to federal question jurisdiction under 28 U.S.C. § 1331.

30.     On September 1, 2011, Plaintiffs gave notice of VWR's Clean Air Act violations and Plaintiff's intent to file suit to the Administrator of the EPA, to the Regional Administrator of EPA Region IX, to the State of California, and to VWR, as required by §304(b) of the Act, 42 U.S.C. § 7604(b).

31.     More than sixty (60) days have passed since service of the notices described in the previous paragraph. VWR remains in violation of the Clean Air Act. Neither EPA, the state, nor the Air District have commenced, nor are diligently prosecuting, a civil action in a court of the United States or any state to require compliance with the federal Clean Air Act requirements pursuant to 42 U.S.C. § 7604(b)(1)(B).  Plaintiffs have received no communication from VWR regarding the notices of intent to sue discussed above.

32.     Venue is proper in the Fresno Division of the Eastern District of California pursuant to §304(c) of the Clean Air Act, 42 U.S.C. §7604(c), because the source of air pollution subject to the Rule at issue in this case is located in Tulare County.

## FACTUAL BACKGROUND

33.     VWR owns real property located at 8711 W. Riggin Avenue, in the City of Visalia, California, APN 077-360-010, in the San Joaquin Valley Air Basin.  The site is zoned planned heavy industrial, but was used as farmland prior to the VWR Project.

34.     On or about January 2011, VWR commenced construction of a new distribution and shipping facility at the Riggin Avenue property, which construction is now complete or largely complete. The facility is over 500,000 square feet in size, expandable to 750,000 square feet, and will distribute large quantities of hazardous materials, including highly toxic chemicals, to areas throughout California.

35.     VWR, a global laboratory supply and distribution company, supplies pharmaceutical companies, biotech companies, and other industrial, educational and governmental facilities throughout California with a wide range of laboratory supplies and chemicals.

36.     The VWR Development Project is expected to generate thousands of vehicle trips per day.  Professional traffic and transportation planning engineer Tom Brohard, P.E., has calculated that the VWR Project would generate 2670 vehicle trips per day, including 540 multi-axle diesel truck trips, and would have highly significant traffic impacts.

37.     Prior to commencing construction, the Project location was farmland, and is

COMPLAINT: Coalition for Clean Air v. VWR                                                9

located in close proximity to Visalia residences.  The facility will generate air emissions far above San Joaquin Valley Air Pollution Control District ("SJVAPCD" or "Air District") significance thresholds, both during and after construction.  Atmospheric Scientist, Dr. James Clark, Ph.D., has stated that the VWR project "is likely to result in significant adverse impacts on air quality due to emissions of nitrogen oxides ("NOx"), reactive organic gases ("ROG"), both of which are ozone and fine particulate matter (PM2.5) precursors, and PM10 from the use of construction equipment."  Dr. Clark also calculates that the VWR Project will generate significant air pollution during operations.

38.     The San Joaquin Valley has the worst fine particulate matter (PM-2.5) pollution in the United States, with the highest recorded annual average and 24-hour PM-2.5 levels.  75 Fed. Reg. 74518, 74519 (Nov. 30, 2010).  The Valley has one of the worst ozone problems in the United States, and is designated an extreme nonattainment area, the worst possible designation.  76 Fed. Reg. 57846, 57846-57847 (Sept. 16, 2011).  The San Joaquin Valley "hosts one of the nation's worst particulate air pollution problems."  *Latino Issues Forum v. United States EPA* (9th Cir. 2009) 558 F.3d 936, 949).  As the Ninth Circuit Court stated in upholding Rule 9510:

> The residents of the San Joaquin Valley breathe "an air that kills." The air in the Valley contains dangerous levels of particulate matter and ozone pollution, substances that every year cause the deaths of many Americans, not to mention much cardiorespiratory disease. *Nat'l Assn. Home Bldrs. v. San Joaquin Valley APCD ("NAHB v. SJVAPCD")*, 627 F.3d at 731 (9th Cir. 2010).

39.     The Air District determined that much of this deadly pollution comes from "indirect" sources of pollution, such as trucks, cars, and construction equipment associated with new development projects, and adopted Air District Rule 9510 ("Rule 9510") to reduce this pollution.  *Cal. Bldg. Indus. Ass'n. v. San Joaquin Valley Air Pollution Control Dist*. ("*CBIA v. SJVAPCD*") (2009) 178 Cal.App.4th 120, 126-127.

40.     VWR's massive truck distribution facility is a major indirect source of air pollution that will draw thousands of diesel trucks to the Central Valley and is subject to Rule 9510.

COMPLAINT: Coalition for Clean Air v. VWR                                                    10

41.     Rule 9510 requires development projects for heavy industrial facilities of 100,000 square feet or larger in size to apply for an indirect source review ("ISR") permit prior to receiving final discretionary approval for a project.  A development project is defined as "any project, or portion thereof, that is subject to a discretionary approval by a public agency, and will ultimately result in the construction of a new building, facility, or structure, or reconstruction of a building, facility, or structure for the purpose of increasing capacity or activity."  See Rule 9510, Sect. 3.13.  All applicants subject to the Rule must submit an Air Impact Assessment ("AIA") application "no later than" the time of applying for a final discretionary approval with the public agency.  Id. at Sect. 5.0.

42.     On August 21, 2009, concerned about the air quality impacts of anticipated future development in the VWR Project area, the Air District wrote to the Planning Department of the City of Visalia to comment on a proposed land division project at the property adjacent to the VWR parcel.  The District's letter identified the need for Rule 9510 Indirect Source Review for individual future development projects in the area that, upon full build-out, "would include or exceed any one of the following:…25,000 feet of light industrial space, 100,000 square feet of heavy industrial space…"

43.     Under the Visalia Municipal Code ("VMC"), the VWR Development Project requires a discretionary "Planned Development Permit" ("PDP").  The City's Municipal Code provides that "A planned development permit must be obtained for all development in a P-I-L or P-I-H [planned heavy industrial] zone, subject to the requirements and procedures in Chapter 17.28."  (VMC §17.22.030.C)  The PDP is discretionary because it involves discretion that calls for the exercise of personal judgment, not the application of set standards.  The PDP is issued by the City's Site Plan Review Committee, which may "approve, ***conditionally approve***, or disapprove the proposed site plan. The site plan review committee shall have the power to ***apply conditions to a planned development permit which the committee finds are in keeping with current city ordinances and to protect the public health, safety and general welfare***." (VMC §17.20.040.A (emphasis added))  In addition, it is clear that the City has exercised discretion to

1  impose mitigation conditions.  The City prepared a list of over 50 mitigating conditions for the

2  VWR proposal.

3      44.     The California Court of Appeal for the Fifth Appellate District held on

4  September 14, 2012, that a PDP is required for the VWR Project, and that the PDP is a

5  discretionary permit.  *Coalition for Clean Air v. City of Visalia (VWR Int'l)*, slip. Op. at 29,

6  2012 Cal. App. LEXIS 984, ___ Cal.App.4th ___ (5th Dist. Sept. 14, 2012).  The Court of

7  Appeal reversed the decision of the Tulare County Superior Court, which had dismissed an

8  action brought by these same Plaintiffs against VWR under the California Environmental

9  Quality Act ("CEQA") and other state laws.

10     45.     In or around September 2010, VWR submitted, and the City of Visalia ("City")

11 considered, a Project application for the VWR Project.  On or about September 22, 2010, the

12 City of Visalia Site Plan Review Committee ("SPR Committee") reviewed the Project, directed

13 VWR to make about 50 separate modifications to the Project, and then return for further review

14 by the Committee.  Among the Committee's directives was the following, "If your project

15 requires a discretionary action. . . Please note that the project is subject to SJVAPCD Rule 9510.

16 The applicant is encouraged to do early indirect source modeling consultation with the Air

17 District."

18     46.     On October 14, 2010, VWR submitted a letter to the City Engineer, proposing to

19 construct 126 parking spots for the Project, and requesting discretionary relief from the City's

20 requirement of 1 parking space per 1,000 square feet (or 500 parking spaces for the Project's

21 500,000 sq. ft.).  That same date, VWR also resubmitted revised Project plans to the City.

22     47.     On October 27, 2010, the County of Tulare Resource Management Agency

23 wrote to the City, the lead agency responsible for approving the Project, inquiring about the

24 status of the Project's Rule 9510 compliance, as well as requesting review under the California

25 Environmental Quality Act, Pub. Res. Code §21000, et seq. ("CEQA").  The letter stated:

26

27         [W]e have concerns regarding the environmental review process that was considered for
           its [the VWR Project's] approval and subsequent ministerial determination to issue

28

building permits without proper environmental analysis.  We would like to receive your response to the following questions so that we may evaluate the adequacy and proper level of California Environmental Quality Act (CEQA) compliance: … (5) Is the project proposal compliant with Rules of the San Joaquin Valley Air Pollution Control District? Including Regulation VIII and Indirect Source Review Rule 9510 (ISR).  We strongly advise you not issue any building permits for this project until the CEQA compliance questions are properly addressed.

48.      On November 8, 2010, the City approved the VWR Project, in a letter from Community Development Director Chris Young, which stated, "The Site plan review number 10-113 is approved as a Revise and Proceed to building permits and off-site civil improvement design drawings."

49.      On November 16, 2010, the California Department of Transportation ("CalTrans"), District 6, wrote a letter to the City of Visalia setting forth CalTrans' findings that the VWR Project would have significant adverse impacts on traffic and that a "traffic Impact Study (TIS)" would be required to "determine the extent and mitigation needed to reduce the traffic impacts at these locations to less than significant."  CalTrans explained that the VWR Project "will have a significant impact to the following interchanges: SR99/Betty Drive; S R99/Goshen Avenue, and SR 198/Plaza Drive."

50.      On December 10, 2010, the Visalia City Council voted to give VWR up to $1.5 million to pay for major street improvements necessary for the Project, a discretionary act which allocated Visalia taxpayer money to fund Project-related improvements.  The staff report for the December 10 City Council meeting stated that the VWR Project had been approved by the SPR Committee on November 8, 2010.

51.      On December 20, 2010, Teamsters Joint Council 7 and its members wrote to the City requesting CEQA review for the Project, and on December 24, 2010, requesting review under Rule 9510 prior to proceeding with Project construction.

52.      Despite these comments, and despite VWR's affirmative duty to apply to the Air District for an Indirect Source Review permit for the VWR Project prior to Project approval, VWR did not, at any time prior to commencing Project construction or operations, nor to the

present, submit an application to the SJVAPCD pursuant to Rule 9510, and has not obtained approval from the SJVAPCD for any air pollution controls and monitoring, as required by Rule 9510.  Compliance with Rule 9510 would have required VWR to reduce pollution from its Project by approximately 50% during both construction and operation.

53.     On information and belief, Project construction began in January 2, 2011.  As a result of VWR's illegal construction activities that have already commenced, members of the Plantiff organizations are presently being exposed to air pollution at levels twice as high as allowed by the Act.  Every day since January 2, 2011 when Project construction began is a new violation of Rule 9510, subject to penalties and injunctive relief under the Clean Air Act.  Thus, Petitioners intend to seek the maximum penalties and injunctive relief allowed by law for each and every day from January 2, 2011 to the present and through the date that VWR comes into compliance with the Clean Air Act.

54.     VWR has an ongoing duty to submit an application and obtain an Indirect Source permit from the SJVAPD pursuant to Rule 9510.  By proposing to construct a minimum 500,000 square foot distribution facility in Visalia, California which was subject to Rule 9510 requirements, and by gaining approval from the City to commence construction and to enter into other discretionary agreements in furtherance of the Project without complying with its duty to apply for and obtain an Indirect Source Rule permit under Rule 9510, VWR has failed to comply with an emission standard or limitation under the Act, and has violated Rule 9510.

55.     VWR commenced operations of the VWR Project in Visalia on or about September 10, 2012.  As a result of VWR's illegal operation of the Project without complying with the federal Clean Air Act Rule 9510 members of the Plantiff organizations are presently being exposed to air pollution at levels twice as high as allowed by the Act.  Every day since September 10, 2012 when Project operations began is a new violation of Rule 9510, subject to penalties and injunctive relief under the Clean Air Act.  Thus, Petitioners intend to seek the maximum penalties and injunctive relief allowed by law for each and every day from September 10, 2012 to the present and through the date that VWR comes into compliance with the Clean

Air Act.

56.     Unless this Court enjoins VWR's operations, members of the Plaintiff organizations will continue to be exposed to unlawful levels of air pollution from diesel trucks and other sources at approximately twice the level allowed by federal law.

## LEGAL BACKGROUND

57.     The Clean Air Act sets out a comprehensive regulatory scheme designed to prevent and control air pollution.  Congress passed the Clean Air Act in order to prevent air pollution and to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare.  42 U.S.C. §7401.  The Act directs the EPA to prescribe national ambient air quality standards ("NAAQS") at a level sufficient to protect the public health and welfare.  42 U.S.C. §7409(a) and (b).

58.     Each state is required to develop a "state implementation plan" ("SIP") to achieve the NAAQS established by the EPA.  42 U.S.C. §7410(a).  If US EPA approves a SIP, or any rules into the SIP, its requirements become federal law and are fully enforceable in federal court by the local agency, US EPA, or "any person."

59.     Section 304(a) of the Clean Air Act, 42 U.S.C § 7604(a), authorizes any person to commence a civil action on his own behalf against any person, "who is alleged to have violated (if there is evidence that alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter."

60.     The term "emission standard or limitation" is broadly defined to include "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard;" and "any other standard, limitation, or schedule established under any permit issued pursuant to title V [42 USCS §§ 7661 et seq.] or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations."  42 U.S.C. § 7604(f).

61.     The Clean Air Act, 42 U.S.C §§ 7604(f)(1),(3), and (4) defines "Emission standard or limitation under this Act" to mean:

COMPLAINT: Coalition for Clean Air v. VWR                                         15

(1) "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard" . . . or (3) "any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, or any requirement under section 7411 or 7412 of this title (without regard to whether such requirement is expressed as an emission standard or otherwise)"; or (4) "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations which is in effect under this chapter or under an applicable implementation plan."

62.     The Air District is the  local governmental air quality control agency charged under the California Clean Air Act with promulgating rules and regulations to reduce air pollution in the San Joaquin Valley.  The San Joaquin Valley Air Pollution Control District's jurisdiction includes eight counties in California's Central Valley: San Joaquin, Stanislaus, Merced, Madera, Fresno, Kings, Tulare and the San Joaquin Valley Air Basin portion of Kern.

63.     The Air District promulgated Rule 9510, known as the "Indirect Source Rule," which is at issue in this action.  The Air District maintains its main office in Fresno, with regional offices in Modesto and Bakersfield.

64.     Once an Air District Regulation is approved by US EPA into California's State Implementation Plan (SIP), it becomes an enforceable "Emission standard or limitation" as defined by 42 U.S.C §7604(f)(1), (3), and (4).

65.     By committing the violations of Rule 9510, VWR has violated the Clean Air Act §304(a), 42 U.S.C. §7604(a) by violating an "Emission standard or limitation" as defined by 42 U.S.C §7604(f)(1), (3), and (4).

66.     Rule 9510 is designed to control air pollution emitted from indirect sources.  An indirect source is defined as "any facility, building, structure, or installation, or combination thereof, which attracts or generates mobile source activity that results in emissions of any pollutant, or precursor thereof, for which there is a state ambient standard."  See Rule 9510, sect. 3.17; see also 42 USC § 7410(a)(5)(C).  Applicable state ambient air standards for Rule 9510 include PM10 and ozone.  Id. at sect. 1.1.

67.     The San Joaquin Valley Air Basin is classified as an extreme nonattainment area for ozone, and is subject to a stringent attainment plan for PM10.  See 75 Fed. Reg. 10420 (March 8, 2010 EPA Approval and Promulgation of Implementation Plans: 1-Hour Ozone Extreme Area Plan for San Joaquin Valley, CA); 73 Fed. Reg. 66759-66775 (Approval of PM-10 Maintenance Plan for the San Joaquin Valley Air Basin).

68.     The purposes of Rule 9510 are threefold, to "[f]ulfill the District's emission reduction commitments in the PM10 and Ozone Attainment Plans; [a]chieve emission reductions from the construction and use of development projects through design features and on-site measures; [and] [p]rovide a mechanism for reducing emissions from the construction of and use of development projects through off-site measures."  Id. at sect. 1.1-1.3.

69.     The federal Clean Air Act permits the states to implement indirect source review programs, such as Rule 9510, to create "facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations-- (i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or (ii) preventing maintenance of any such standard after such date." 42 U.S.C. § 7410(a)(5)(D).

70.     Pursuant to this authority, on or about December 15, 2005, the Air District adopted Rule 9510 to implement its indirect source review program, at which time the Rule became enforceable under state law.  On May 21, 2010, EPA proposed to approve Rule 9510 into the California State Implementation Plan ("SIP").  76 Fed. Reg. 26609 (May 9, 2011). Rule 9510 was approved by EPA on May 9, 2011, and became federally enforceable under the federal Clean Air Act on June 8, 2011.  Id.

71.     EPA's approval of Rule 9510 was challenged by industry groups, but was ultimately upheld by the United States Court of Appeals for the Ninth Circuit.  Nat'l Assn. of Homebuilders v. San Joaquin Valley Air Poll. Cont. Dist., 627 F.3d 730 (9th Cir. 2010).

72.     Rule 9510 provides that any heavy industrial facility of 100,000 square feet or larger in size must apply for an indirect source review ("ISR") permit.  See Rule 9510, Sect. 2.1.4. If the facility is considered "light industrial," an ISR permit is required for any facility larger than 25,000 square feet.  *Id.* at Sect. 2.1.3.  Rule 9510, sect. 5.0, provides that a facility must apply for an ISR permit prior to receiving final discretionary approval for its project. The ISR permit must be finalized prior to the commencement of project construction since the ISR permit must contain measures to reduce emissions from construction equipment. *Id.* at Sect. 6.1. The Rule also requires the Air District to formulate a list of site-specific discretionary pollution reduction measures to reduce construction emissions by 20% for nitrogen oxides ("NOx") and 45% for particulate matter under 10 microns in diameter ("PM10"). *Id.* at Sect. 6.1. Finally, it also requires the Air District to formulate a list of site-specific discretionary measures to reduce operational emissions by 33% for NOx and 50% for PM10. *Id.* at Sect. 6.2.

**First Cause of Action**
**Clean Air Act, 42 U.S.C. §7604(a) – Violation of Rule 9510**
**Declaratory and Injunctive Relief, Civil Penalties**
**_By All Plaintiffs Against Defendant VWR_**

73.     All of the above paragraphs are incorporated herein by reference as if set forth again in full.

74.     EPA approved SJVAPCD Rule 9510 as part of the California SIP on May 9, 2011.  76 Fed. Reg. 26609; 40 CFR 52.220(c)(348)(i)(A)(3).

75.     Rules 9510 is an "emissions standard or limitation" as defined in § 304(f) (1), (4) of the Clean Air Act, 42 U.S.C. § 7604(f)(1), (4), and § 302(k), 42 U.S.C. § 7604(k).  Rule 9510 is therefore federally enforceable with the force and effect Federal Law.  See, e.g., Sections 113(b)(1), 304(a)(2) and 304(f) of the Act, 42 U.S.C. §§ 7413(b)(1), 7604(a)(2) & (f); *Her Majesty the Queen v. Detroit*, 874 F.2d 332, 335 (6th Cir. 1989); *American Lung Association v. Kean*, 871 F.2d 319, 322 (3d Cir. 1989).

76.     Rule 9510 requires development projects for heavy industrial facilities of 100,000 square feet or larger in size to apply for an indirect source review ("ISR") permit prior

to applying for a final discretionary approval for a project.  See Rule 9510, Sects. 2.1, 5.0.

77.     VWR applied for a discretionary Planned Development Permit from the City of Visalia on or about October 14, 2010.  VWR applied for discretionary relief from Visalia parking requirements on or about October 14, 2010.  VWR applied for discretionary funding from the City of Visalia for roadway improvements necessary for the Project, on or about December 10, 2010.

78.     Because VWR has applied for discretionary approvals from the City, and has commenced and continues with ongoing construction and operation of the VWR Project without having the Air District perform the requisite Rule 9510 pre-construction Indirect Source Review of the Project, VWR has violated and continues to violate the Act.

79.     VWR's operation of the Project without an ISR Permit violates Rule 9510 and the Act.

80. VWR's violations of Rule 9510 are a violation of an emission standard or limitation, within the meaning of the Clean Air Act, are on-going and will continue unless remedied by an order from the Court.

81.     Each day that VWR fails to obtain a Rule 9510 Permit is a separate violation of the Act.  Each day that VWR constructed the Project without a Rule 9510 Permit is a separate violation of the Act.  Each day that VWR operates the Project without a Rule 9510 Permit is a separate violation of the Act. Each violation and each day of violation constitutes a separate violation subject to penalties, injunctive and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1.     A declaration by this Court that VWR has violated the Clean Air Act and the provisions of the California State Implementation Plan (SIP) known as Rule 9510.

2.     A preliminary and permanent injunction, including a temporary restraining order, to require VWR to cease and desist from any further construction or operation of the VWR Project unless and until it fully complies with Rule 9510.

COMPLAINT: Coalition for Clean Air v. VWR                                          19

3.      An Order requiring the Defendants to pay civil penalties of $37,500 per day for each violation of Rule 9510 pursuant to Clean Air Act §304(a), 42 U.S.C. §7604(a).

4.      An award of $100,000 for beneficial mitigation projects to enhance the public health or environment in the community near the VWR Project and/or the San Joaquin Valley Air Basin pursuant to section 304(g) of the federal Clean Air Act.  Such an award would mitigate, to some degree, the harm to Plaintiffs and their members living, working, and recreating near the VWR Project caused by Defendants' violations of the Clean Air Act. Plaintiffs respectfully request that the Court consult with the US EPA Administrator, or her designee, in selecting such projects.

5.       An Order requiring VWR to take other appropriate actions to remedy, mitigate, or offset the harm to public health and the environment caused by the violations of the Act and District Rules alleged above.

6.      An award to Plaintiffs of its costs of litigation, including reasonable attorneys' and expert witness fees, as authorized by section 304(d) of the Clean Air Act, 42 U.S.C. §7604(d) and/or any other applicable provision(s) of state and/or federal law.

7.      All such other relief as this Court deems appropriate.

///

Dated:  September 24, 2012              Respectfully Submitted,

                                        LOZEAU|DRURY LLP


                                        ___/s/ *Richard Drury*_____
                                        Richard Drury
                                        Counsel for Plaintiffs

# EXHIBIT 1



**LOZEAU DRURY** LLP   T 510.836.4200   410 12th Street, Suite 250   www.lozeaudrury.com
F 510.836.4205   Oakland, Ca 94607   richard@lozeaudrury.com

BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED

September 1, 2011


John M. Ballbach – Chairman, President and
   Chief Executive Officer
Gregory L. Cowan – Senior Vice President
and Chief Financial Officer
VWR international, LLC
1310 Goshen Parkway
Westchester PA 19380

John M. Ballbach – Chairman, President
   and Chief Executive Officer
Gregory L. Cowan – Senior  Vice
President and Chief Financial Officer
VWR international, LLC
Radnor Corporate Center
Building One, Suite 200
100 Matsonford Road
Radnor, PA 19087-8660


John M. Ballbach – Chairman, President and
   Chief Executive Officer
Gregory L. Cowan – Senior Vice President
and Chief Financial Officer
VWR International, LLC
c/o CSC Lawyers Incorporating Service
Registered Agent for VWR International, LLC
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833


   **Re:   Notice of Intent to File Suit Under the Clean Air Act**

Dear Mr. Ballbach, Mr. Cowan:

        Section 304(b)(1) of the federal Clean Air Act (the "Act"), 42 U.S.C. § 7604(b)(1),
requires that citizens give notice of any citizen suit before filing suit.  Accordingly, the
Coalition for Clean Air ("CCA"), Center for Environmental Health ("CEH"), Association of
Irritated Residents ("AIR"), and the Teamsters Joint Council 7 ("Teamsters")
(collectively, "Noticing Parties") hereby provide notice, pursuant to section 304(b)(1) of
the Act, 42 U.S.C. § 7604(b)(1), to the following persons in their capacities identified
below:

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

- VWR International, LLC  ("VWR"), as the violator of an "emission standard or limitation" under the Act, within the meaning of Section 304(a)(1) of the Act, 42 U.S.C. §7604(a)(1);

- United States Environmental Protection Agency ("EPA");

- State of California, as the state in which the violation occurred and will continue to occur.

The Noticing Parties intend to bring suit under the Act, after expiration of sixty (60) days from the date of this letter.  The lawsuit will be brought in the United States District Court for the Eastern District of California, against VWR for their violations of the Act, as more specifically stated below.

## A. Background

### 1. VWR Development Project.

VWR owns real property located at 8711 W. Riggin Avenue, in the City of Visalia, California, APN 077-360-010, in the San Joaquin Valley Air Basin.  The site is zoned planned heavy industrial.  In or about January 2011, VWR commenced construction of a new distribution and shipping facility at the Riggin Avenue property, which construction remains ongoing at the time of this Notice.  The facility will be over 500,000 square feet in size, expandable to 750,000 square feet, and will distribute large quantities of hazardous materials, including highly toxic chemicals, to areas throughout California ("VWR Development Project" or "Project").  VWR, a global laboratory supply and distribution company, supplies pharmaceutical companies, biotech companies, and other industrial, educational and governmental facilities throughout California with a wide range of laboratory supplies and chemicals.

The VWR Development Project is expected to generate hundreds, if not thousands, of truck trips per day.  Professional traffic and transportation planning engineer Tom Brohard, P.E., has calculated that the VWR Project would generate almost 10,000 vehicle trips per day, and would have highly significant traffic impacts.  Mr. Brohard's comments are attached hereto as Exhibit A   Prior to commencing construction, the Project location was farmland, and is located in close proximity to Visalia residences.  The facility will generate air emissions far above San Joaquin Valley Air Pollution Control District ("SJVAPCD" or "Air District") significance thresholds, both during and after construction.  Atmospheric Scientist, Dr. James Clark, Ph.D., has stated that construction of the VWR project "is likely to result in significant adverse impacts on air quality due to emissions of nitrogen oxides ("NOx"), reactive organic gases ("ROG"), both of which are ozone precursors, and PM10 from the use of construction equipment. Therefore, construction would result in significant adverse impacts on air quality."  Dr. Clark's comments are attached hereto as Exhibit B.

2

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

SJVAPCD Rule 9510, Indirect Source Review ("Rule 9510"), discussed further in Section A.2 below, requires development projects for heavy industrial facilities of 100,000 square feet or larger in size to apply for an indirect source review ("ISR") permit prior to receiving final discretionary approval for a project. A development project is defined as "any project, or portion thereof, that is subject to a discretionary approval by a public agency, and will ultimately result in the construction of a new building, facility, or structure, or reconstruction of a building, facility, or structure for the purpose of increasing capacity or activity." See Rule 9510, Sect. 3.13. All applicants subject to the Rule must submit an Air Impact Assessment ("AIA") application "no later than" the time of applying for a final discretionary approval with the public agency. *Id*. at Sect. 5.0.

On August 21, 2009, concerned about the air quality impacts of anticipated future development in the VWR Project area, the Air District wrote to the Planning Department of the City of Visalia to comment on a proposed land division project at the property adjacent to the VWR parcel. The District's letter identified the need for Rule 9510 Indirect Source Review for individual future development projects in the area that, upon full build-out, "would include or exceed any one of the following:…25,000 feet of light industrial space, 100,000 square feet of heavy industrial space…" A copy of the District's letter is attached hereto as Exhibit C.

Under the Visalia Municipal Code ("VMC"), the VWR Development Project requires a discretionary "Planned Development Permit" ("PDP"). The City's Municipal Code provides that "A planned development permit must be obtained for all development in a P-I-L or P-I-H [planned heavy industrial] zone, subject to the requirements and procedures in Chapter 17.28." (VMC §17.22.030.C) The PDP is discretionary because it involves discretion that calls for the exercise of personal judgment, not the application of set standards. The PDP is issued by the City's Site Plan Review Committee, which may "approve, conditionally approve, or disapprove the proposed site plan. The site plan review committee shall have the power to apply conditions to a planned development permit which the committee finds are in keeping with current city ordinances and to protect the public health, safety and general welfare." (VMC §17.20.040.A) In addition, it is clear that the City has exercised discretion to impose mitigation conditions. The City prepared a list of over 50 mitigating conditions for the VWR proposal.

In or around September 2010, VWR submitted, and the City of Visalia ("City") considered, a Project application for the VWR Project. On or about September 22, 2010, the City of Visalia Site Plan Review Committee ("SPR Committee") reviewed the Project, directed VWR to make about 50 separate modifications to the Project, and then return for further review by the Committee. Among the Committee's directives was the following, "If your project requires a discretionary action. . . Please note that the project is subject to SJVAPCD Rule 9510. The applicant is encouraged to do early indirect source modeling consultation with the Air District." A copy of the September 22, 2010 SPR Committee comments are attached hereto as Exhibit D.

3

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

On October 14, 2010, VWR submitted a letter to the City Engineer, proposing to construct 126 parking spots for the Project, and requesting discretionary relief from the City's requirement of 1 parking space per 1,000 square feet (or 500 parking spaces for the Project's 500,000 sq. ft.).  A copy of VWR's October 14, 2010 letter is attached hereto as Exhibit E.  That same date, VWR also resubmitted revised Project plans to the City.

On October 27, 2010, the County of Tulare Resource Management Agency wrote to the City, the lead agency responsible for approving the Project, inquiring about the status of the Project's Rule 9510 compliance, as well as requesting review under the California Environmental Quality Act, Pub. Res. Code §21000, et seq. ("CEQA").  The letter stated:

> [W]e have concerns regarding the environmental review process that was considered for its [the VWR Project's] approval and subsequent ministerial determination to issue building permits **without proper environmental analysis**. We would like to receive your response to the following questions so that we may evaluate the adequacy and proper level of California Environmental Quality Act (CEQA) compliance:….. (5) **Is the project proposal compliant with Rules of the San Joaquin Valley Air Pollution Control District?  Including Regulation VIII and Indirect Source Review Rule 9510 (ISR).**  We strongly advise you not issue any building permits for this project until the CEQA compliance questions are properly addressed.

A copy of the County's October 27, 2010 letter to the City is attached hereto as Exhibit F.

On November 8, 2010, the City approved the VWR Project, in a letter from Community Development Director Chris Young, which stated, "The Site plan review number 10-113 is approved as a Revise and Proceed to building permits and off-site civil improvement design drawings."  A copy of the November 8, 2010 approval is attached hereto as Exhibit G.

On November 16, 2010, the California Department of Transportation ("CalTrans"), District 6, wrote a letter to the City of Visalia setting forth CalTrans' findings that the VWR Project would have significant adverse impacts on traffic and that a "traffic Impact Study (TIS)" would be required to "determine the extent and mitigation needed to reduce the traffic impacts at these locations to less than significant." CalTrans explained that the VWR Project "will have a significant impact to the following interchanges: SR99/Betty Drive; S R99/Goshen Avenue, and SR 198/Plaza Drive."  A copy of the November 16, 2010 CalTrans letter is attached hereto as Exhibit H.

On December 10, 2010, the Visalia City Council voted to give VWR up to $1.5 million to pay for major street improvements necessary for the Project, a discretionary

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

act which allocated Visalia taxpayer money to fund Project-related improvements.  The staff report for the December 10 City Council meeting stated that the VWR Project had been approved by the SPR Committee on November 8, 2010.  A copy of the December 10, 2010 staff report is attached hereto as Exhibit I.

On December 20, 2010, Teamsters Joint Council 7 and its members also wrote to the City requesting CEQA review for the Project, and on December 24, 2010, requesting review under Rule 9510 prior to proceeding with Project construction.  A copy of the Teamsters' comments are attached hereto as Exhibit J.

Despite these comments, and despite VWR's affirmative duty to engage the Air District in conducting Indirect Source Review for the VWR Development Project prior to Project approval, it appears that VWR did not, at any time prior to commencing Project construction nor to the present, submit an application to the SJVAPCD pursuant to Rule 9510, and has not obtained approval from the SJVAPCD for any air pollution controls and monitoring, as required by Rule 9510.  Compliance with Rule 9510 would have required VWR to reduce pollution from its Project by approximately 50% during both construction and operation.

On information and belief, Project construction began in January 2, 2011.  As a result of VWR's illegal construction activities that have already commenced, members of the Noticing Party organizations are presently being exposed to air pollution at levels twice as high as allowed by the Act.  Every day since January 2, 2011 when Project construction began is a new violation of Rule 9510, subject to penalties and injunctive relief under the Clean Air Act.  Thus, Petitioners intend to seek the maximum penalties and injunctive relief allowed by law for each and every day from January 2, 2011 to the present and through the date that VWR comes into compliance with the Clean Air Act.

VWR has an ongoing duty to submit an application and obtain an Indirect Source permit from the SJVAPD pursuant to Rule 9510.  By proposing to construct a minimum 500,000 square foot distribution facility in Visalia, California which was subject to Rule 9510 requirements, and by gaining approval from the City to commence construction and to enter into other discretionary agreements in furtherance of the Project without complying with its duty to apply for and obtain an Indirect Source Rule permit under Rule 9510, VWR has failed to comply with an emission standard or limitation under the Act, and has violated SJVAPCD Rule 9510.

### 2.  Rule 9510, Indirect Source Review.

Rule 9510 is designed to control air pollution emitted from indirect sources.  An indirect source is defined as "any facility, building, structure, or installation, or combination thereof, which attracts or generates mobile source activity that results in emissions of any pollutant, or precursor thereof, for which there is a state ambient

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

standard."  See Rule 9510, sect. 3.17; see also 42 USC § 7410(a)(5)(C).  Applicable state ambient air standards for Rule 9510 include PM10 and ozone.  *Id.* at sect. 1.1.

The San Joaquin Valley Air Basin is classified as an extreme nonattainment area for ozone, and is subject to a stringent attainment plan for PM10.  See 75 Fed. Reg. 10420 (March 8, 2010 EPA Approval and Promulgation of Implementation Plans: 1-Hour Ozone Extreme Area Plan for San Joaquin Valley, CA); 73 Fed. Reg. 66759-66775 (Approval of PM-10 Maintenance Plan for the San Joaquin Valley Air Basin). Rule 9510 was promulgated by SJVAPCD, the local governmental air quality control agency charged under the California Clean Air Act with promulgating rules and regulations to reduce significant air pollution in the San Joaquin Valley.  The purposes of Rule 9510 are threefold, to "[f]ulfill the District's emission reduction commitments in the PM10 and Ozone Attainment Plans; [a]chieve emission reductions from the construction and use of development projects through design features and on-site measures; [and] [p]rovide a mechanism for reducing emissions from the construction of and use of development projects through off-site measures."  *Id.* at sect. 1.1-1.3.

The federal Clean Air Act permits the states to implement indirect source review programs, such as Rule 9510, to create "facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations-- (i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or (ii) preventing maintenance of any such standard after such date."  42 U.S.C. § 7410(a)(5)(D).

Pursuant to this authority, on or about December 15, 2005, the Air District adopted Rule 9510 to implement its indirect source review program, at which time the Rule became enforceable under state law.  On May 21, 2010, EPA proposed to approve Rule 9510 into the California State Implementation Plan ("SIP").  76 Fed. Reg. 26609 (May 9, 2011).  Rule 9510 was approved by EPA on May 9, 2011, and became federally enforceable under the federal Clean Air Act  on June 8, 2011.  *Id.*

Rule 9510 provides that any heavy industrial facility of 100,000 square feet or larger in size must apply for an indirect source review ("ISR") permit.  See Rule 9510, Sect. 2.1.4. If the facility is considered "light industrial," an ISR permit is required for any facility larger than 25,000 square feet.  *Id.* at Sect. 2.1.3.  Rule 9510, sect. 5.0, provides that a facility must apply for an ISR permit *prior to receiving final discretionary approval for its projec*t. The ISR permit must be finalized ***prior to the commencement of project construction*** since the ISR permit must contain measures to reduce emissions from construction equipment. *Id.* at Sect. 6.1.  The Rule also requires the Air District to formulate a list of site-specific discretionary pollution reduction measures to reduce construction emissions by 20% for nitrogen oxides ("NOx") and 45% for particulate matter under 10 microns in diameter ("PM10").  *Id.* at Sect. 6.1. Finally, it also requires

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

the Air District to formulate a list of site-specific discretionary measures to reduce operational emissions by 33% for NOx and 50% for PM10. *Id.* at Sect. 6.2.

## B. VWR's Violations of Emission Standard or Limitation.

The Act authorizes citizen suits against any person who has violated or is in violation of an "emission standard or limitation."  Section 304 of the Act, 42 U.S.C. § 7604(a)(1).  The term "emission standard or limitation" is broadly defined to include "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard;" and "any other standard, limitation, or schedule established under any permit issued pursuant to title V [42 USCS §§ 7661 et seq.] or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations."  42 U.S.C. § 7604(f).

EPA approved SJVAPCD Rule 9510 as part of the California SIP on May 9, 2011.  76 Fed. Reg. 26609.  Rule 9510 is therefore federally enforceable with the force and effect of any provision of the Act.  See, e.g., Sections 113(b)(1), 304(a)(2) and 304(f) of the Act, 42 U.S.C. §§ 7413(b)(1), 7604(a)(2) & (f); *Her Majesty the Queen v. Detroit*, 874 F.2d 332, 335 (6th Cir. 1989); *American Lung Association v. Kean*, 871 F.2d 319, 322 (3d Cir. 1989); *United States v. Congoleum Corp.*, 635 F. Supp. 174, 177 (E.D. Pa. 1986).

Rule 9510 requires development projects for heavy industrial facilities of 100,000 square feet or larger in size to apply for an indirect source review ("ISR") permit prior to receiving final discretionary approval for a project.  See Rule 9510, Sects. 2.1, 5.0.  VWR received, at a minimum, discretionary approvals from the City of Visalia for exemption from the City's parking space requirements, as well as $1.5 million public funding approval for roadway improvements related to the Project, and is required to obtain a discretionary PDP.  Because VWR has obtained discretionary approvals from the City, and has commenced and continues with ongoing construction of the VWR Project without having the Air District perform the requisite Rule 9510 pre-construction Indirect Source Review of the Project, VWR has violated and will continue to violate the Act.

## C. Potential Resolution of Issues During the Sixty Day Period.

The entities and individuals giving this notice are:

- Coalition for Clean Air, Joe Lyou, Executive Director, Address: 1140 N. Van Ness Avenue, Suite 104, Fresno, CA 93728; Phone: (213) 630-1192;
- Center for Environmental Health, Michael Green, Executive Director, Address: 2201 Broadway, Suite 302, Oakland, CA 94612; Phone: (510) 655-3900;

Mr. Bailbach, Mr. Cowan Case 1:12-cv-01569-LJO-BAM Document 1 Filed 09/24/12 Page 29 of 124
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011

- Association of Irritated Residents, Tom Frantz, President, Address: 30100 Orange St, Shafter, CA 93263, Phone: (661) 746-1344, and
- Teamsters Joint Council 7, Doug Bloch, Political Director, Address: 1225 13th St, Modesto, CA 9535. Phone: (415) 467-7768.

Legal counsel representing the Noticing Parties in this matter is as follows:

Richard T. Drury
Michael R. Lozeau
Christina M. Caro
Lozeau | Drury LLP
410 12th Street, Suite 250
Oakland, CA 94607
P: 510.836.4200
F: 510.836.4205
www.lozeaudrury.com
richard@lozeaudrury.com

During the sixty (60) day notice period, the Noticing Parties are willing to discuss effective remedies for the violations of the Act at issue in this notice. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate them within the next 10 days with our outside counsel, or with the listed persons within each organization, so that the discussions may be completed before the end of the sixty (60) day notice period. We do not intend to delay the filing of a complaint in federal court if the discussions fail to resolve these matters within the sixty (60) day notice period, and we intend to seek all appropriate relief, including injunctive relief, penalties, and all costs of litigation, including, but not limited to, attorney's fees, expert witness fees and other costs.

We believe this notice provides information sufficient for you to determine the violations of the federal Clean Air Act at issue. If, however, you have any questions, please also feel free to contact us for clarification.

We look forward to hearing from you.

Sincerely,

Richard T. Drury
Michael R. Lozeau
Christina M. Caro
Lozeau | Drury LLP
Attorneys for Noticing Parties

8

# EXHIBIT A

1    Michael R. Lozeau (CA Bar No. 142893)
2    Richard T. Drury (CA Bar No. 163559)
    Christina Caro (CA Bar No. 250797)
3    LOZEAU DRURY LLP
    410 12th Street, Suite 250
4    Oakland, CA 94607
    Tel: (510) 836-4200; Fax: (510) 836-4205
5    E-mail: richard@lozeaudrury.com
6    Attorneys for all Petitioners and Plaintiffs
7
    (Additional Counsel on Next Page)
8

FILED
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

FEB 17 2011

LARAYNE CLEEK, CLERK

BY:_____

9            SUPERIOR COURT FOR THE STATE OF CALIFORNIA
              IN AND FOR THE COUNTY OF TULARE

10   COALITION FOR CLEAN AIR, a California      Case No.: VCU 240546
    non-profit corporation; CENTER FOR
11   ENVIRONMENTAL HEALTH, a California
12   non-profit corporation, ASSOCIATION OF     DECLARATION OF TOM BROHARD,
    IRRITATED RESIDENTS, an unincorporated     P.E., IN SUPPORT OF MOTION FOR
13   association; KEVIN LONG, an individual; and    JUDGMENT ON WRIT OF MANDATE –
    TEAMSTERS JOINT COUNCIL 7, an            FIRST CAUSE OF ACTION: CEQA
14   organized labor union;
15                             Date: March 15, 2011
          Petitioners and Plaintiffs,          Time: 8:30 a.m.
16                             Dept.: 7
        vs.                            Visalia Courthouse
17                             Hon. Paul Vortman
18   CITY OF VISALIA, a municipal corporation;
    CITY COUNCIL FOR THE CITY OF
19   VISALIA, a municipal corporation; CITY OF
    VISALIA SITE PLAN REVIEW
20   COMMITTEE, a municipal corporation; CHRIS
    YOUNG, Community Development Director, in
21   his official capacity; SAN JOAQUIN VALLEY
    UNIFIED AIR POLLUTION CONTROL
22   DISTRICT, a local air pollution control agency;
    and DOES I – X, inclusive,
23
24         Respondents and Defendants.

25   VWR INTERNATIONAL, LLC, a Delaware
    corporation; MIDSTATE HAYES 184
26   DISTRIBUTION CENTER, LLC, a California
27   corporation;  and ROES I – X, inclusive,

28        Real Parties in Interest and Defendants.

_____

               DECLARATION OF TOM BROHARD, P.E.     VCU 240546

Richard M. Franco (CA Bar No. 170970)
CENTER FOR ENVIRONMENTAL HEALTH
2201 Broadway,  Ste. 302
Oakland, CA 94612
Tel: (510) 655-3900; Fax: (510) 655-9100
Email: rick@ceh.org
Attorneys for Petitioner and Plaintiff Center for Environmental Health

Brent Newell (CA Bar No. 210312)
Alegria De La Cruz (CA Bar No. 229713)
CENTER ON RACE, POVERTY & THE ENVIRONMENT
1302 Jefferson Street, Suite 2
Delano, CA 93215
Tel (661) 720-9140; Fax (661) 720-9483
E-mail: adelacruz@crpe-ej.org
Attorneys for Petitioner and Plaintiff Association of Irritated Residents

I, Tom Brohard, hereby declare:

1. I have personal knowledge of the following and if called as a witness could competently testify thereto.

2. I have over 40 years of professional engineering experience and have extensive experience in traffic engineering and transportation planning.

3. I formed Tom Brohard & Associates in 2000 and currently serve as the City Traffic Engineer for the City of Indio and as Consulting Transportation Engineer for the Cities of Big Bear Lake, Mission Viejo and San Fernando.

4. I am licensed as a Professional Civil Engineer in California and Hawaii and am licensed as a Professional Traffic Engineer in California.

5. I have a Bachelor of Science degree in Engineering from Duke University.

6. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

7. I have reviewed documents relating to the proposed VWR International Distribution Center Project in the City of Visalia, California (the "proposed VRW facility") in connection with the December 20, 2010 meeting of the Visalia City Council.

8. From my review of the relevant materials, it is my understanding that VWR International is planning to construct a 500,000 square foot distribution center just north of Riggin Avenue between Plaza Drive and Kelsey Street in Visalia.

9. The Institute of Transportation Engineers ("ITE") publishes daily and peak hour trip generation rates for a variety of different land uses. These rates are used to forecast vehicle trips for development projects.

10. In the most recent update of Trip Generation (8th Ed., 2008), ITE Land Use 030 describes "Truck Terminals" as follows: "Truck terminals are facilities where goods are transferred between trucks, between trucks and railroads, or between trucks and ports." The proposed VWR facility is considered a "Truck Terminal."

11. Based on the rates set forth in Trip Generation (8th Ed., 2008), daily and peak hour vehicle trips for the use of the proposed VWR facility as a Truck Terminal are forecast as follows: (a) Weekday daily trips—9.85 trips per thousand square feet

times 500,000 square feet equates to 4,925 daily trips; (b) A.M. peak hour trips—0.90 trips per thousand square feet times 500,000 square feet equates to 450 A.M. peak hour trips; and (c) P.M. peak hour trips—0.82 trips per thousand square feet times 500,000 square feet equates to 410 P.M. peak hour trips.

12. The trip forecasts set forth above will include a number of "large truck" trips, defined as trips by vehicles with 3 or more axles. Accepted traffic engineering and transportation planning practices and principles indicate large trucks are equivalent to three passenger vehicles in terms of their potential traffic impacts on street segments and at intersections. If only 25% of the vehicles arriving at and departing from the proposed VWR facility involve large trucks, then the number of passenger car equivalent trips will be double the number of trips forecast above in paragraph 11. Therefore, for purposes of forecasting potential traffic impacts, the proposed VWR facility would be expected to generate the equivalent of 9,850 daily trips, including 900 A.M. peak hour trips and 820 P.M. peak hour trips.

13. In a document titled, "Transportation Impact Analyses for Site Development" (2010), ITE recommends that a traffic impact study be conducted for any project forecast to generate at least 100 peak hour trips. The peak hour volumes forecast above for the proposed VWR facility are many times higher than the threshold of 100 peak hour trips recommended by ITE.

14. Based on the size and use of the proposed VWR facility, this project is likely to have significant traffic impacts. The full extent of such impacts requires preparation of a traffic impact study as part of an Environmental Impact Report (EIR). Such a study would fully analyze potential traffic impacts of the proposed VWR facility, and would evaluate and propose feasible and effective mitigation measures.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at La Quinta, California on February 9, 2011.

1

2

Tom Brohard, P.E.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Tom Brohard, PE

| | |
|---|---|
| ***Licenses:*** | 1975 / Professional Engineer / California – Civil, No. 24577 |
| | 1977 / Professional Engineer / California – Traffic, No. 724 |
| | 2006 / Professional Engineer / Hawaii – Civil, No. 12321 |
| | |
| ***Education:*** | 1969 / BSE / Civil Engineering / Duke University |
| | |
| ***Experience:*** | 40 Years |
| | |
| ***Memberships:*** | 1977 / Institute of Transportation Engineers – Fellow, Life |
| | 1978 / Orange County Traffic Engineers Council - Chair 1982-1983 |
| | 1981 / American Public Works Association - Member |

Tom is a recognized expert in the field of traffic engineering and transportation planning. His background also includes responsibility for leading and managing the delivery of various contract services to numerous cities in Southern California.

Tom has extensive experience in providing transportation planning and traffic engineering services to public agencies. Since May 2005, he has served as Consulting City Traffic Engineer three days a week to the City of Indio. He also currently provides "on call" Traffic and Transportation Engineer services to the Cities of Big Bear Lake and San Fernando. In addition to conducting traffic engineering investigations for Los Angeles County from 1972 to 1978, he has previously served as City Traffic Engineer in the following communities:

- o Bellflower ....................................................... 1997 - 1998
- o Bell Gardens................................................. 1982 - 1995
- o Huntington Beach ........................................ 1998 - 2004
- o Lawndale ...................................................... 1973 - 1978
- o Los Alamitos ................................................ 1981 - 1982
- o Oceanside ................................................... 1981 - 1982
- o Paramount ................................................... 1982 - 1988
- o Rancho Palos Verdes.................................. 1973 - 1978
- o Rolling Hills.................................................. 1973 - 1978, 1985 - 1993
- o Rolling Hills Estates..................................... 1973 - 1978, 1984 - 1991
- o San Marcos ................................................. 1981
- o Santa Ana.................................................... 1978 - 1981
- o Westlake Village .......................................... 1983 - 1994

During these assignments, Tom has supervised City staff and directed other consultants including traffic engineers and transportation planners, traffic signal and street lighting personnel, and signing, striping, and marking crews. He has secured over $5 million in grant funding for various improvements. He has managed and directed many traffic and transportation studies and projects. While serving these communities, he has personally conducted investigations of hundreds of citizen requests for various traffic control devices. Tom has also successfully presented numerous engineering reports at City Council, Planning Commission, and Traffic Commission meetings in these and other municipalities.

**Tom Brohard and Associates**

In his service to the City of Indio since May 2005, Tom has accomplished the following:

- ❖ Oversaw preparation and adoption of the Circulation Element Update of the General Plan including development of Year 2035 buildout traffic volumes, revised and simplified arterial roadway cross sections, and reduction in acceptable Level of Service criteria under certain constraints

- ❖ Oversaw preparation of fact sheets/design exceptions to reduce shoulder widths on Jackson Street over I-10 as well as justifications for protected-permissive left turn phasing at I-10 on-ramps, the first such installation in Caltrans District 8 in Riverside County; oversaw preparation of plans and provided assistance during construction of a $1.5 million project to install traffic signals and widen three of four ramps at the I-10/Jackson Street Interchange under a Caltrans encroachment permit issued under the Streamlined Permit Process

- ❖ Oversaw preparation of fact sheets/design exceptions to reduce shoulder widths on Monroe Street over I-10 as well as striping plans to install left turn lanes on Monroe Street at the I-10 Interchange under a Caltrans encroachment permit

- ❖ Oversaw preparation of traffic impact analyses for Project Study Reports evaluating different alternatives for buildout improvement of the I-10/Monroe Street and the I-10/Golf Center Parkway Interchanges

- ❖ Oversaw preparation of plans, specifications, and contract documents and provided assistance during construction of 22 new traffic signal installations

- ❖ Oversaw preparation of plans and provided assistance during construction for the conversion of two traffic signals from fully protected left turn phasing to protected-permissive left turn phasing with flashing yellow arrows

- ❖ Reviewed and approved over 450 work area traffic control plans as well as signing and striping plans for all City and developer funded roadway improvement projects

- ❖ Oversaw preparation of a City wide traffic safety study of conditions at all schools

- ❖ Prepared over 350 work orders directing City forces to install, modify, and/or remove traffic signs, pavement and curb markings, and roadway striping

- ❖ Oversaw preparation of engineering and traffic surveys to establish enforceable speed limits on over 125 street segments

- ❖ Reviewed and approved traffic impact studies prepared for more than 16 major development projects

Since forming Tom Brohard and Associates in 2000, Tom has reviewed many traffic impact reports and environmental documents for various development projects. He has provided expert witness services and also prepared traffic studies for public agencies and private sector clients.

**Tom Brohard and Associates**

# EXHIBIT B

<table>
<tr><td>1</td><td>Michael R. Lozeau (CA Bar No. 142893)</td></tr>
</table>

Michael R. Lozeau (CA Bar No. 142893)
Richard T. Drury (CA Bar No. 163559)
Christina Caro (CA Bar No. 250797)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200; Fax: (510) 836-4205
E-mail: richard@lozeaudrury.com
Attorneys for all Petitioners and Plaintiffs

(Additional Counsel on Next Page)

**FILED**
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

**FEB 1 7 2011**

LARAYNE CLEEK, CLERK
BY: _____

SUPERIOR COURT FOR THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF TULARE

| | |
|---|---|
| COALITION FOR CLEAN AIR, a California non-profit corporation; CENTER FOR ENVIRONMENTAL HEALTH, a California non-profit corporation, ASSOCIATION OF IRRITATED RESIDENTS, an unincorporated association; KEVIN LONG, an individual; and TEAMSTERS JOINT COUNCIL 7, an organized labor union;<br><br>    Petitioners and Plaintiffs,<br><br>    vs.<br><br>CITY OF VISALIA, a municipal corporation; CITY COUNCIL FOR THE CITY OF VISALIA, a municipal corporation; CITY OF VISALIA SITE PLAN REVIEW COMMITTEE, a municipal corporation; CHRIS YOUNG, Community Development Director, in his official capacity; SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT, a local air pollution control agency; and DOES I – X, inclusive,<br>    Respondents and Defendants.<br><br>VWR INTERNATIONAL, LLC, a Delaware corporation; MIDSTATE HAYES 184 DISTRIBUTION CENTER, LLC, a California corporation;  and ROES I – X, inclusive,<br><br>    Real Parties in Interest and Defendants. | Case No.:  VCU 240546<br><br>DECLARATION OF DR. JAMES J.J. CLARK, Ph.D. IN SUPPORT OF MOTION FOR JUDGMENT ON WRIT OF MANDATE – FIRST CAUSE OF ACTION: CEQA<br><br>Date: March 15, 2011<br>Time: 8:30 a.m.<br>Dept.: 7<br>Visalia Courthouse<br>Hon. Paul Vortman |

DECLARATION OF DR. JAMES CLARK, Ph.D.     VCU 240546

1

## DECLARATION OF JAMES J J CLARK, PH.D.

2

3  I, James J. J. Clark, Ph.D., declare as follows:

4  1. I have personal knowledge of the facts stated herein and, if

5  called as a witness, could and would competently testify thereto

6  under oath.  I understand that this declaration will be used in

7  support of the plaintiff's claims of harm against the

8  defendants.

9  2. I am presently the Principal Toxicologist at Clark and

10  Associates Environmental Consulting, Inc. in Los Angeles,

11  California.  I write frequently on matters related to chemicals

12  in the environment and public health.  I have been retained as

13  an expert toxicologist, risk analysis, and air dispersion

14  modeler in the above matter.  I have been retained by the

15  plaintiffs in this action to provide impartial professional

16  opinions with respect to the plaintiff's claims that the

17  proponents of the project have not met their obligation to

18  evaluate the project properly under the California Environmental

19  Quality Act (CEQA) and that the implementation of the proposed

20  project could produce harm to the public health of the residents

21  of Goshen and Visalia, California.

22  3. I graduated in 1987 with a Bachelor's Degree in Biochemical

23  and Biophysical Sciences from the University of Houston.  In

24  1993, I received a Masters degree in Environmental Health

25  Sciences from the University of California at Los Angeles,

26  School of Public Health.  I earned a Doctorate in Environmental

27  Health Sciences from the University of California at Los

28  Angeles, School of Public Health in 1995.  I have also been

trained and certified under OSHA 29 CFR 1910.120 for Hazardous Waste Operations & Emergency Response. I am an active member of various professional societies, including the American Public Health Association (APHA), the International Society of Environmental Forensics (ISEF), the California Redevelopment Agency (CRA), the American Chemical Society (ACS), the Association for Environmental Health and Sciences (AEHS).

4. From 1987 through 1992, I worked as a toxicological researcher at the University of California at Los Angeles, Department of Medicine, Pulmonary Division, under the supervision of physicians who were investigating the pulmonary toxicity of air pollutants. The research included epidemiological evaluations of populations exposed to criteria pollutants, the potentiating effects of inhaled beta-agonists on the hyper-reactive responses of asthmatic patients, patients with chronic-obstructive pulmonary disease (COPD), and patients with interstitial lung disease to criteria pollutants including ozone and oxides of sulfur. While studying in my graduate programs at UCLA, I also worked for environmental consulting companies involved in human health risk assessments and toxicological evaluations of evaluation contaminants. Since 1996, after completing my doctoral thesis on a novel multi-pathway risk model, I have worked at several environmental consulting firms, evaluating the toxicological impacts of contaminants in selected populations, coordinating regional air pollution studies, performing exposure assessments and numeric risk assessments, supervising remedial investigations and removal actions, and acting as the Corporate Health and Safety Officer.

5. My previous work experience has included considerable CEQA analysis, risk assessment, evaluation of environmental toxic exposures, design and execution of environmental monitoring and health assessment studies, and modeling of exposure to toxic compounds. I also have participated in and/or directed numerous air/emission related risk assessments, including toxicological assessment of benzene and other volatile substances from mobile and stationary sources and gasoline-related sources.  I have continued to research the effects of contaminants in the environment and have presented those results at numerous professional assemblies and in a recently published college textbook.  Specifically, I have studied the toxicological effects of many chemicals, including benzene, for over 20 years as part of my training in toxicology and daily work experience as a Toxicologist.  A more complete listing of my qualifications is presented in **Exhibit "A"** which contains my current Curriculum Vitae.

6. I have authored a number of books, book chapters, journal and proceedings articles on exposure to chemicals in the environment.  A full list of my publications are presented in **Exhibit "A".**

7. I have reviewed agenda item for the December 20, 2010 City of Visalia Council's agenda for development of a 151-acre parcel between Plaza Drive and Kelsey Street.  The agenda is attached as **Exhibit "B".**  According to the agenda, the development is for construction of a Van Waters and Rogers (VWR) distribution facility.  VWR is a distributor of research laboratory products to pharmaceutical and biotech companies, as well as, industrial,

1   and governmental organizations.[1]   According to a VWR company

2   press release, the proposed facility will have a foot print of

3   approximately 500,000 square feet and will be built to "enhance

4   VWR's distribution network and continue to provide a productive

5   supply chain solution for the Western United States."[2]

6   8. A review of the City of Visalia's City Council's Agendas[3]

7   shows two Agenda items related to the Annexation of Parcel APN-

8   077-120-014 (the location of the proposed project) in 2007.   The

9   first item (attached as **Exhibit C**), listed in the August 20,

10   2007 Agenda states:

11       "a) Certification of Negative Declaration No. 2007-047 for
12       Annexation No.   2007-01 (Vargas), and Expansion of the
13       Sphere of Influence.
14
15       b) Initiation of Proceedings for Annexation No. 2007-01
16       (Vargas), and expansion of the City of Visalia Sphere of
17       Influence to accommodate the Annexation:   A request by
18       David and Ana Vargas, applicant (MSJ Partners, agents) to
19       annex three parcels and right-of-way totaling
20       482.6 acres into the City limits of Visalia and to expand
21       the Local Agency Formation Commission (LAFCO) Sphere of
22       Influence for the City of Visalia to include 640 acres
23       currently located inside the City of Visalia's 129,000
24       Population Urban Development Boundary.   The property is
25       located on the west and east sides of Plaza Drive (Road 80)
26       between Riggin Avenue and Road 320 in the County of Tulare.
27       (APN: 077-120-008, 010, 014)"
28   The item was continued until September 17, 2007.

---

[1] http://www.vwr.com/index.htm

[2]
http://www.ci.visalia.ca.us/depts/housing_n_economic_development/economic_dev
elopment/industrial_park.asp

[3]
http://www.ci.visalia.ca.us/government/city_council/ccagendas/city_council_ag
endas/default.asp

Declaration of James J. J. Clark, Ph.D.

9. The September 17, 2007 City of Visalia City Council Agenda (attached as **Exhibit D**) contained the following information regarding the same item:

"a) Certification of Negative Declaration No. 2007-047 which evaluates environmental impacts associated with Annexation No. 2007-01 (Vargas). The property is located on the west and east sides of Plaza Drive (Road 80) between Riggin Avenue and Road 320 in the County of Tulare. (APN 077-120-008,010, 014). **Resolution 2007-72 required.**

b) Initiation of Proceedings for Annexation No. 2007-01 (Vargas): A request by David and Ana Vargas, applicant (MSJ Partners, agents) to annex three parcels and right-of-way totaling 482.6 acres into the City limits of Visalia and to expand the Local Agency Formation Commission (LAFCO) Sphere of Influence for the City of Visalia to include the annexation site. The property is located on the west and east sides of Plaza Drive (Road 80) between Riggin Avenue and Road 320 in the County of Tulare. (APN: 077-120-008, 010, 014) **Resolution 2007-73 and 2007-80 required.**

c) Authorization for City Manager to sign and enter into a Pre-Annexation Agreement between the City of Visalia and Property Owners associated with Annexation No. 2007-01 (Vargas)."

10. Both **Exhibits C** and **D** state that the Negative Declaration No. 2007-047 evaluates environmental impacts associated with Annexation No. 2007-01. The Exhibits do not state that the Negative Declaration is for the development of the site.

11.  **A specific environmental review of the VWR International Project has never been performed/recorded after the notice that Negative Declaration No. 2007-047 (for the annexation) was issued in 2007.**

12.  A review of the San Joaquin Valley Air Pollution Control Districts (SJVAPCD) Public Notices website shows no notice for the proposed project.  The SJVAPCD's website[4] has entries as far back as August 21, 2001.  It is clear from the the SJVAPCD's records that no ND was recorded with them for this project.

13.  **It is my opinion, that in light of the failure to prepare a CEQA document for the project being constructed, the proponents have failed to meet their obligation under CEQA to properly evaluate the impacts of the proposed project.  Therefore the project should be immediately halted until an Initial Study (IS) and Environmental Impact Report (EIR) is completed.**

14.  CEQA requires that an environmental review document such as an IS be prepared for all projects undergoing review.  In addition, the environmental review document must contain an accurate description of the entire project.  This is because an accurate and complete project description is necessary to perform an adequate evaluation of the potential environmental effects of a proposed project. In contrast, an inaccurate or incomplete project description renders the analysis of environmental impacts inherently unreliable.

15.  Since the proponents have failed to perform any Air Quality Analysis of the project as required under CEQA, the impacts on the environment and citizens of the Cities of Goshen and Visalia

---

[4] (http://www.valleyair.org/notices/public_notices_idx.htm)

are unknown. Following the completion of the necessary environmental assessments an estimate of the impacts can be made and the necessary mitigation measures put in place. An air quality analysis will (1) adequately screen the project impacts; (2) use the required air dispersion model for determining the ground level concentration of contaminants at the site and in the community; (3) adequately evaluate hazardous emissions from the adjacent roadways; (4) address non-carcinogenic health risks of emissions from the adjacent roadways; (5) analyze potential health risks from toxic air contaminants ("TACs") during the operational phase of the project, and; (7) identify cumulative impacts. Therefore, an EIR should be prepared to include a thorough evaluation of all air quality issues associated with the project.

16. **All projects should be reviewed to ensure that an adequate estimate of the air quality burden the proposed Project will place on the Air Basin.** Evaluations of proposed projects under the CEQA must consider the broad impacts on air quality for an air basin. The Project site is located within the San Joaquin Valley Air Pollution Control District. The Project area is designated in attainment for the federal and state $NO_2$ and $SO_2$ standards, unclassified for federal and state CO standards, unclassified for the state $H_2S$ standard, and non-attainment for the federal and state ozone, $PM_{10}$, and $PM_{2.5}$ standards. Past, present and future development projects contribute to the region's adverse air quality impacts on a cumulative basis. By its very nature, air pollution is largely a cumulative impact."[5]

---

[5] BAAQMD. 2010. California Environmental Quality Act Air Quality Guidelines

1   17.  A  proper  cumulative  impact  analysis  is  vital  for  an

2   environmental  analysis  because  the  full  environmental  impact  of

3   a  proposed  project  cannot  be  gauged  in  a  vacuum.   One  of  the

4   most  important  environmental  lessons  that  has  been  learned  is

5   that  the  environmental  damage  often  occurs  incrementally  from  a

6   variety  of  small  sources  with  which  they  interact."[6]

7   18.  **NOx, ROG, and PM10 Emissions From Construction Are Likely**

8   **To Be Significant.**   Unlike  the  operational  emissions  from  most

9   projects  which  are  typically  more  or  less  continuous,  emissions

10  from  construction  sites  are  highly  variable  depending  on  the

11  type  of  construction  that  is  being  performed.   For  example,

12  grading  results  in  large  quantities  of  fugitive  dust  and

13  combustion  emissions  from  diesel-powered  equipment.  Paving  and

14  application  of  architectural  coatings  in  contrast  result  mostly

15  in  ROG  emissions.   Short-term  emissions  during  the  various

16  construction  phases  can  be  considerable  and  may  result  in

17  degradation  of  local  and  regional  air  quality  and  severe  health

18  effects.   The  CEQA  Guidelines,  Appendix  G,  establish  that

19  impacts  on  air  quality  would  be  significant  if  a  project  would

20  violate  any  ambient  air  quality  standard  or  substantially

21  contribute  to  an  existing  or  projected  violation  of  an  ambient

22  air  quality  standard.   To  determine  whether  such  violations

23  occur,  it  is  common  practice  for  lead  agencies  to  compare

24  project  emissions  to  quantitative  significance  thresholds

25  developed  by  local  air  districts  as  a  screening  tool  for  CEQA

26  review.   Thresholds  of  significance  for  construction  emissions

[6] Bakersfield Citizens (2004) 124 Cal. App. 4th at 1214 (quoting Communities
for a Better Environment v. California Resources Agency 103 Cal.App.4[th] at
116).

1    are typically expressed on a short-term basis, *i.e.* daily or

2    hourly basis to adequately capture impacts due to the high

3    variability of emissions during different construction stages.

4    The Project site is under the jurisdiction of the SJVAPCD.

5    19.   According to the SJVAPCD website the emission thresholds

6    for proposed projects are:

7    ● Ozone Precursor Emissions

8            Reactive Organic Gases (ROG) 10 tons/year

9            Oxides of Nitrogen (NOx) 10 tons/year

10   ● PM-10 Emissions

11           Complying with SJVAPCD Regulation VIII reduces to less

12           than significant. Large or high intensity construction

13           projects near sensitive receptors may require

14           mitigation beyond Regulation VIII. (See GAMAQI Table

15           6-3.)

16   ● CO Emissions

17           Project causes or contributes to an exceedance of

18           state or federal ambient CO standards. Determined by

19           screening or modeling.

20   ● Hazardous Air Pollutant Emissions

21           Based on potential to increase cancer risk for the

22           person with maximum exposure potential by 10 in one

23           million. Non-cancer Hazard Index > 1. Determined by

24           screening or modeling.

25           //

26

- Odor Impacts

        Based on distance of odor source from people and
        complaint record for facility or similar facility.
        More than one confirmed complaint per year averaged
        over a three-year period, or three unconfirmed
        complaints per year averaged over a three-year period.
        (See GAMAQI Table 4-2)

- Construction Emissions

        Same thresholds as above, but apply only during
        construction period. Ozone precursors calculated on an
        annual basis.

20.   In the alternative, the Proponent could have used short-term significance thresholds developed by other air districts to screen for significance of criteria pollutant emissions. The table below presents a summary of short-term emissions thresholds developed by other air districts for assessing impacts on air quality from construction projects.

**CEQA significance thresholds for construction emissions from various air districts**

| Air district construction thresholds | NOx (lb/day) | ROG (lb/day) | PM10 (lb/day) | PM2.5 (lb/day) | CO (lb/day) |
|---|---|---|---|---|---|
| EDCAPCD[7] | 82 | 82 | | | |
| FRAQMD[8] | 25 | 25 | 80 | | |

[7] EDCAPCD = El Dorado County Air Pollution Control District, CEQA Guide, February 2002

[8] FRAQMD = Feather River Air Quality Management District, http://www.fraqmd.org/CEQA_Thresholds.htm

Declaration of James J. J. Clark, Ph.D.

| Air district construction thresholds | NOx (lb/day) | ROG (lb/day) | PM10 (lb/day) | PM2.5 (lb/day) | CO (lb/day) |
|---|---|---|---|---|---|
| MBUAPCD[9] | | | 82 | | 550 |
| SCAQMD[10] | 100 | 75 | 150 | 55 | 550 |
| SMAQMD[11] | 85 | | | | |
| YSAQMD[12] | 82 | 82 | 150 | | |

//

21.   Based on the construction significance thresholds from other air districts and the amount of time construction is anticipated to take at the site, the project is likely to result in significant adverse impacts on air quality due to emissions of nitrogen oxides ("NOx"), reactive organic gases ("ROG"), both of which are both ozone precursors, and $PM_{10}$ from the use of construction equipment.   Therefore, construction would result in significant adverse impacts on air quality.

22.   Given that the region is not in compliance with the health-based ambient air quality standards for PM2.5 and ozone, any increases in emissions would further aggravate an already

[9] MBUAPCD = Monterey Bay Unified Air Pollution Control District, CEQA Air Quality Guidelines, June 2004

[10] SCAQMD = South Coast Air Quality Management District, SCAQMD Air Quality Significance Thresholds, October 2006

[11] SMAQMD Sacramento Metropolitan Air Quality Management District, Guide to Air Quality Assessment, July 2004

[12] YSAQMD, Yolo-Solano Air Quality Management District, Air Quality Handbook, Guidelines for Determining Air Quality Thresholds of Significance and Mitigation Measures for Proposed Development Projects that Generate Emissions from Motor Vehicles, revised 2002

Declaration of James J. J. Clark, Ph.D.

existing severe air quality problem, requiring that all feasible mitigation be required.   There are numerous mitigation measures available which should be required to reduce emissions and resulting significant adverse impacts on air quality during the Project's nearly three-year construction period.

23.   Construction-related emissions will include: 1) grading, excavation, roadbuilding and other earthmoving activities, 2) travel by construction equipment, especially on unpaved surfaces, and 3) exhaust from construction equipment

24.   **During construction, a large number of diesel-powered equipment would operate on site and numerous diesel-powered trucks would deliver supplies.  No attempt has been made to address the potential health risks associated with exhaust emissions of diesel particulate matter from these sources.**

25.   Diesel exhaust contains nearly 40 toxic substances and may pose a serious public health risk for residents in the vicinity of the facility. Diesel exhaust has been linked to a range of serious health problems including an increase in respiratory disease, lung damage, cancer, and premature death.   Fine diesel particles are deposited deep in the lungs in the smallest airways and can result in increased respiratory symptoms and disease; decreased lung function, particularly in children and individuals with asthma; alterations in lung tissue and respiratory tract defense mechanisms; and premature death.[13] Exposure to diesel exhaust increases the risk of lung cancer. It also causes non-cancer effects including chronic bronchitis,

---

[13] California Air Resources Board (CARB), Initial Statement of Reasons for Rulemaking, Proposed Identification of Diesel Exhaust as a Toxic Air Contaminant, Staff Report, June 1998.

Declaration of James J. J. Clark, Ph.D.

1  inflammation of lung tissue, thickening of the alveolar walls,
2  immunological allergic reactions, and airway constriction.[14]
3  26.   As early as 1988, the National Institute for Occupational
4  Safety and Health identified diesel exhaust as a potential
5  occupational carcinogen. In 1998, the California Air Resources
6  Board ("CARB") formally identified the particulate fraction of
7  diesel exhaust as a toxic air contaminant and concluded that
8  exposure to diesel exhaust particulate matter causes cancer and
9  acute respiratory effects.[15] The U.S. EPA followed suit in 2002
10  and concluded that "long-term (i.e., chronic) inhalation
11  exposure is likely to pose lung cancer hazard to humans, as well
12  as damage the lung in other ways depending on exposure.  Short-
13  term (i.e., acute) exposures can cause irritation and
14  inflammatory symptoms of a transient nature… The assessment also
15  indicates that evidence for exacerbation of existing allergies
16  and asthma symptoms is emerging."[16] Diesel exhaust is estimated
17  to contribute to more than 75% of the added cancer risk from air
18  toxics in the United States.[17]
19  27.   Lagging emission standards and very old equipment in fleets
20  have made construction equipment one of the largest sources of

[14] Findings of the Scientific Review Panel on The Report on Diesel Exhaust as
adopted at the Panel's April 22, 1998 Meeting.

[15] California Air Resources Board, Initial Statement of Reasons for
Rulemaking, Proposed Identification of Diesel Exhaust as a Toxic Air
Contaminant, Staff Report, June 1998.

[16] U.S. EPA, Health Assessment Document for Diesel Engine Exhaust, Report
EPA/600/8-90/057F, May 2002.

[17] Environmental Defense Fund, Cleaner Diesel Handbook, Bring Cleaner Fuel and
Diesel Retrofits into Your Neighborhood, April 2005;
http://www.edf.org/documents/4941_cleanerdieselhandbook.pdf, accessed March
27, 2008.

Declaration of James J. J. Clark, Ph.D.

toxic diesel exhaust particulate pollution in California. An estimated 70% of California's construction equipment is currently not covered by federal and state regulations because it is too old. [18]

28. Since no timeline has been provided for the construction phase of the proposed project no analysis can be performed on the potential health impacts from the construction phase. Heavy-duty diesel-powered construction equipment exhaust would release considerable amounts of diesel particulate matter, which is 89% $PM_{2.5}$. Clouds of soot emitted by heavy-duty construction equipment can travel downwind for miles, then drift into heavily populated areas.

29. A recent analysis found that air pollution from diesel construction equipment is already taking a heavy toll on the health and economic well-being of Californians. This study found that the San Francisco Bay Area air basin is second only to the Los Angeles area in health and economic damage from construction equipment emissions. For 2005, this includes estimates of more than 150 premature deaths, 100 hospitalizations for respiratory and cardio-vascular disease, more than 280 cases of acute bronchitis, 3,000 incidences of asthma attacks and other lower respiratory symptoms, 44,000 days of lost work and school absences, and well over 100,000 days of restricted activity. This loss of life and productivity cost the residents of the San Francisco Bay Area air basin an estimated $1.2 billion. These estimates are conservative because they do not include emissions

---

[18] Los Angeles Times, Dire Health Effects of Pollution Reported, Diesel Soot from Construction Equipment Is Blamed for Illnesses and Premature Deaths, December 6, 2006.

from a large number of small construction projects (residential and commercial and projects smaller than one acre in size). Further, John Hakel, vice president of the Associated General Contractors, which represents construction equipment fleet owners and general contractors, commented that the report appeared to underestimate the sheer volume of construction equipment.[19]

30. Using the U.S. EPA's AP-42[20] emission factor for construction related emissions of total suspended particulate of 1.2 tons per acre per month of activity, the California Air Resource Board (CARB) estimates that 64% of construction-related total suspended particulate emissions is $PM_{10}$.   This yields the following **emission factors for uncontrolled construction-related $PM_{10}$ emissions:**

- 0.77 tons per acre per month of $PM_{10}$, or
- 51 lbs. per acre per day of $PM_{10}$.

31. The amount of acreage that will need to be graded at the site is vague and undefined.  Assuming that $1/100^{th}$ of the site (approximately 5.15 acres) will be initially reworked during the construction phase of the project (within 1st 3 months of the project), the cumulative uncontrolled construction-related $PM_{10}$

---

[19] Union of Concerned Scientists, Digging up Trouble: Construction Pollution in the Bay Area; http://www.ucsusa.org/assets/documents/clean_vehicles/Bay-Area-Fact-Sheet.pdf, accessed March 27, 2008.

[20] U.S. EPA. 1995. Compilation of Air Pollutant Emission Factors, Volume I: Stationary, Point and Area Sources, AP-42, 5th Edition, January 1995 for further information

1  emissions for the project would be approximately 3.7 tons of

2  $PM_{10}$.

3  0.77 tons per acre per month x 1.716 acres per month x 3 months

4  = 3.966 tons of $PM_{10}$

5  32. When the 3.966 tons (equivalent to 7,931 lbs) of $PM_{10}$

6  emissions are applied to the 3 month period when earthmoving is

7  reasonably anticipated to occur, a daily estimate of 127 lbs

8  (7,931/62 business days over 3-months) is derived.  This daily

9  emission of 127 lbs is far in excess of the BAAQMD's 80 pound

10 per day threshold of significance for $PM_{10}$.  If more than 5.15

11 acres is reworked during the construction phase of the project,

12 even more $PM_{10}$ emissions will occur.

13 33. According to the SJVAPCD CEQA guidance[21], "Project

14 operations refer to activities that will occur at a project site

15 when construction is complete and the site has been occupied

16 with its intended use. Emissions from project operations can be

17 divided into three main categories: indirect sources; area

18 sources; and stationary sources. Indirect sources are defined as

19 any building, facility, structure, or property that attracts or

20 generates mobile source activity (autos and trucks)....Air

21 quality impact assessments should evaluate all three categories

22 of emissions when determining impacts from project operations."

23 34. During the operational phase of the project the project

24 will have the potential to generate significant quantities of

25 criteria pollutants ($NO_x$, $SO_x$, Ozone precursors, PM).

26 35. According to Table 3-1 of the most recent BAAQMD CEQA

27 guidance, a construction of a 259,000 square foot light

[21]SJVAPCD.  2002.  GUIDE FOR ASSESSING AND MITIGATING AIR QUALITY IMPACT

1  industrial or warehouse operation will typically violate NOx
2  construction thresholds and GHG operational thresholds.   The
3  proposed project is twice the size of the screening threshold,
4  ensuring a violation of local air quality thresholds.

5  36.   The air quality impacts from the traffic associated with a
6  500,000 square foot facility are signficant.    Typically the
7  impacts are quantified by the number of vehicle trips per day.
8  In the case of the proposed project, the primary concern will be
9  the number of truck trips per day.   A truck trip is one round
10 trip (one trip segment to a site and one trip segment away from
11 a  site).    According   to  traffic  expert,  Tom  Borhard[22],
12 Professional Traffic Engineer, "daily and peak hour vehicle
13 trips for the use of the proposed VWR facility as a Truck
14 Terminal are forecast as follows:  (a) Weekday daily trips—9.85
15 trips per thousand square feet times 500,000 square feet equates
16 to 4,925 daily trips; (b)  A.M. peak hour trips—0.90 trips per
17 thousand square feet times 500,000 square feet equates to 450
18 A.M. peak hour trips; and (c)  P.M. peak hour trips—0.82 trips
19 per thousand square feet times 500,000 square feet equates to
20 410 P.M. peak hour trips."

21 37.  Brohard[23] further declares that "if only 25% of the vehicles
22 arriving at and departing from the proposed VWR facility involve
23 large trucks, then the number of passenger car equivalent trips
24 will be double the number of trips forecast above in paragraph

[22] Declaration Of Tom Brohard In Support Of Application For Temporary
Restraining Order

[23] Declaration Of Tom Brohard In Support Of Application For Temporary
Restraining Order

11 (of his declaration).  Therefore, for purposes of forecasting potential traffic impacts, the proposed VWR facility would be expected to generate the equivalent of 9,850 daily trips, including 900 A.M. peak hour trips and 820 P.M. peak hour trips."  This number of vehicle trips will have a significant impact on the local air quality and must be evaluated before further construction of the project proceeds.

38.  Additionally, the project may result in significant greenhouse gas (GHG) emissions.  The SJVAPCD has not established a strict threshold but requires an analysis of whether the project would reduce GHG by 29% over business as currently practiced.   The location of the VWR distribution center in Visalia would likely increase GHG emissions over current practices.  VWR warehouses are currently distributed across a multi-state region, placing each warehouse near its customers. The new warehouse would be centralized, requiring each truck trip to travel extremely long distances.  This would appear to increase GHGs over business as usual.

39.  **An Environmental Impact Report (EIR) should be prepared to assess potentially significant impacts to air quality from NOx and GHG emissions.  The EIR should include an analysis of the emissions, including any necessary emissions modeling, and identify any mitigation that would be necessary to address exceedences of the thresholds for NOx, GHGs and any other emissions, including Reactive Organic Gases (ROG), and particulate matter ($PM_{10}$).**

40.  Additionally, there is a significant potential that the proposed project could result in the release of hazardous

1  materials. The company press release states that VWR supplies
2  laboratory products to pharmaceutical and biotech companies, as
3  well as industrial, educational and governmental organizations.[24]
4  These products, which include hazardous materials, may be
5  subject to release during storage, handling and transport to and
6  from the facility.

7  41.  Chemicals known to be handled and transported by VWR
8  include laboratory chemicals and production chemicals, some of
9  which are known to be highly toxic and carcinogenic.[25]  For
10 example, we note that benzene is available from VWR.[26]  Benzene
11 is a known human carcinogen[27] and a spill of benzene may put
12 workers at risk and may pose a contamination threat to the
13 environment.

14 42.  Other VWR distribution facilities have been the subject of
15 federal and state environmental oversight.  For example, the VWR
16 facility in Portland, used for bulk chemical packaging, storage,
17 and distribution, is the subject of an extensive cleanup effort
18 to address chemical releases.[28]

19 43.  **All work at the site should be halted and an EIR should be**
20 **prepared to describe the activities that will be conducted at**

---

[24] http://www.ci.visalia.ca.us/depts/housing_n_economic_development/economic_dev elopment/industrial_park.asp

[25] https://www.vwrsp.com/programs/chemicals/page.cgi?tmpl=chemicals

[26] https://www.vwrsp.com/psearch/ControllerServlet.do?spage=noresults&CurSel=Nt t&Nty=1&Ntx=mode%2Bmatchpartialmax&Ntk=ChemicalNameSynonym|All|MSDS&tmpl=msds &N=0&y=10&Ntt=benzene&x=12

[27] http://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=38&tid=14

[28] http://yosemite.epa.gov/R10/OWCM.NSF/72b5220edcd9cf5b88256500005decf3/205682 cc5d8f6d3388256a0700077828/$FILE/Final%20VanWaters.pdf

1  **the proposed facility, including chemical storage and handling**
2  **procedures, the types of chemicals to be handled, and mitigation**
3  **that is necessary to safeguard public health and the environment**
4  **from releases of hazardous materials.**

5  44.   I declare under penalty of perjury under the laws of the
6  State of California that the foregoing is true and correct.
7  This Declaration was executed on this 14th day of February, 2011,
8  at Los Angeles, California.

9
10
11                          James J. J. Clark, Ph.D.

12
13
14
15
16
17
18
19
20

Exhibit A:  Curriculum Vitae James J. J. Clark, Ph.D.

Declaration of James J. J. Clark, Ph.D.

# CLARK & ASSOCIATES
ENVIRONMENTAL CONSULTING, INC.
3710 May Street
Los Angeles, CA  90066
Tel: (310)  907-6165
Fax: (310) 398-7626
Email: jclark.assoc@gmail.com

---

## *James J. J. Clark, Ph.D.*　　　　**Toxicology/Exposure Assessment Modeling**

*Principal Toxicologist*　　　　　　　**Risk Assessment/Analysis/Dispersion Modeling**

### Education:

Ph.D.,　Environmental Health Science, University of California, 1995

M.S.,　Environmental Health Science, University of California, 1993

B.S.,　Biophysical and Biochemical Sciences, University of Houston, 1987

### Professional Experience:

Dr. Clark is a well recognized toxicologist, air modeler, and health scientist.  He has 20 years of experience in researching the effects of environmental contaminants on human health including environmental fate and transport modeling (SCREEN3, AEROMOD, ISCST3, Johnson-Ettinger Vapor Intrusion Modeling); exposure assessment modeling (partitioning of contaminants in the environment as well as PBPK modeling); conducting and managing human health risk assessments for regulatory compliance and risk-based clean-up levels; and toxicological and medical literature research.

Significant projects performed by Dr. Clark include the following:

### LITIGATION SUPPORT

**Case:  Rose Roper V. Nissan North Amreica, et al.  Superior Court Of The State Of California For The County Of Los Angeles – Central Civil West.   Cvilil Action . NC041739**

**Client:  Rose, Klein, Marias, LLP, Long Beach, California**

Dr. Clark performed a toxicological assessment of an individual occupationally exposed to multiple chemicals, including benzene, who later developed a respiratory distress.  A review of the individual's medical and occupational history was performed to prepare an exposure assessment.  The exposure assessment was evaluated

---

against the known outcomes in published literature to exposure to respiratory irritants.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Trial date  pending.**

**Case:  O'Neil V. Sherwin Williams, et al.  United States District Court Central District Of California**

**Client:  Rose, Klein, Marias, LLP, Long Beach, California**

Dr. Clark performed a toxicological assessment of an individual occupationally exposed to petroleum distillates who later developed a bladder cancer.  A review of the individual's medical and occupational history was performed to prepare a quantitative exposure assessment.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Summary judgement for defendants.**

**Case:  Moore V., Shell Oil Company, et al.  Superior Court Of The State Of California For The County Of Los Angeles**

**Client:  Rose, Klein, Marias, LLP, Long Beach, California**

Dr. Clark performed a toxicological assessment of an individual occupationally exposed to chemicals while benzene who later developed a leukogenic disease.  A review of the individual's medical and occupational history was performed to prepare a quantitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to refined petroleum hydrocarbons.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Settlement in favor of plaintiff.**

**Case:  Raymond Saltonstall V. Fuller O'Brien, KILZ, and Zinsser, et al.  United States District Court Central District Of California**

**Client:  Rose, Klein, Marias, LLP, Long Beach, California**

Dr. Clark performed a toxicological assessment of an individual occupationally exposed to benzene who later developed a leukogenic disease.  A review of the individual's medical and occupational history was performed to prepare a quantitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to refined petroleum hydrocarbons.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Settlement in favor of plaintiff.**

**Case:  Richard Boyer and Elizabeth Boyer, husband and wife, V. DESCO Corporation, et al.  Circuit Court of Brooke County, West Virginia.  Civil Action Number  04-C-7G.**

**Client:  Frankovitch, Anetakis, Colantonio & Simon, Morgantown, West Virginia.**

Dr. Clark performed a toxicological assessment of a family exposed to chlorinated solvents released from the defendant's facility into local drinking water supplies.  A review of the individual's medical and occupational history was performed to prepare a qualitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to chlorinated solvents.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Settlement in favor of plaintiff.**

**Case:  JoAnne R. Cook, V. DESCO Corporation, et al.  Circuit Court of Brooke County, West Virginia.  Civil Action Number 04-C-9R**

**Client:  Frankovitch, Anetakis, Colantonio & Simon, Morgantown, West Virginia.**

Dr. Clark performed a toxicological assessment of an individual exposed to chlorinated solvents released from the defendant's facility into local drinking water supplies.  A review of the individual's medical and occupational history was performed to prepare a qualitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to chlorinated solvents.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Settlement in favor of plaintiff.**

**Case:  Patrick Allen And Susan Allen, husband and wife, and Andrew Allen, a minor, V. DESCO Corporation, et al.  Circuit Court of Brooke County, West Virginia.  Civil Action Number 04-C-W**

**Client:  Frankovitch, Anetakis, Colantonio & Simon, Morgantown, West Virginia.**

Dr. Clark performed a toxicological assessment of a family exposed to chlorinated solvents released from the defendant's facility into local drinking water supplies.  A review of the individual's medical and occupational history was performed to prepare a qualitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to chlorinated solvents.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Settlement in favor of plaintiff.**

**Case:   Michael Fahey, Susan Fahey V. Atlantic Richfield Company, et al.   United States District Court Central District Of California Civil Action Number CV-06 7109 JCL.**

**Client:  Rose, Klein, Marias, LLP, Long Beach, California**

Dr. Clark performed a toxicological assessment of an individual occupationally exposed to refined petroleum hydrocarbons who later developed a leukogenic disease.  A review of the individual's medical and occupational history was performed to prepare a qualitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to refined petroleum hydrocarbons.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Settlement in favor of plaintiff.**

**Case:   Tanya Drummond V. E.I. Dupont De Nemours and Company, Meadowbrook Corporation, Mattheissen & Hegler Zinc Company Inc, Nuzum Trucking Company, T.L. Diamond & Company, Inc., and Joseph Paushel, Circuit Court of Harrison County, West Virginia.  Civil Action Number 04-C-296-2.**

**Client:  Cochran, Cherry, Givens, Smith, Lane & Taylor, P.C., Dothan, Alabama**

Dr. Clark performed a comprehensive exposure assessment of a plaintiff exposed to toxic metals from a former zinc smelting facility.  The site has undergone a CERCLA mandated removal action/remediation for the presence of the toxic metals.  Intensive modeling results (from physical and numerical models) were used to determine a daily dose of metals in the plaintiff over a life time of exposure along with a causal analysis to determine the contribution of the toxic metals to the renal carcinomas the plaintiff died from.

**Case Result:  Settlement in favor of plaintiff.**

**Case:  City of Stockton v. BNSF Railway Co., et al. Eastern District of California, Case No. 2:05-CV-02087**

Dr. Clark offered opinions regarding the potential health risks from exposure to chemicals present in and emanating from the soil and into the air at a site formerly operated by the defendant using the regulatory guidance framework from USEPA and DTSC.  The evaluation was designed to establish cleanup goals based upon the current and future land uses of the Site.  A second objective was to evaluate whether current conditions at the Site put patrons and staff of the Children's Museum at an elevated potential health risk from exposure to chemicals present in and emanating from the soil and into the air at the Site.

**Case Result:  Judgement in favor of plaintiff.**

**Case:  Constance Acevedo, et al., V. California Spray-Chemical Company, et al., Superior Court Of The State Of California, County Of Santa Cruz.  Case No. CV 146344**

Dr. Clark performed a comprehensive exposure assessment of community members exposed to toxic metals from a former lead arsenate manufacturing facility.  The former manufacturing site had undergone a DTSC mandated removal action/remediation for the presence of the toxic metals at the site.  Opinions were presented regarding the elevated levels of arsenic and lead (in attic dust and soils) found throughout the community and the potential for harm to the plaintiffs in question.

**Case Result:  Settlement in favor of defendant.**

**Case:  Lori Lynn Moss and Rand Moss, et al.  V.  Venoco, Inc.  et al.  Superior Court of the State of California, County of Los Angeles, Central Civil West.  Case Number BC 297083**

**Client:  Baron & Budd, PC.  Dallas, TX.**

Dr. Clark performed a comprehensive exposure assessment of plaintiffs (former students at a school adjacent to the plant) to dioxin-like compounds from a large urban electrical utility generator and from multiple oil and gas production facilities adjacent to an active school.  Modeling of emissions has confirmed that emissions from the facilities have impacted the school, resulting in significant exposure to carcinogens and neurotoxins.  Intensive modeling results (from physical and numerical models) were used to determine a daily dose of contaminants from multiple sites over decades of exposure.

**Case Result:  Under Appeal.**

**Case:  Michael Nawrocki V. The Coastal Corporation, Kurk Fuel Company, Pautler Oil Service, State of New York Supreme Court, County of Erie, Index Number I2001-11247**

**Client:  Richard G. Berger Attorney At Law, Buffalo, New York**

Dr. Clark performed a toxicological assessment of an individual occupationally exposed to refined petroleum hydrocarbons who later developed a leukogenic disease.  A review of the individual's medical and occupational history was performed to prepare a qualitative exposure assessment.  The exposure assessment was evaluated against the known outcomes in published literature to exposure to refined petroleum hydrocarbons.  The results of the assessment and literature have been provided in a declaration to the court.

**Case Result:  Judgement in favor of defendant.**

**Case:  RFI et al., V. City of Santa Clarita,  Superior Court of the State of California, County of Los Angeles**

**Client:  City of Santa Clarita, Santa Clarita, California**

Dr. Clark provided testimony regarding the characterization, remediation and development activities of a former 1,000 acre munitions manufacturing facility.  The site is impacted with a number of contaminants including perchlorate, unexploded ordinance, and volatile organic compounds (VOCs).  The site is currently under a number of regulatory consent orders, including an Immanent and Substantial Endangerment Order.  Dr. Clark provided depositional testimony and trial testimony on the extent of contamination in the subsurface and groundwater, the migration of contaminants offsite, and cost estimates for remediating the contamination.

**Case Result:  Under Appeal.**

**Case:  Costco Wholesale Corporation, etc, V. San Francisco Bay Area Rapid Transit District, etc., et. al., Superior Court of the State of California For the County of San Mateo**

Dr. Clark evaluated analytical laboratory results to determine whether remediation efforts by the plaintiff were necessary based on the proposed site land use.  Deposition testimony was offered on the composition of petroleum hydrocarbons in the subsurface at the site, clean-up standards, and the necessity of remediation.

**Case Result:  Settlement in favor of defendant.**

**SELECTED AIR MODELING RESEARCH/PROJECTS**

**Client – Confidential**

Dr. Clark performed a comprehensive evaluation of criteria pollutants, air toxins, and particulate matter emissions from a carbon black production facility to determine the impacts on the surrounding communities.  The results of the dispersion model will be used to estimate acute and chronic exposure concentrations to multiple contaminants and will be incorporated into a comprehensive risk evaluation.

**Client – Confidential**

Dr. Clark performed a comprehensive evaluation of air toxins and particulate matter emissions from a railroad tie manufacturing facility to determine the impacts on the surrounding communities.  The results of the dispersion model have been used to estimate acute and chronic exposure concentrations to multiple contaminants and have been incorporated into a comprehensive risk evaluation.

**Client – Los Angeles Alliance for a New Economy (LAANE), Los Angeles, California**

Dr. Clark is advising the LAANE on air quality issues related to current flight operations at the Los Angeles International Airport (LAX) operated by the Los Angeles World Airport (LAWA) Authority.  He is working with the LAANE and LAX staff to develop a comprehensive strategy for meeting local community concerns over emissions from flight operations and to engage federal agencies on the issue of local impacts of community airports.

**Client – City of Santa Monica, Santa Monica, California**

Dr. Clark is advising the City of Santa Monica on air quality issues related to current flight operations at the facility. He is working with the City staff to develop a comprehensive strategy for meeting local community concerns over emissions from flight operations and to engage federal agencies on the issue of local impacts of community airports.

**Client:  Omnitrans, San Bernardino, California**

Dr. Clark managed a public health survey of three communities near transit fueling facilities in San Bernardino and Montclair California in compliance with California Senate Bill 1927.  The survey included an epidemiological survey of the effected communities, emission surveys of local businesses, dispersion modeling to determine potential emission concentrations within the communities, and a comprehensive risk assessment of each community. The results of the study were presented to the Governor as mandated by Senate Bill 1927.

**Client:  Confidential, San Francisco, California**

Summarized cancer types associated with exposure to metals and smoking.  Researched the specific types of cancers associated with exposure to metals and smoking.  Provided causation analysis of the association between cancer types and exposure for use by non-public health professionals.

**Client:  Confidential, Minneapolis, Minnesota**

Prepared human health risk assessment of workers exposed to VOCs from neighboring petroleum storage/transport facility. Reviewed the systems in place for distribution of petroleum hydrocarbons to identify chemicals of concern (COCs), prepared comprehensive toxicological summaries of COCs, and quantified potential risks from carcinogens and non-carcinogens to receptors at or adjacent to site. This evaluation was used in the support of litigation.

**Client – United Kingdom Environmental Agency**

Dr. Clark is part of team that performed comprehensive evaluation of soil vapor intrusion of VOCs from former landfill adjacent residences for the United Kingdom's Environment Agency.  The evaluation included collection of liquid and soil vapor samples at site, modeling of vapor migration using the Johnson Ettinger Vapor Intrusion model, and calculation of site-specific health based vapor thresholds for chlorinated solvents, aromatic hydrocarbons, and semi-volatile organic compounds.  The evaluation also included a detailed evaluation of the use,

chemical characteristics, fate and transport, and toxicology of chemicals of concern (COC).  The results of the evaluation have been used as a briefing tool for public health professionals.

**EMERGING/PERSISTENT CONTAMINANT RESEARCH/PROJECTS**

**Client:  Ameren Services, St. Louis, Missouri**

Managed the preparation of a comprehensive human health risk assessment of workers and residents at or near an NPL site in Missouri.  The former operations at the Property included the servicing and repair of electrical transformers, which resulted in soils and groundwater beneath the Property and adjacent land becoming impacted with PCB and chlorinated solvent compounds.  The results were submitted to U.S. EPA for evaluation and will be used in the final ROD.

**Client:  City of Santa Clarita, Santa Clarita, California**

Dr. Clark is managing the oversight of the characterization, remediation and development activities of a former 1,000 acre munitions manufacturing facility for the City of Santa Clarita.  The site is impacted with a number of contaminants including perchlorate, unexploded ordinance, and volatile organic compounds (VOCs).  The site is currently under a number of regulatory consent orders, including an Immanent and Substantial Endangerment Order.  Dr. Clark is assisting the impacted municipality with the development of remediation strategies, interaction with the responsible parties and stakeholders, as well as interfacing with the regulatory agency responsible for oversight of the site cleanup.

**Client:  Confidential, Los Angeles, California**

Prepared comprehensive evaluation of perchlorate in environment.  Dr. Clark evaluated the production, use, chemical characteristics, fate and transport, toxicology, and remediation of perchlorate.  Perchlorates form the basis of solid rocket fuels and have recently been detected in water supplies in the United States.  The results of this research were presented to the USEPA, National GroundWater, and ultimately published in a recent book entitled *Perchlorate in the Environment*.

**Client – Confidential, Los Angeles, California**

Dr. Clark is performing a comprehensive review of the potential for pharmaceuticals and their by-products to impact groundwater and surface water supplies.  This evaluation will include a review if available data on the history of pharmaceutical production in the United States; the chemical characteristics of various pharmaceuticals; environmental fate and transport; uptake by xenobiotics; the potential effects of pharmaceuticals on water treatment systems; and the potential threat to public health.  The results of the evaluation may be used as a briefing tool for non-public health professionals.

**PUBLIC HEALTH/TOXICOLOGY**

**Client:  Brayton Purcell, Novato, California**

Dr. Clark performed a toxicological assessment of residents exposed to methyl-tertiary butyl ether (MTBE) from leaking underground storage tanks (LUSTs) adjacent to the subject property.  The symptomology of residents and guests of the subject property were evaluated against the known outcomes in published literature to exposure to MTBE.  The study found that residents had been exposed to MTBE in their drinking water; that concentrations of MTBE detected at the site were above regulatory guidelines; and, that the symptoms and outcomes expressed by residents and guests were consistent with symptoms and outcomes documented in published literature.

**Client:  Confidential, San Francisco, California**

Identified and analyzed fifty years of epidemiological literature on workplace exposures to heavy metals.  This research resulted in a summary of the types of cancer and non-cancer diseases associated with occupational exposure to chromium as well as the mortality and morbidity rates.

**Client:  Confidential, San Francisco, California**

Summarized major public health research in United States.  Identified major public health research efforts within United States over last twenty years.  Results were used as a briefing tool for non-public health professionals.

**Client:  Confidential, San Francisco, California**

Quantified the potential multi-pathway dose received by humans from a pesticide applied indoors.  Part of team that developed exposure model and evaluated exposure concentrations in a comprehensive report on the plausible range of doses received by a specific person.  This evaluation was used in the support of litigation.

**Client:  Covanta Energy, Westwood, California**

Evaluated health risk from metals in biosolids applied as soil amendment on agricultural lands.  The biosolids were created at a forest waste cogeneration facility using 96% whole tree wood chips and 4 percent green waste.  Mass loading calculations were used to estimate Cr(VI) concentrations in agricultural soils based on a maximum loading rate of 40 tons of biomass per acre of agricultural soil.  The results of the study were used by the Regulatory agency to determine that the application of biosolids did not constitute a health risk to workers applying the biosolids or to residences near the agricultural lands.

**Client – United Kingdom Environmental Agency**

Oversaw a comprehensive toxicological evaluation of methyl-*tertiary* butyl ether (M*t*BE) for the United Kingdom's Environment Agency.  The evaluation included available data on the production, use, chemical characteristics, fate and transport, toxicology, and remediation of M*t*BE.  The results of the evaluation have been used as a briefing tool for public health professionals.

**Client – Confidential, Los Angeles, California**

Prepared comprehensive evaluation of *tertiary* butyl alcohol (TBA) in municipal drinking water system. TBA is the primary breakdown product of M*t*BE, and is suspected to be the primary cause of M*t*BE toxicity.  This evaluation will include available information on the production, use, chemical characteristics, fate and transport in the environment, absorption, distribution, routes of detoxification, metabolites, carcinogenic potential, and remediation of TBA.  The results of the evaluation were used as a briefing tool for non-public health professionals.

**Client – Confidential, Los Angeles, California**

Prepared comprehensive evaluation of methyl *tertiary* butyl ether (MTBE) in municipal drinking water system. MTBE is a chemical added to gasoline to increase the octane rating and to meet Federally mandated emission criteria. The evaluation included available data on the production, use, chemical characteristics, fate and transport, toxicology, and remediation of MTBE.  The results of the evaluation have been were used as a briefing tool for non-public health professionals.

**Client – Ministry of Environment, Lands & Parks, British Columbia**

Dr. Clark assisted in the development of water quality guidelines for methyl tertiary-butyl ether (MTBE) to protect water uses in British Columbia (BC).  The water uses to be considered includes freshwater and marine life, wildlife, industrial, and agricultural (e.g., irrigation and livestock watering) water uses.  Guidelines from other jurisdictions for the protection of drinking water, recreation and aesthetics were to be identified.

**Client:  Confidential, Los Angeles, California**

Prepared physiologically based pharmacokinetic (PBPK) assessment of lead risk of receptors at middle school built over former industrial facility.  This evaluation is being used to determine cleanup goals and will be basis for regulatory closure of site.

**Client:  Kaiser Venture Incorporated, Fontana, California**

Prepared PBPK assessment of lead risk of receptors at a 1,100-acre former steel mill.  This evaluation was used as the basis for granting closure of the site by lead regulatory agency.

**RISK ASSESSMENTS/REMEDIAL INVESTIGATIONS**

**Client:  Confidential, Atlanta, Georgia**

Researched potential exposure and health risks to community members potentially exposed to creosote, polycyclic aromatic hydrocarbons, pentachlorophenol, and dioxin compounds used at a former wood treatment facility. Prepared a comprehensive toxicological summary of the chemicals of concern, including the chemical

characteristics, absorption, distribution, and carcinogenic potential.  Prepared risk characterization of the carcinogenic and non-carcinogenic chemicals based on the exposure assessment to quantify the potential risk to members of the surrounding community.  This evaluation was used to help settle class-action tort.

**Client:  Confidential, Escondido, California**

Prepared comprehensive Preliminary Endangerment Assessment (PEA) of dense non-aqueous liquid phase hydrocarbon (chlorinated solvents) contamination at a former printed circuit board manufacturing facility.  This evaluation was used for litigation support and may be used as the basis for reaching closure of the site with the lead regulatory agency.

**Client:  Confidential, San Francisco, California**

Summarized epidemiological evidence for connective tissue and autoimmune diseases for product liability litigation.  Identified epidemiological research efforts on the health effects of medical prostheses.  This research was used in a meta-analysis of the health effects and as a briefing tool for non-public health professionals.

**Client:  Confidential, Bogotá, Columbia**

Prepared comprehensive evaluation of the potential health risks associated with the redevelopment of a 13.7 hectares plastic manufacturing facility in Bogotá, Colombia  The risk assessment was used as the basis for the remedial goals and closure of the site.

**Client:  Confidential, Los Angeles, California**

Prepared comprehensive human health risk assessment of students, staff, and residents potentially exposed to heavy metals (principally cadmium) and VOCs from soil and soil vapor at 12-acre former crude oilfield and municipal landfill.  The site is currently used as a middle school housing approximately 3,000 children.  The evaluation determined that the site was safe for the current and future uses and was used as the basis for regulatory closure of site.

**Client:  Confidential, Los Angeles, California**

Managed remedial investigation (RI) of heavy metals and volatile organic chemicals (VOCs) for a 15-acre former manufacturing facility.  The RI investigation of the site included over 800 different sampling locations and the collection of soil, soil gas, and groundwater samples.  The site is currently used as a year round school housing approximately 3,000 children.  The Remedial Investigation was performed in a manner that did not interrupt school activities and met the time restrictions placed on the project by the overseeing regulatory agency.  The RI Report identified the off-site source of metals that impacted groundwater beneath the site and the sources of VOCs in soil gas and groundwater.  The RI included a numerical model of vapor intrusion into the buildings at the site from the vadose zone to determine exposure concentrations and an air dispersion model of VOCs from the proposed soil

vapor treatment system.  The Feasibility Study for the Site is currently being drafted and may be used as the basis for granting closure of the site by DTSC.

**Client:  Confidential, Los Angeles, California**

Prepared comprehensive human health risk assessment of students, staff, and residents potentially exposed to heavy metals (principally lead), VOCs, SVOCs, and PCBs from soil, soil vapor, and groundwater at 15-acre former manufacturing facility.  The site is currently used as a year round school housing approximately 3,000 children. The evaluation determined that the site was safe for the current and future uses and will be basis for regulatory closure of site.

**Client:  Confidential, Los Angeles, California**

Prepared comprehensive evaluation of VOC vapor intrusion into classrooms of middle school that was former 15-acre industrial facility.  Using the Johnson-Ettinger Vapor Intrusion model, the evaluation determined acceptable soil gas concentrations at the site that did not pose health threat to students, staff, and residents.  This evaluation is being used to determine cleanup goals and will be basis for regulatory closure of site.

**Client –Dominguez Energy, Carson, California**

Prepared comprehensive evaluation of the potential health risks associated with the redevelopment of 6-acre portion of a 500-acre oil and natural gas production facility in Carson, California.  The risk assessment was used as the basis for closure of the site.

**Kaiser Ventures Incorporated, Fontana, California**

Prepared health risk assessment of semi-volatile organic chemicals and metals for a fifty-year old wastewater treatment facility used at a 1,100-acre former steel mill.  This evaluation was used as the basis for granting closure of the site by lead regulatory agency.

**ANR Freight - Los Angeles, California**

Prepared a comprehensive Preliminary Endangerment Assessment (PEA) of petroleum hydrocarbon and metal contamination of a former freight depot.  This evaluation was as the basis for reaching closure of the site with lead regulatory agency.

**Kaiser Ventures Incorporated, Fontana, California**

Prepared comprehensive health risk assessment of semi-volatile organic chemicals and metals for 23-acre parcel of a 1,100-acre former steel mill.  The health risk assessment was used to determine clean up goals and as the basis for granting closure of the site by lead regulatory agency.  Air dispersion modeling using ISCST3 was performed to determine downwind exposure point concentrations at sensitive receptors within a 1 kilometer radius of the site.

The results of the health risk assessment were presented at a public meeting sponsored by the Department of Toxic Substances Control (DTSC) in the community potentially affected by the site.

**Unocal Corporation - Los Angeles, California**

Prepared comprehensive assessment of petroleum hydrocarbons and metals for a former petroleum service station located next to sensitive population center (elementary school).  The assessment used a probabilistic approach to estimate risks to the community and was used as the basis for granting closure of the site by lead regulatory agency.

**Client:  Confidential, Los Angeles, California**

Managed oversight of remedial investigation most contaminated heavy metal site in California.  Lead concentrations in soil excess of 68,000,000 parts per billion (ppb) have been measured at the site.  This State Superfund Site was a former hard chrome plating operation that operated for approximately 40-years.

**Client:  Confidential, San Francisco, California**

Coordinator of regional monitoring program to determine background concentrations of metals in air.  Acted as liaison with SCAQMD and CARB to perform co-location sampling and comparison of accepted regulatory method with ASTM methodology.

**Client:  Confidential, San Francisco, California**

Analyzed historical air monitoring data for South Coast Air Basin in Southern California and potential health risks related to ambient concentrations of carcinogenic metals and volatile organic compounds.  Identified and reviewed the available literature and calculated risks from toxins in South Coast Air Basin.

**IT Corporation, North Carolina**

Prepared comprehensive evaluation of potential exposure of workers to air-borne VOCs at hazardous waste storage facility under SUPERFUND cleanup decree.  Assessment used in developing health based clean-up levels.

**Professional Associations**

American Public Health Association (APHA)

Association for Environmental Health and Sciences (AEHS)

California Redevelopment Association (CRA)

International Society of Environmental Forensics (ISEF)

Society of Environmental Toxicology and Chemistry (SETAC)

**Publications and Presentations:**

**Books and Book Chapters**

Sullivan, P., **J.J. J. Clark,** F.J. Agardy, and P.E. Rosenfeld.  (2007).  *Synthetic Toxins In The Food, Water and Air of American Cities.*  Elsevier, Inc.  Burlington, MA.

Sullivan, P. and **J.J. J. Clark**.  2006.  *Choosing Safer Foods, A Guide To Minimizing Synthetic Chemicals In Your Diet.*  Elsevier, Inc.  Burlington, MA.

Sullivan, P., Agardy, F.J., and **J.J.J. Clark**.  2005.  *The Environmental Science of Drinking Water.*  Elsevier, Inc. Burlington, MA.

Sullivan, P.J., Agardy, F.J., **Clark, J.J.J.**  2002.  *America's Threatened Drinking Water:  Hazards and Solutions.*  Trafford Publishing, Victoria B.C.

**Clark, J.J.J.**  2001.  "TBA:  Chemical Properties, Production & Use, Fate and Transport, Toxicology, Detection in Groundwater, and Regulatory Standards" in *Oxygenates in the Environment.*  Art Diaz, Ed.. Oxford University Press: New York.

**Clark, J.J.J.**   2000. "Toxicology of Perchlorate" in *Perchlorate in the Environment.*   Edward Urbansky, Ed. Kluwer/Plenum: New York.

**Clark, J.J.J.**  1995.  Probabilistic Forecasting of Volatile Organic Compound Concentrations At The Soil Surface From Contaminated Groundwater.  UMI.

Baker, J.; **Clark, J.J.J.**; Stanford, J.T.  1994.  Ex Situ Remediation of Diesel Contaminated Railroad Sand by Soil Washing.  Principles and Practices for Diesel Contaminated Soils, Volume III.  P.T. Kostecki, E.J. Calabrese, and C.P.L. Barkan, eds.  Amherst Scientific Publishers, Amherst, MA.  pp 89-96.

**Journal and Proceeding Articles**

Tam L. K.., Wu C. D., Clark J. J. and **Rosenfeld, P.E.** (2008) A Statistical Analysis Of Attic Dust And Blood Lipid Concentrations Of Tetrachloro-p-Dibenzodioxin (TCDD) Toxicity Equialency Quotients (TEQ) In Two Populations Near  Wood Treatment Facilities. Organohalogen Compounds, Volume 70 (2008) page 002254.

Tam L. K.., Wu C. D., Clark J. J. and **Rosenfeld, P.E.** (2008) Methods For Collect Samples For Assessing Dioxins And Other Environmental Contaminants In Attic Dust: A Review.  Organohalogen Compounds, Volume 70 (2008) page 000527

Hensley A.R., Scott, A., Rosenfeld P.E., **Clark, J.J.J.**  (2007).  "Attic Dust And Human Blood Samples Collected Near A Former Wood Treatment Facility." *Environmental Research.* 105:194-199.

Rosenfeld, P.E., **Clark, J. J.,** Hensley, A.R., and Suffet, I.H.  2007. "The Use Of An Odor Wheel Classification For The Evaluation of Human Health Risk Criteria For Compost Facilities" Water Science & Technology.  55(5): 345-357.

Hensley A.R., Scott, A., Rosenfeld P.E., **Clark, J.J.J.**  2006.  "Dioxin Containing Attic Dust And Human Blood Samples Collected Near A Former Wood Treatment Facility." The 26th International Symposium on Halogenated Persistent Organic Pollutants – DIOXIN2006, August 21 – 25, 2006. Radisson SAS Scandinavia Hotel in Oslo Norway.

Rosenfeld, P.E., **Clark, J. J.** and Suffet, I.H.  2005.  "The Value Of An Odor Quality Classification Scheme For Compost Facility Evaluations" The U.S. Composting Council's 13th Annual Conference January 23 - 26, 2005, Crowne Plaza Riverwalk, San Antonio, TX.

Rosenfeld, P.E., **Clark, J. J.** and Suffet, I.H.  2004.  "The Value Of An Odor Quality Classification Scheme For Urban Odor" WEFTEC 2004. 77th Annual Technical Exhibition & Conference October 2 - 6, 2004, Ernest N. Morial Convention Center, New Orleans, Louisiana.

**Clark, J.J.J**.  2003.  "Manufacturing, Use, Regulation, and Occurrence of a Known Endocrine Disrupting Chemical (EDC), 2,4-Dichlorophnoxyacetic Acid (2,4-D) in California Drinking Water Supplies."  National Groundwater Association Southwest Focus Conference:  Water Supply and Emerging Contaminants.  Minneapolis, MN.  March 20, 2003.

Rosenfeld, P. and **J.J.J. Clark**.  2003.  "Understanding Historical Use, Chemical Properties, Toxicity, and Regulatory Guidance"  National Groundwater Association Southwest Focus Conference:  Water Supply and Emerging Contaminants. Phoenix, AZ.  February 21, 2003.

**Clark, J.J.J.**, Brown A.  1999.  Perchlorate Contamination:  Fate in the Environment and Treatment Options. In Situ and On-Site Bioremediation, Fifth International Symposium.  San Diego, CA, April, 1999.

**Clark, J.J.J.**  1998.  Health Effects of Perchlorate and the New Reference Dose (RfD).  Proceedings From the Groundwater Resource Association Seventh Annual Meeting, Walnut Creek, CA, October 23, 1998.

Browne, T., **Clark, J.J.J.**  1998.  Treatment Options For Perchlorate In Drinking Water.  Proceedings From the Groundwater Resource Association Seventh Annual Meeting, Walnut Creek, CA, October 23, 1998.

**Clark, J.J.J.**, Brown, A., Rodriguez, R.  1998.  The Public Health Implications of MtBE and Perchlorate in Water: Risk Management Decisions for Water Purveyors.  Proceedings of the National Ground Water Association, Anaheim, CA, June 3-4, 1998.

**Clark J.J.J.**, Brown, A., Ulrey, A.  1997.  Impacts of Perchlorate On Drinking Water In The Western United States.  U.S. EPA Symposium on Biological and Chemical Reduction of Chlorate and Perchlorate, Cincinnati, OH,  December 5, 1997.

**Clark, J.J.J.**; Corbett, G.E.; Kerger, B.D.; Finley, B.L.; Paustenbach, D.J.  1996.  Dermal Uptake of Hexavalent Chromium In Human Volunteers:  Measures of Systemic Uptake From Immersion in Water At 22 PPM. Toxicologist. 30(1):14.

Dodge, D.G.; **Clark, J.J.J.**; Kerger, B.D.; Richter, R.O.; Finley, B.L.; Paustenbach, D.J.  1996.  Assessment of Airborne Hexavalent Chromium In The Home Following Use of Contaminated Tapwater.  Toxicologist. 30(1):117-118.

Paulo, M.T.; Gong, H., Jr.; **Clark, J.J.J.**  (1992).  Effects of Pretreatment with Ipratroprium Bromide in COPD Patients Exposed to Ozone.  American Review of Respiratory Disease. 145(4):A96.

Harber, P.H.; Gong, H., Jr.; Lachenbruch, A.; **Clark, J.**; Hsu, P.  (1992).  Respiratory Pattern Effect of Acute Sulfur Dioxide Exposure in Asthmatics.  American Review of Respiratory Disease. 145(4):A88.

McManus, M.S.; Gong, H., Jr.; Clements, P.; **Clark, J.J.J.**  (1991).  Respiratory Response of Patients With Interstitial Lung Disease To Inhaled Ozone.  American Review of Respiratory Disease. 143(4):A91.

Gong, H., Jr.; Simmons, M.S.; McManus, M.S.; Tashkin, D.P.; Clark, V.A.; Detels, R.; **Clark, J.J.**   (1990).   Relationship Between Responses to Chronic Oxidant and Acute Ozone Exposures in Residents of Los Angeles County.   American Review of Respiratory Disease.  141(4):A70.

Tierney, D.F. and **J.J.J. Clark.**  (1990).  Lung Polyamine Content Can Be Increased By Spermidine Infusions Into Hyperoxic Rats.  American Review of Respiratory Disease.  139(4):A41.

# EXHIBIT C

 

August 21, 2009

Fred Brusuelas
City of Visalia
Planning Department
315 E. Acequia Ave.
Visalia, CA  93291

**Project:   Tentative Parcel Map No. 2009-03**

**District Reference No:  20090497**

Dear Mr. Brusuelas:

The San Joaquin Valley Unified Air Pollution Control District (District) has reviewed the subject project. The division of land into individual parcels will not have an impact on air quality. However, if approved, future development will contribute to the overall decline in air quality due to construction activities, increased traffic, and ongoing operational emissions. The District offers the following comments:

1. Future development may require further environmental review and mitigation. Referral documents for those projects should include a project summary detailing, at a minimum, the land use designation, project size, and proximity to sensitive receptors and existing emission sources.

2. Individual development projects would be subject to District Rule 9510 (Indirect Source Review) if upon full build-out the project would include or exceed any one of the following:

- 50 dwelling units
- 2,000 square feet of commercial space;
- 25,000 square feet of light industrial space;
- 100,000 square feet of heavy industrial space;
- 20,000 square feet of medical office space;
- 39,000 square feet of general office space; or
- 9,000 square feet of educational space; or
- 10,000 square feet of government space; or
- 20,000 square feet of recreational space; or
- 9,000 square feet of space not identified above

**Seyed Sadredin**
Executive Director/Air Pollution Control Officer

| **Northern Region** | **Central Region (Main Office)** | **Southern Region** |
|---|---|---|
| 4800 Enterprise Way | 1990 E. Gettysburg Avenue | 34946 Flyover Court |
| Modesto, CA 95356-8718 | Fresno, CA 93726-0244 | Bakersfield, CA 93308-9725 |
| Tel (209) 557-6400 FAX (209) 557-6475 | Tel  559 230-6000 FAX: 559 230-6061 | Tel 661-392-5500 FAX 661-392-5585 |

www.valleyair.org     www.healthyairliving.com

Tentative Parcel Map 2009-03                                                                          *Page 2*
District Reference No. 20090497

3. District Rule 9510 is intended to mitigate a project's impact on air quality through project design elements or by payment of applicable off-site mitigation fees. Any applicant subject to District Rule 9510 is required to submit an Air Impact Assessment (AIA) application to the District no later than seeking final discretionary approval, and to pay any applicable off-site mitigation fees before issuance of the first building permit.

4. For future projects, the District recommends that demonstration of compliance with District Rule 9510, including payment of all applicable fees, be made a condition of project approval. Information about how to comply with District Rule 9510 can be found online at: http://www.valleyair.org/ISR/ISRHome.htm.

5. Individual development projects may also be subject to the following District rules: Regulation VIII, (Fugitive PM10 Prohibitions), Rule 4102 (Nuisance), Rule 4601 (Architectural Coatings), and Rule 4641 (Cutback, Slow Cure, and Emulsified Asphalt, Paving and Maintenance Operations). In the event an existing building will be renovated, partially demolished or removed, the project may be subject to District Rule 4002 (National Emission Standards for Hazardous Air Pollutants).

6. The above list of rules is neither exhaustive nor exclusive. To identify other District rules or regulations that apply to this project or to obtain information about District permit requirements, the applicant is strongly encouraged to contact the District's Small Business Assistance Office at (559) 230-5888. Current District rules can be found online at: www.valleyair.org/rules/1ruleslist.htm.

If you have any questions or require further information, please call Debbie Johnson, at (559) 230-5817.

Sincerely,

Dave Warner
Director of Permits Services

*For* Arnaud Marjollet
Permit Services Manager

DW:dj

# EXHIBIT D

# SITE PLAN REVIEW COMMENTS

**Andrew Chamberlain, Planning Division (559) 713-4003**
Date:  September 22, 2010

SITE PLAN NO:      10-113
PROJECT:             NEW WAREHOUSE & DISTRIBUTION FACILITY
                            NEW 500,499 SF BUILDING ON 31.9 ACRES (IH ZONED)
APPLICANT TITLE:  DAVID HILTY, MIDSTATE HAYES (PROP. OWNER)
LOCATION TITLE:   8711 RIGGIN, W.
APN TITLE:         077-360-010

General Plan:       IH – Heavy Industrial
Existing Zoning:   IH – Heavy Industrial

## Planning Division Recommendation:
☒ Revise and Proceed to Off-Agenda Review

☐ Resubmit

## Project Requirements:
- Variance to required 40-foot setback along Riggin and Kelsey – see comments below, the project may also be modified to eliminate the need for a variance process.

**PROJECT SPECIFIC INFORMATION**: 09/22/2010
1. The site is within Design District "H" which requires a 40 foot landscape setback along the Riggin and Kelsey roadway frontages which are identified as "major roads". The setback is measured from property line after any right-of-way dedications.

   Riggin Frontage – The 40 foot landscape setback minimum is met along this frontage, though the inclusion of the ponding basing will require a landscape plan which includes landscaping the basin and the addition of a tree-row along the back side (south side) of the basin which is out of the typical 40 foot landscape setback area.

   Kelsey Frontage – The 40 foot landscape setback is not met along the Kelsey frontage due to the parking lots and fire lane, and would require a variance action at the Planning Commission to request the reduction to approximately 25 feet. The Planning Commission may, approve, deny or modify a variance request. An alternative would be to basically move the site plan approximately 18 to 20 feet to the west which would then meet the 40 foot landscape setback requirement.
2. Fences – The proposed fence locations along Riggin and Kelsey are within the required 40 foot landscape setback, and will require a variance action at the Planning Commission to request fences over 4 feet tall in the required 40 foot landscape setback. The Planning Commission may, approve, deny or modify a variance request. An alternative would be to relocate the fences out of the setback area, thus eliminating the need for a variance.
3. Access Gates – See Engineering Comments, the gates need to be located far enough back to allow a semi truck and trailer to be standing in front of the gates and not across traffic lanes on Riggin, and the same on Kelsey for smaller vehicles. This can be addressed by moving the gates out of the required 40 foot front setback area and accommodate the Engineering comments.
4. Landscaping along Riggin and Kelsey – Landscaping is required along the full length of the Riggin Avenue frontage. The Kelsey Street frontage needs full landscaping improvements to the south end of the access drive on Kelsey. South of the access drive, only tree plantings are required to the southern limits of the building along the Kelsey frontage. This would

simply be trees at approximately 20 foot spacing with drip irrigation located where the future 40 foot landscape setback will occur when the full improvements go in along Kelsey.

5. Provide an Operational Statement with numbers of employees so the parking demand and parking provided may be reviewed for code consistency.

6. Off-Agenda reviews typically require that 5 copies of the revised site plan be sent to the Chief Building Official, Dennis Lehman, along with any other Site Plan Review requested information. Please contact Mr. Lehman if there are nay questions.

## CITY GENERAL PLAN CONSISTENCY

Staff initial finding is that the proposed site plan IS CONSISTENT with the City General Plan. Because this project requires discretionary approval by the City Council and/or Planning Commission the final determination of consistency will be made by the Planning Commission and/or City Council.

### If your project requires a discretionary action:

### San Joaquin Valley Air Pollution Control District (SJVAPCD)

Please note that the project is subject to SJVAPCD Rule 9510. The applicant is encouraged to do early indirect source modeling consultation with the Air District (please see http://www.aqmd.gov/rules/proposed/2301/sjvapcd_rule9510.pdf).

| Design District: "H"          | Maximum Building Height: | 75 Feet     |
|-------------------------------|--------------------------|-------------|
| **Minimum Setbacks:**         | **Building**             | **Landscaping** |
| ➢ Frontage on major roads     | 40 Feet                  | 40 Feet     |
| ➢ Frontage on minor roads     | 25 Feet                  | 25 Feet     |
| ➢ Frontage on interior roads  | 15 Feet                  | 15 Feet     |
| ➢ Side                        | 0 Feet                   | 0 Feet      |
| ➢ Side abutting railroad right-of-way | 40 Feet          | 40 Feet     |
| ➢ Rear                        | 0 Feet                   | 0 Feet      |

*Major roads are defined as arterials and collectors such as Goshen Ave., Plaza Dr., etc.*
*Minor roads are defined as local streets such as Elowin Ct., Clancy Dr., etc.*
*Interior roads provide access to parcels within development*

**Minimum Site Area:** 5 acres minimum site area. If site less than this minimum area is approved in accordance with section No. 17.30.130 (A) of this chapter, it is required that setbacks be determined at the time of parceling the property. The parcels being created shall be designed to accommodate the landscape areas and building setbacks as required by this section.
Properties subdivided into less than 5 acre sites shall provide a common or joint storm drainage facility to be maintained through a property owners association formed at the time of subdivision.

**Screening requirement:** An eight foot masonry wall is required along a property line that abuts a residentially zoned property. (See also 17.36, 17.36.050, 17.36.070)

### Parking:

1. Provide an off-agenda operational statement with numbers of employees, otherwise parking is required at one stall per 1,000 square feet of storage area.

2. 30% of the required parking stalls may be compact and shall be evenly distributed in the lot (Zoning Ordinance Section 17.34.030.I).

3. Provide handicapped space(s) [see Zoning Ordinance Section 17.34.030.H).

4. An 80 sq. ft. minimum landscape well is required every 10 contiguous parking stalls (Zoning Ordinance Section 17.34.040.D & 17.30.130.C).

5. A planter is required every other row. Said planter shall be 7 feet in width and shall contain trees on twenty (20) foot centers (Zoning Ordinance Section 17.30.130.C.6).
6. No repair work or vehicle servicing allowed in a parking area (Zoning Ordinance Section 17.34.030.L).
7. It is highly recommended that bicycle rack(s) be provided on site plan.
8. No parking shall be permitted in a required front/rear/side yard (Zoning Ordinance Section 17.34.030.F).
9. Design/locate parking lot lighting to deflect any glare away from abutting residential areas, calculations to be shown on construction documents (Zoning Ordinance Section 17.34.030.J).
10. Parking lot to be screened from view by a 3-foot tall solid wall or shrubs when located adjacent to a public street.
11. Provide transit facilities on site plan.
12. Provide off-street loading facility (Zoning Ordinance Section 17.34.070 & 17.34.080).
13. The project should provide preferential parking spaces for carpools and vanpools to decrease the number of single occupant vehicle work trips. The preferential treatment could include covered parking spaces or close-in parking spaces, or designated free parking, or a guaranteed space for the vehicle.

**Fencing and Screening:**

1. Provide screening for roof mounted equipment (Zoning Ordinance Section 17.30.130.F).
2. Provide second-story screening for all windows that may intrude into adjacent residential properties. Details and cross-sections will be required to be reviewed and approved prior to issuance of building permits (Zoning Ordinance Section 17.30.130.F).
3. Provide screened trash enclosure with solid screening gates (Zoning Ordinance Section 17.30.130.F).
4. Provide solid screening of all outdoor storage areas. Outdoor storage to be screened from public view with solid material (Zoning Ordinance Section 17.30.130.F).
5. Outdoor retail sales prohibited.
6. NOTE: The maximum height of block walls and fences is 7-feet in the appropriate areas; this height is measured on the tallest side of the fence. If the height difference is such that the fence on the inside of the project site is not of sufficient height, the fence height should be discussed with Planning Staff prior to the filing of applications to determine if an Exception to fence/wall height should also be submitted.

**Landscaping:**

1. On September 30, 2009, the State Model Water Efficient Landscape Ordinance (MWELO) was finalized by the State Department of Water Resources to comply with AB 1881. AB 1881 along with the MWELO became effective on January 1, 2010. As of January 1, 2010, the State Model Water Efficient Landscape Ordinance became effective by adoption of a City urgency ordinance on December 21, 2009. The ordinance applies to projects installing 2,500 square feet or more of landscaping. It requires that landscaping and irrigation plans be certified by a qualified entity (i.e., Landscape Architect) as meeting the State water conservation requirements. The City's implementation of this new State law will be accomplished by self-certification of the final landscape and irrigation plans by a California licensed landscape architect or other qualified entity with sections signed by appropriately licensed or certified persons as required by the ordinance.
2. Provide street trees at an average of 20-feet on center along street frontages. All trees to be 15-gallon minimum size (Zoning Ordinance Section 17.30.130.C).
3. All landscape areas to be protected with 6-inch concrete curbs (Zoning Ordinance Section 17.30.130.F).
4. All parking lots to be designed to provide a tree canopy to provide shade in the hot seasons and sunlight in the winter months.

5. Provide a detailed landscape and irrigation plan as a part of the building permit package (Zoning Ordinance Section 17.34.040).
6. An 80 sq. ft. minimum landscape well is required every 10 contiguous parking stalls (Zoning Ordinance Section 17.30.130.C).
7. Provide a detailed landscape and irrigation plan as a part of the building permit package.
8. Locate existing oak trees on site and provide protection for all oak trees greater than 2" diameter (see Oak Tree Preservation Ordinance).

Maintenance of landscaped areas. - A landscaped area provided in compliance with the regulations prescribed in this title or as a condition of a use permit or variance shall be planted with materials suitable for screening or ornamenting the site, whichever is appropriate, and plant materials shall be maintained and replaced as needed, to screen or ornament the site. (Prior code § 7484)

### Lighting:

1. All lighting is to be designed and installed so as to prevent any significant direct or indirect light or glare from falling upon any adjacent residential property.
2. In no case shall more than 0.5 lumens be exceeded at any property line, and in cases where the adjacent residential unit is very close to the property line, 0.5 lumens may not be acceptable.

The comments found on this document pertain to the site plan submitted for review on the above referenced date. Any changes made to the plan submitted must be submitted for additional review.

**NOTE:** Staff recommendations contained in this document are not to be considered support for a particular action or project unless otherwise stated in the comments.

Signature _____

4
SITE PLAN # 2010-113

# EXHIBIT E



**VWR International, LLC**

Radnor Corporate Center
Building One
Suite 200
P.O. Box 6660
100 Matsonford Road
Radnor, PA 19087
www.vwr.com

October 14, 2010

Chris Young, City Engineer
City of Visalia
315 E. Acequia Avenue
Visalia CA 93921

Dear Mr. Young:

VWR International, LLC is intending to construct a 500,000 square foot warehouse at 8711 West Riggin Avenue in Visalis, CA. There will be approximately 125 employees working over two (2) shifts. The maximum number of employees at any one time will be approximately 125. VWR is providing 126 standard parking spaces to accommodate this staff. VWR does not feel that complying with the requirement of one (1) space per 1,000 square feet of storage is warranted.

Sincerely,

Joseph M. Zerillo
Vice President Distribution

# EXHIBIT F



# RESOURCE MANAGEMENT AGENCY

5961 SOUTH MOONEY BLVD
VISALIA, CA. 93277
PHONE (559) 624-7000
FAX (559) 730-2653

Jake Raper, Jr
Brett L. Fussel
Roger Hunt

Planning
Public Works
Administration/Community
Development

JAKE RAPER JR, AICP, DIRECTOR

October 27, 2010

Mr. Dennis Lehman, Building Official
City of Visalia Building Division
315 E. Acequia Avenue
Visalia, California 93291

*Re: CEQA Inquiry Regarding a proposed 500,499 sq. ft. Warehouse and Distribution facility at 8711 W. Riggin; APN 077-360-010*

Dear Mr. Lehman:

We have been informed that the Visalia Site Plan Review Committee has approved a proposal for the construction of a 500,499 square foot Warehouse Distribution Facility to be located at 8711 W. Riggin; APN 077-360-010. We have also been informed that this project proposal will receive building permits through a ministerial process (over the counter). Should this information be true, we have concerns regarding the environmental review process that was considered for its approval and subsequent ministerial determination to issue building permits without proper environmental analysis.

We would like to receive your response to the following questions so that we may evaluate the adequacy and proper level of California Environmental Quality Act (CEQA) compliance:

1. What was the CEQA environmental basis or environmental document used to make the ministerial determination for project approval and building permit issuance?

2. Was there a prior CEQA environmental analysis or initial study prepared for the proposal?

3. Was a traffic study prepared for this proposal?

4. Are there mitigation measures incorporated into the project proposal that address impacts to the county road system?

5. Is the project proposal compliant with Rules of the San Joaquin Valley Air Pollution Control Board? Including Regulation VIII and Indirect Source Review Rule 9510 (ISR).

We strongly advise you not issue any building permits for this project until the CEQA compliance questions are properly addressed. Your response to the aforementioned questions by November 8, 2010 will be greatly appreciated.

Sincerely,

Fred Brusuelas, *AICP Chief Planner*
Planning Branch, Countywide Planning

# EXHIBIT G



*City of Visalia*

*Community Development*

*315 E. Acequia Ave., Visalia, CA 93291*

*Engineering Division*

November 8, 2010

Site Plan No: 10-113
Project:      New 500,499 SF Warehouse & Distribution Facility
Applicant:    David Hilty (Midstate Hayes – Property Owner)
Address:      8711 W Riggin Ave
APN:          077-360-010

On September 22, 2010 the City of Visalia Site Plan Review Committee issued a Revise and Proceed requiring an off-agenda review of a revised site plan for the proposed VWR Distribution facility. The revised site plan was submitted for off-agenda review by the committee on October 14, 2010.

Site plan review number 10-113 is approved as a Revise and Proceed to building permits and off-site civil improvement design drawings.

Approved:

Chris Young, P.E.
Community Development Director
City of Visalia

CC: SPR 10-113 File



# EXHIBIT H

STATE OF CALIFORNIA—BUSINESS, TRANSPORTA   N AND HOUSING AGENCY                                    ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF TRANSPORTATION**
**DISTRICT 6**
1352 WEST OLIVE AVENUE
P.O. BOX 12616
FRESNO, CA 93778-2616
PHONE (559) 488-7396
FAX (559) 488-4088
TTY (559) 488-4066







R   CE   L       
N    1   ı           

COMM
CITY OF VISALIA

*Flex your power!*
*Be energy efficient!*

November 16, 2010

2135-IGR/CEQA
6-TUL-99-40.79 +/-
SP 10-113
WAREHOUSE/DISTRIBUTION FACILITY
AGENDA 9/22/10

Ms. Sandra Cloyd
City of Visalia
Public Works Department Engineering Services
315 East Acequia Avenue
Visalia, CA 93291

Dear Ms. Cloyd:

Thank you for the opportunity to review Site Plan (SP) 10-113 proposing to construct a 500,499 square foot Warehouse & Distribution Facility on a 31.9 acre site. The project is located at 8711 Riggin Avenue, on the SWC of Riggin Avenue (Ave 312) and Raod 84, approximately 2 miles east of State Route (SR) 99/ Betty Drive interchange. Caltrans has the following comments:

It is recommended that a Traffic Impact Study (TIS) be prepared to determine the extent and mitigation needed to reduce the traffic impacts at these locations to less than significant. The traffic generated by this type of development and its proximity of approximately 2 miles north and east of SR 198 and SR 99, respectively, will have a significant impact to the following interchanges: SR 99/Betty Drive, SR 99/Goshen Avenue and SR 198/Plaza Drive. The proposed development is estimated to generate approximately 160 trips in the PM peak hour and 150 trips in the AM peak hour according to the Trip Generation Manual 8th Edition. Please have the preparer of the traffic study reference the Caltrans Guide for the Preparation of Traffic Impact Studies, dated December 2002, and send the scope of the TIS to Caltrans before the traffic study is conducted. Caltrans Guide, while advisory, contains Best Practices and gives insight into Caltrans' expectations when reviewing a traffic study. If the traffic consultant has any issues or concerns regarding the use of the Guide or its interpretation, please contact us so resolution can be reached.

There is a Caltrans project to upgrade the interchange at SR 198 and Plaza Drive. The City of Visalia is the lead agency for this project. Construction is scheduled to begin in 2013. This interchange is nearing capacity and the City should consider advancing the schedule or constructing interim improvements such as ramp widening.

There is also a Caltrans project to reconstruct the interchange at SR 99 and Betty Drive. Construction is tentatively scheduled to begin in early 2013. The project proponent should be made aware that the partial SR 99 interchange at Avenue 304 (Goshen Avenue) is planned for closure in the future.

*"Caltrans improves mobility across California"*

*Ms. Sandra Cloyd*
*November 16, 2010*
*Page 2 of 2*

It is recommended that the City of Visalia and the County of Tulare consider a Joint Development Impact Mitigation Program. The program would secure funding for a zone of benefit (Goshen) for the future improvements to local and State facilities necessitated by the accumulated impacts of the proposed development. The project proponent would contribute per the Development Fee program to the improvements of the SR 198/Plaza Drive and SR 99/Betty Drive interchanges.

Please be advised that any future development in the vicinity of a State Route, whether the entitlement is deemed by the lead agency to be discretionary or ministerial should be sent to Caltrans for review. Please send a response to our comments prior to staff's recommendations to the Planning Commission and/or the City Council or Board of Supervisors. Also please provide a copy of the resolution approving the project. If you have any questions, please call me at (559) 488-7396.

Sincerely,

DAVID DEEL
Associate Transportation Planner
District 6

c:      Mr. Doug Damko, Senior Civil Engineer, City of Visalia.

# EXHIBIT I

## City of Visalia
## Agenda Item Transmittal

**Meeting Date:** December 10, 2010

**Agenda Item Number (Assigned by City Clerk):**

**Agenda Item Wording:** Request that the City Council authorize the City Manager to approve and execute both the Improvement and the Reimbursement Agreements with VWR International, LLC for the arterial and collector street improvements to Riggin Avenue (between Plaza Drive and Kelsey Street) and to Kelsey Street (extending approximately 325 feet south of Riggin Avenue). These improvements will be constructed along with VWR's new distribution facility which is located at the southwest corner of Riggin Avenue and Kelsey Street. The total reimbursement from the Traffic Impact Fee Program Fund shall not exceed $1.5 million

**Deadline for Action:** December 10, 2010

**Submitting Department:** Community Development Department/ Engineering Division

**Contact Name and Phone Number:**
Chris Young, Community Dev. Director - 713-4392
Jason Huckleberry, Associate Engineer - 713-4259

**For action by:**
X City Council
___ Redev. Agency Bd.
___ VPFA

**For placement on which agenda:**
___ Work Session
___ Closed Session

**Regular Session:**
___ Consent Calendar
X Regular Item
___ Public Hearing

Est. Time (Min.): 15

**Review:**

Dept. Head   CY 12/9/10
(Initials & date required)

Finance _____
City Atty _____
(Initials & date required or N/A)

City Mgr _____
(Initials Required)

If report is being re-routed after revisions leave date of initials if no significant change has affected Finance or City Attorney Review.

**Department Recommendation:** Authorize the City Manager to approve and execute both the Improvement and the Reimbursement Agreements with VWR International, LLC for arterial and collector street improvements to be constructed along with the VWR's distribution facility development project. The reimbursement will repay VWR for constructing those portions of north and south sides of Riggin Avenue and west side of Kelsey Street that are the responsibility of the City per the Transportation Impact Fee Program. The total reimbursement (which will be taken from the Traffic Impact Fee Program Fund) shall not exceed $1.5 million.

City staff and VWR engineers have been working diligently in recent weeks to refine construction cost estimates for improvements to Plaza Drive and Kelsey Street. Cost information was not sufficiently available on time to place the reimbursement agreement on the December 6, 2010 Council agenda. Due to schedule obligations for VWR in moving their project forward aggressively, they have informed City staff that Council authorization to execute the reimbursement agreement is needed prior to the December 20, 2010 Council meeting.

**Summary:** Pennsylvania based VWR International, LLC, is building a 500,000 square foot distribution facility at the southwest corner of Riggin Avenue and the Kelsey Street alignment. VWR wishes to open their facility in 2012. In order to meet their aggressive construction schedule, VWR has requested that the City process and approve the required Improvement

Page 1 of 6

AR000122

and Reimbursement Agreements as quickly as possible.  In recognition of the significant economic development benefits that the VWR facility will bring to the City and the region, both Council and City staff have worked diligently with VWR to meet their aggressive schedule.

These agreements delineate the costs of certain street improvements that need to be made to the adjacent arterial and collector streets (Kelsey and Riggin) prior to the opening of VWR's facility.  The City and VWR, share the responsibility for the cost of constructing specific portions of these street improvements per the City's Transportation Impact Fee Program.  In addition, VWR has agreed to incorporate the additional previously planned Riggin Avenue street improvements from Plaza Drive to the western boundary of their site.  Combining these two projects will allow for a more "competitive bidding", minimize the inconvenience caused by road construction, and shorten the project timeline.

Council recently approved an MOU between the County and the City that specified that the City of Visalia would "take the lead" on the Riggin Avenue improvements east of Plaza Drive.  This MOU provides that up to $2 million (previously allocated by the City out of the TIF Program Fund) may be used toward the reimbursement of VWR's contractor for the Riggin Avenue improvements as called for in the City's Circulation Element.

**Background:**  As part of this project, the developer has agreed to reconstruct Riggin Avenue (beginning at the east side of Plaza Drive and ending at the Kelsey Street alignment), as well as collector street improvements on Kelsey Street (beginning at Riggin Avenue and extending south approximately 325 feet).

Improvements to Riggin Avenue will include curb, gutter, full pavement structural section, median islands, and street lights.  The south side of Riggin will be constructed to "full width" (two eastbound traffic lanes) and one new westbound lane will be constructed on the north side of Riggin Avenue. Collector street improvements to Kelsey Street will include curb, gutter, full pavement structural section, and street lights. In accordance with the Transportation Impact Fee Program adopted by Council on December 1, 2008, the developer shall be responsible for the cost of curb, gutter, and six feet of pavement fronting their parcel. All costs for improvements outside of this scope are the responsibility of the City and are accounted for in a reimbursement agreement and shall be reimbursed to the developer upon the completion of the improvements. The "street improvement plans" are substantially complete and undergoing final review by City staff.  The reimbursement amount is estimated to be $1.3 million but final construction cost calculations are not yet completed.

The City has entered into a Memorandum of Understanding with the County of Tulare to reconstruct Riggin Avenue from Betty Drive to approximately 500 feet east of Plaza Drive. As part of this agreement, the City has committed $2 million to the County's Riggin Avenue project. Funds from that agreement, allocated from the Transportation Impact Fee program, will now be utilized to complete Riggin Avenue improvements with the VWR project.

A preliminary reimbursement agreement has been drafted, reviewed, and approved as to form by the City Attorney's office. Upon final plan approval and final review of cost calculations by the City, the Improvement and Reimbursement Agreements will be finalized and executed by VWR International LLC and the City Manager.

**Prior Council/Board Actions:** None

**Committee/Commission Review and Actions:** Approved by Site Plan Review Committee on 11/8/2010

AR000123

**Alternatives**: None recommended.

**Attachments**: 1. Location Map
2. Draft Cost Exhibit

**Recommended Motion (and Alternative Motions if expected)**: I move to give the City Manager authorization to execute the Improvement and Reimbursement Agreements with VWR International, LLC for an amount not to exceed $1,500,000.00

---

### *Environmental Assessment Status*

**CEQA Review:**

**NEPA Review:**

---

**Tracking Information:** (*Staff must list/include appropriate review, assessment, appointment and contract dates and other information that needs to be followed up on at a future date*)

Copies of this report have been provided to:

AR000124

**EXHIBIT 1**



VWR Distribution Facility
Location Map

AR000125

## EXHIBIT 2

### Reimbursement Agreement · VWR Distribution, Inc.

**A. RIGGIN AVE. CITY REIMBURSED OFFSITE STREET IMPROVEMENTS**

| No. | VWR Spec No. | ITEM | QUANTITY | UNITS | | Estimated UNIT COST | | AMOUNT |
|-----|------|------|------|------|---|------|---|------|
| 1 | 120159 | Temporary Traffic Stripe (Paint) | 12,839 | LF | $ | 0.30 | $ | 3,851.70 |
| 2 | 120149 | Temporary Pavement Marking (Paint) | 111 | SF | $ | 3.00 | $ | 333.00 |
| 3 | 150717 | Remove Traffic Stripe and Pavement Marking | 209 | SF | $ | 3.00 | $ | 627.00 |
| 4 | 152475 | Adjust Sewer Manhole Cover to Grade | 5 | EA | $ | 850.00 | $ | 4,250.00 |
| 5 | 190101 | Roadway Excavation | 13,842 | CY | $ | 16.00 | $ | 221,472.00 |
| 6 | | Plane and Remove Existing Asphalt Concrete | 382 | SY | $ | 3.00 | $ | 1,146.00 |
| 7 | 260201 | Class 2 Aggregate Base | 7,616 | CY | $ | 28.00 | $ | 213,248.00 |
| 8 | 390103 | Asphalt Concrete (Type B) | 6,004 | TON | $ | 63.00 | $ | 378,252.00 |
| 9 | 4 | Drain Inlet (Minor Concrete - Type GO) | 2 | EA | $ | 2,500.00 | $ | 5,000.00 |
| 10 | 650309 | 15" Reinforced Concrete Pipe (Class III) | 28 | LF | $ | 55.00 | $ | 1,540.00 |
| 11 | 705202 | 15" Concrete Flared End Section | 2 | EA | $ | 1,100.00 | $ | 2,200.00 |
| 12 | 731501 | Median Concrete Curb | 4,289 | LF | $ | 13.00 | $ | 55,757.00 |
| 13 | 731504 | Curb and Gutter | 1,284 | LF | $ | 18.00 | $ | 23,112.00 |
| 14 | 731519 | Stamped Median Concrete | 4,508 | SF | $ | 8.00 | $ | 36,064.00 |
| 15 | 5 | Street Monument | 1 | EA | $ | 700.00 | $ | 700.00 |
| 16 | 820130 | Object Marker | 6 | EA | $ | 50.00 | $ | 300.00 |
| 17 | 840504 | 4" Thermoplastic Traffic Stripe | 1814 | LF | $ | 0.30 | $ | 544.20 |
| 18 | 840506 | 8" Thermoplastic Traffic Stripe | 2292 | LF | $ | 0.60 | $ | 1,375.20 |
| 19 | 840515 | Thermoplastic Pavement Marking | 467 | SF | $ | 3.00 | $ | 1,401.00 |
| 20 | 850111 | Pavement Marker (Retroreflective) | 1180 | EA | $ | 4.00 | $ | 4,720.00 |
| 21 | | Street Lights - Dual Mast Arms (16,000 Lumen HPSV) | 6 | EA | $ | 1,000.00 | $ | 6,000.00 |
| 22 | | Street Light Conduit & Boxes | 1 | LS | $ | 22,520.00 | $ | 22,520.00 |
| 23 | | So Cal Edison Power Pole Relocations | 5 | EA | $ | 15,000.00 | $ | 75,000.00 |
| 24 | | Irrigation Service to Median Island | 1 | EA | $ | 4,000.00 | $ | 4,000.00 |
| 25 | | 3" PVC Irrigation Sleeves Across Median Islands | 450 | LF | $ | 8.00 | $ | 3,600.00 |
| 26 | | 4" PVC Electrical Conduit | 192 | LF | $ | 12.00 | $ | 2,304.00 |
| 27 | | Traffic Signal Loops | 1 | LS | $ | 15,000.00 | $ | 15,000.00 |
| 28 | 150742 | Remove Road Signs | 1 | EA | $ | 100.00 | $ | 100.00 |
| 29 | 152390 | Relocate Road Signs | 2 | EA | $ | 200.00 | $ | 400.00 |
| 30 | | Redwood Utility Marker | 10 | EA | $ | 50.00 | $ | 500.00 |
| | | | | | | **Section A Total -** | **$** | **1,085,317.10** |

**B. KELSEY ST. CITY REIMBURSED OFFSITE STREET IMPROVEMENTS**

| No. | VWR Spec No. | ITEM | QUANTITY | UNITS | | Estimated UNIT COST | | AMOUNT |
|-----|------|------|------|------|---|------|---|------|
| 1 | 190101 | Roadway Excavation | 415 | CY | $ | 16.00 | $ | 6,640.00 |
| 2 | 260201 | Class 2 Aggregate Base | 104 | CY | $ | 28.00 | $ | 2,912.00 |
| 3 | 390103 | Asphalt Concrete (Type B) | 140 | TON | $ | 63.00 | $ | 8,820.00 |
| 4 | 840504 | 4" Thermoplastic Traffic Stripe | 456 | LF | $ | 0.30 | $ | 136.80 |
| 5 | | Timber Barricade | 1 | EA | $ | 500.00 | $ | 500.00 |
| 6 | | So Cal Edison Utility Pole Relocation w/ Guy | 1 | EA | $ | 2,000.00 | $ | 2,000.00 |
| | | | | | | **Section B Total -** | **$** | **21,008.80** |

AR000126

## EXHIBIT 2

### Reimbursement Agreement - VWR Distribution, Inc.

**C. PROJECT COMPONENTS - CITY/DEVELOPER SHARED COST IMPROVEMENTS**

| No. | VWR Spec No. | ITEM | QTY/UNITS | Estimated COST | CITY SHARE (%) | CITY SHARE ($) |
|---|---|---|---|---|---|---|
| 1 | 999990 | Mobilization | 1/LS | $90,000.00 | 50% | $  45,000.00 |
| 2 | 074019 | Prepare Storm Water Pollution Prevention Plan | 1/LS | $4,000.00 | 50% | $   2,000.00 |
| 3 | 074020 | Water Pollution Control | 1/LS | $12,000.00 | 75% | $   9,000.00 |
| 4 | 074029 | Temporary Silt Fence | 1/LS | $2,000.00 | 75% | $   1,500.00 |
| 5 | 120090 | Construction Area Signs | 1/LS | $6,000.00 | 75% | $   4,500.00 |
| 6 | 120100 | Traffic Control System | 1/LS | $40,000.00 | 75% | $  30,000.00 |
| 7 | 120102 | Traffic Control Surveillance | 1/LS | $10,000.00 | 75% | $   7,500.00 |
| 8 | 160101 | Clearing and Grubbing | 1/LS | $15,000.00 | 75% | $  11,250.00 |
| | | | | | **Section C Total -** | **$   110,750.00** |

**D. KELSEY ST - DEVELOPER SHARE OF DEFERRED STREET IMPROVEMENTS TO BE PAID TO CITY OF VISALIA**

| No. | VWR Spec No. | ITEM | QUANTITY | UNITS | Estimated UNIT COST | AMOUNT |
|---|---|---|---|---|---|---|
| 1 | 190101 | Roadway Excavation | 173 | CY | $   16.00 | $    2,768.00 |
| 2 | 731504 | Curb and Gutter | 810 | LF | $   18.00 | $   14,580.00 |
| 3 | 260201 | Class 2 Aggregate Base | 105 | CY | $   28.00 | $    2,940.00 |
| 4 | 390103 | Asphalt Concrete (Type B) | 137 | TON | $   53.00 | $    8,631.00 |
| 5 | | Street Lights (Complete) | 3 | EA | $ 3,500.00 | $   10,500.00 |
| | | | | | **Hard Cost Total -** | **$   39,419.00** |
| | | Project Design and Construction Management (10% of Hard Costs) - | | | | $    3,941.90 |
| | | | | | **Section D Total -** | **$   43,360.90** |

Totals Section A, B, & C :  $ 1,217,075.90

Project Design and Construction Management (10% of Hard Costs) :  $   121,707.59

Estimated Offsite Total :  $ 1,338,783.49

Developer Share of Deferred Kelsey St Improvements (Section D) :  $   (43,360.90)

Estimated Project Reimbursement Total :  $ 1,295,422.59

AR000127

# EXHIBIT J



LOZEAU DRURY LLP    T  510.836.4200    410 12th Street, Suite 250    www.lozeaudrury.com
                    F  510.836.4205    Oakland, Ca 94607              richard@lozeaudrury.com

BY EMAIL, FAX and US MAIL

December 24, 2010

Mark Montelongo
San Joaquin Valley Air Pollution Control District
Central Region
1990 E. Gettysburg Ave.
Fresno, CA  93726
FAX:  559-230-6061
Mark.montelongo@valleyair.org

Mayor Bob Link and Honorable Members of the City Council
City of Visalia
c/o Donjia Huffmon, Chief Deputy City Clerk
attn: Andrew Chamberlain, achamberlain@ci.visalia.ca.us
425 E. Oak Street, Suite 301
Visalia, CA 93291
Email: dhuffmon@ci.visalia.ca.us
Fax:  559-713-4800

> RE:   Request for Indirect Source Review (Rule 9510) Enforcement
>       for VWR Industries 500,000 Square Foot
>       Trucking Facility Proposed in Visalia

Dear Mr. Montelongo:

I am writing on behalf of Visalia resident Kevin Long, the Center for Environmental Health, and Teamsters Joint Council 7 and their members concerning the City of Visalia's recent approval of a 500,000 square foot ("sf") warehouse proposed by VWR International.  The VWR facility is expected to generate up to 10,000 truck trips per day, which will generate nitrogen oxide (NOx) and particulate matter pollution far above Air District significance thresholds.  VWR is in plain violation of San Joaquin Valley Air Pollution Control District ("SJVAPCD" or "Air District") Rule 9510 ("Indirect Source Rule" or "ISR") because it has failed to apply for an ISR permit and intends to construct the massive warehouse without any ISR permit.  We therefore request that

the Air District take immediate action to prevent construction of the VWR facility unless and until VWR complies fully with Rule 9510.

We are also addressing this letter to the City of Visalia ("City") to request that the City refrain from issuing any permits in furtherance of the VWR project unless and until VWR complies with Rule 9510. Any such permits will be in plain violation of law. Also, the City must not provide any financial incentives for the VWR project (including but not limited to the $1.5 million for roadway improvements approved on December 10, 2010) or actions related to the project since this would constitute an illegal expenditure of funds in violation of Code of Civil Procedure section 559a due to the clear violations of Rule 9510.

## PROJECT BACKGROUND

The VWR facility is proposed to be located at the northeast corner of Riggin Avenue and Plaza Drive in Visalia. VWR and the City of Visalia have stated that VWR intends to commence construction in January 2011. At full build-out, the facility is proposed to be 500,000 square feet in size. It will distribute materials, including highly toxic chemicals to areas throughout the region. The project is expected to generate almost 10,000 truck trips per day. The Project location is currently farmland, and is located in close proximity to residences. (See attached comments of Traffic Engineer, Tom Brohard, PE) The facility will generate air emissions far above Air District significance thresholds. (See attached comments of Matthew Hagemann, PG)

## RULE 9510 INDIRECT SOURCE PERMIT IS REQUIRED

SJVAPCD Rule 9510 provides that any heavy industrial facility of 100,000 sf or larger in size must apply for an ISR permit. (Rule 9510, sect. 2.1.4) If the facility is considered "light industrial," an ISR permit is required for any facility larger than 25,000 sf. In either case, the proposed VWR facility is between 5 and 20 times larger than the minimum size facility requiring an ISR permit.

Rule 9510, sect. 5.0, provides that a facility must apply for an ISR permit prior to receiving final discretionary approval for its project. The ISR permit must be finalized prior to the commencement of project construction since the ISR permit must contain measures to reduce emissions from construction equipment. (Sect. 6.1)

We confirmed in our conversation today that VWR has not applied for an ISR permit, and that the Air District has no pending applications from VWR. In fact, you informed me that our conversation today was the first time you had heard of the VWR facility.

Rule 9510 requires the Air District to formulate a list of site-specific discretionary pollution reduction measures to reduce construction emissions by 20% for nitrogen oxides (NOx) and 45% for particulate matter under 10 microns in diameter (PM10). (Sect. 6.1)  It also requires the Air District to formulate a list of site-specific discretionary measures to reduce operational emissions by 33% for NOx and 50% for PM10.  (Sect. 6.2)

VWR received its final discretionary approvals from the City on December 20, 2011, but has failed to apply for any ISR permit.  VWR received other discretionary approvals from the City well after the March 1, 2006 effective date of Rule 9510.  In particular, the tentative subdivision map for the project was approved in August 2009 (Tentative Parcel Map 2009-03).  The annexation of the project parcel into City jurisdiction was approved in 2007.  On December 10, 2010, the City approved a payment of $1.5 million dollars to VWR for road improvements necessary for the project, as well as dedication of a road necessary for the VWR project.  All of these discretionary actions occurred after the effective date of Rule 9510.   Nevertheless, VWR has failed entirely to comply with Rule 9510.

VWR intends to commence construction in January 2011 (less than one month). Due to its violations of Rule 9510, VWR will generate substantially more NOx and PM10 pollution during both project construction and operation than would be allowed by the Rule.

We therefore request that the Air District take immediate action to direct VWR and the City to cease and desist from any permitting, construction, site grading or any other actions in furtherance of the VWR project unless and until VWR fully complies with Rule 9510.

**CEQA REVIEW IS REQUIRED**

Rule 9510 requires the Air District to exercise discretionary authority to craft site-specific measures to reduce the air quality impacts of the VWR project.  The expert comments attached hereto make clear that the VWR project will generate emissions far above the Air District's CEQA significance thresholds.  As such, review under the California Environmental Quality Act ("CEQA") is required prior to any final project approval.

We understand that the SJVAPCD generally does not conduct CEQA review for projects, and instead relies on entities with general police power jurisdiction such as cities and counties to conduct CEQA review.  However, in this case, despite our written requests, the City has failed to conduct CEQA review for the VWR project.  (See attached comment letter)  In such cases, the Air District, as a responsible agency, must

VWR Industries Visalia
Request for Rule 9510 Enforcement
December 24, 2010
Page 4 of 4

conduct CEQA review, unless it can persuade the City to conduct CEQA review as required.  For example, the South Coast Air Quality Management District routinely conducts CEQA review for refinery and other major industrial projects in the South Coast since the County of Los Angeles often does not exercise discretionary authority over such projects.

We have requested that the City conduct CEQA review for the VWR project, but it has steadfastly refused.  Therefore, it is the duty of the Air District to conduct CEQA review as a responsible agency, and to assume lead agency status.  The project may not proceed until CEQA review is completed by either the lead agency or a responsible agency.

Thank you for considering our comments.  Please do not hesitate to call me on my cell phone (415-846-9148) or email (Richard@lozeaudrury.com) with any questions or concerns.

Sincerely,

Richard Drury
Attorney at Law



LOZEAU DRURY LLP    T 510.836.4200    410 12th Street, Suite 250    www.lozeaudrury.com
                    F 510.836.4205    Oakland, Ca 94607              richard@lozeaudrury.com

BY EMAIL and US MAIL

December 20, 2010

Mayor Bob Link and Honorable Members of the City Council
City of Visalia
c/o Donjia Huffmon, Chief Deputy City Clerk
425 E. Oak Street, Suite 301
Visalia, CA 93291
Email: dhuffmon@ci.visalia.ca.us
Fax:  559-713-4800

Re:    Comment Letter on Proposed VWR International Distribution Facility.  Final
       Parcel Map Approval of Map 2009-03, APN-077-120-016.  Request for CEQA
       Review

Dear Mayor Link and Members of the City Council:

I am writing on behalf of Visalia resident Kevin Long, the Center for Environmental Health, and Teamsters Joint Council 7 and its members concerning Agenda Item 10h on this evening's Visalia City Council agenda concerning Final Parcel Map Approval of Map 2009-03, APN-077-120-016 ("Project").  Teamster families number over 700 in Visalia and therefore have a high stake in determining if VWR will be a good fit into our community. Concerns have also been raised about VWR's history chemical spills, its handling of hazardous materials and the negative health and safety effects having up to almost 10,000 truck trips a day through the Visalia community. Community members also question if taxes would go up to make up for the improvements and tax abatements promised by Visalia officials to attract VWR.

The agenda item and other announcements by City staff state that the proposed action is to allow the construction in January 2011 of a 500,000 square foot distribution facility for VWR International.  We believe that this facility may have significant adverse environmental impacts on the surrounding community and that an Environmental Impact Report ("EIR") should therefore be prepared prior to project approval pursuant to the California Environmental Quality Act ("CEQA"), Pub. Res. Code 21000, et seq.  We respectfully request that the City refrain from approving this Project until an EIR has been prepared and circulated for public review.

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

## INTRODUCTION

The City is proposing to approve a major distribution facility for VWR International.  For the area located at the northeast corner of Riggin Avenue and Plaza Drive.  At full build-out, the facility is proposed to be 500,000 square feet and in size.  It will distribute materials, including highly toxic chemicals to areas throughout the region.  The project is expected to generate almost 10,000 truck trips per day.  The Project location is currently farmland, and is located in close proximity to residences.  (See attachments)

The City Council agenda includes a section for "CEQA Review," but that section has been left blank.  We understand from telephone conversations today with City Planning Staff that the City may be relying on a negative declaration that was prepared for the tentative parcel map for the Project area in 2007.  However, we have not been able to obtain a copy of that negative declaration, or a subsequent addendum prepared in 2009.  Nevertheless, we believe that the 2007 negative declaration could not have adequately analyzed the proposed project due to new circumstances, including recently approved development in Visalia that will have cumulative impacts with the proposed VWR Project (see, Visalia Southeast Area Plan, Draft Environmental Impact Report, August 2010, State Clearinghouse No.2009031017), the recognition of new pollutants requiring review under CEQA that were not analyzed in 2007, such as greenhouse gases and particulate matter under 2.5 micros in diameter (PM-2.5), and unusual circumstances such as the fact that the Project will handle highly toxic chemicals.

For these reasons, we respectfully request that the City should require preparation of an EIR for the VWR Project prior to any approvals related to the Project.  At the very least, we request that the City should continue this matter to allow the public an opportunity to review the Negative Declaration that the City purports to be relying upon, but which has not been provided to the public and which is not readily available on the City's website or other publicly accessible locations.

## THE PROJECT IS NOT EXEMPT FROM CEQA

### LEGAL STANDARD

The California Environmental Quality Act, Pub. Res. Code § 21000 et seq., applies to agency projects that may have an adverse environmental impact.  (*Friends of Mammoth v. Board of Supervisors*, 8 Cal.3d 247, 259 (1972); *Friends of B Street v. City of Hayward*, 106 Cal.App.3d 988, 1003 (1980) (project that included removal of trees caused significant effect on environment).)  CEQA's procedural and substantive requirements are "interpreted . . . to afford the fullest possible protection to the environment within its reasonable scope of the statutory language." (*Friends of Mammoth*, 8 Cal.3d at 259.)  CEQA has two broad purposes: 1) avoiding, reducing or preventing environmental damage by requiring alternatives and mitigation measures (14

2

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

Cal. Code Regs. § 15002(a)(2)-(3) (hereinafter "Guidelines"); and 2) providing information to decisionmakers and the public concerning the environmental effects of the proposed project (14 Cal. Code Regs. § 15002(a)(1)).

CEQA applies to discretionary projects and approvals. (§ 21080, subds. (a), (b)(1); Guideline § 15268, subd. (a); *Health First v. March Joint Powers Authority* (2009) 174 Cal.App.4th 1135, 1142-1143 [96 Cal. Rptr. 3d 290].) "The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an EIR, or its functional equivalent, environmental review would be a meaningless exercise." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105.)

CEQA and its Guidelines provide a three-tier review structure. *(Salmon Protection Network v. County of Marin* (2040) 125 Cal.App.4th at 1105.) The first tier determines if the project is exempt, i.e., the project falls within an exempt category or is seen with certainty not to have a significant effect. *( Id.)* CEQA exempt activities are either expressly identified by statute (i.e., statutory exemptions, Pub. Res. Code § 21080.01 et seq.; 14 Cal. Code Regs. §§ 15261-15285) or those that fall into one of more than two-dozen classes deemed categorically exempt by the Secretary of Resources (i.e., categorical exemptions, Pub. Res. Code §§ 21080(b)(10); 14 Cal. Code Regs. §§ 15300). Such exemptions, however, are narrowly construed in light of statutory authority that limits exemptions to projects determined not to have a significant environmental impact. (*East Peninsula Ed. Council., Inc. v. Palos Verdes Peninsula Unified* (1989) 210 Cal.App.3d 155, 171 (project not exempt).) Thus, exemptions cannot be unreasonably expanded beyond their terms. (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1148.)

The CEQA Guidelines describe "discretionary" projects as those requiring "the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations." (Guidelines, § 15357.)

Like the Guidelines, case law describes a decision as discretionary when it involves relatively personal decisions addressed to the sound judgment and enlightened choice of the administrator. (*People v. Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 193*; see also, e.g., Citizens for Non-Toxic Pest Control v. Department of Food & Agriculture* (1986) 187 Cal.App.3d 1575, 1583 [decision discretionary where agency determined whether pest could be eradicated "and what method would be most effective in doing so"].) Further, an approval is discretionary when the agency has the authority to impose significant conditions. (*Friends of Westwood v. City of LA* (1987) 191 Cal.App.3d 259, 269 [building permit approval discretionary where "the city retains discretion require substantial changes in building design"]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo*

3

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

(1985) 172 Cal.App.3d 151, 175 [decision discretionary where agency could "condition the right to an encroachment permit upon 'the location and the manner' of the encroachment"].) In one case, *San Diego Trust v. Friends of Gill* (1981) 121 Cal.App.3d 203, 214, issuance of a demolition permit was held discretionary in light of the city's ability to delay approval of the permit in order to seek alternatives.

The Guidelines treat projects of a mixed nature as discretionary. "Where a project involves an approval that contains elements of both a ministerial action and a discretionary action, the project will be deemed to be discretionary and will be subject to the requirements of CEQA." (Guidelines, § 15268, subd. (d); *Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1139, *Friends of Westwood*, 191 Cal.App.3d at pp. 270-271; *Friends of Gill*, 121 Cal.App.3d at 211.) Furthermore, "where there are doubts whether a project is ministerial or discretionary, they should be resolved in favor of the latter characterization." (*Citizens for Non-Toxic Pest Control*, 187 Cal.App.3d at 1583.)

In applying these principles, the pertinent judicial decisions have developed a "functional" test for distinguishing ministerial from discretionary decisions. (*Friends of Westwood*, 191 Cal.App.3d at p. 272.) That test examines whether the agency has the power to shape the project in ways that are responsive to environmental concerns. (Id. at p. 267; *Mountain Lion Foundation v. Fish & Game Com.*, 16 Cal.4th at p. 117.) Under this functional test, a project qualifies as ministerial "when a private party can legally compel approval without any changes in the design of its project which might alleviate adverse environmental consequences." (*Friends of Westwood*, at 267; accord, *Miller*, 13 Cal.App.4th at 1141-1142.) "Conversely, where the agency possesses enough authority (that is, discretion) to deny or modify the proposed project on the basis of environment consequences the EIR might conceivably uncover, the permit process is 'discretionary' within the meaning of CEQA." (*Friends of Westwood*, at 272.)

If the project is discretionary, "the agency may not grant the permit without first determining in writing whether the proposal has a significant environmental impact." (*Department of Housing & Community Dev., 45 Cal.App.3d at 192*.) "Mandamus lies to set aside a permit issued without that determination." (*Id.*)  "If legitimate questions can be raised about whether the project might have a significant impact and there is any dispute about the possibility of such an impact, the agency cannot find with certainty that a project is exempt."  (*Davidon Homes v. City of San Jose* (1987) 54 Cal.App.4th 106, 117(citations omitted). )

## ANALYSIS

Here, the City is exercising discretion in approving the final parcel map for 2009-03.  The action will subdivide a 151 acre, heavy industrial zoned parcel into seven parcels.  Subdivisions are specifically listed in CEQA as discretionary actions subject to CEQA review.  (Pub.Res.Code 21080(a))  In addition, the City is taking other discretionary actions, such as dedicating a right of way for Riggin Avenue necessary for

4

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

the construction of Riggin Avenue improvements associated with the VWR distribution facility (between Plaza Drive and Kelsey Street). In addition, the parcel map will be granting an irrevocable offer of dedication for the future extension of Kelsey Street, north of Riggin Avenue.

The Visalia City Council held a special meeting on December 10, 2010 to discuss the Project, at which only one issue was discussed:

"Authorize the City Manager to approve and execute both the Improvement and the Reimbursement Agreements with VWR International, LLC for the arterial and collector street improvements to Riggin Avenue (between Plaza Drive and Kelsey Street) and to Kelsey Street (extending approximately 325 feet south of Riggin Avenue). These improvements will be constructed along with VWR's new distribution facility which is located at the southwest corner of Riggin Avenue and Kelsey Street. The total reimbursement from the Traffic Impact Fee Program Fund shall not exceed $1.5 million."

These are all discretionary actions that trigger CEQA review.

## AN EIR IS REQUIRED

### LEGAL STANDARD

CEQA contains a strong presumption in favor of requiring a lead agency to prepare an EIR. This presumption is reflected in the fair argument standard. Under that standard, a lead agency must prepare an EIR whenever substantial evidence in the whole record before the agency supports a fair argument that a project may have a significant effect on the environment. (Pub. Res. Code § 21082.2; *Laurel Heights Improvement Ass'n v. Regents of the University of California* (1993) ("*Laurel Heights II*") 6 Cal. 4th 1112, 1123; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75, 82; *Quail Botanical Gardens v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602.)

Under both CEQA and its Guidelines, if a project may cause a significant effect on the environment, the lead agency must prepare an EIR. (Pub. Res. Code §§ 21100, 21151; CEQA Guidelines §§ 15064(a)(1), (f)(1).) "Significant effect upon the environment" is defined as "a substantial or potentially substantial adverse change in the environment."[1] (Pub. Res. Code § 21068; CEQA Guidelines § 15382.) A project "may" have a significant effect on the environment if there is a "reasonable probability"

---

[1] Under the Guidelines, "significant effect on the environment" means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project, including land, air, water, minerals, flora, fauna, ambient noise and objects of historic or aesthetic significance. . ." (CEQA Guidelines § 15382.)

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

that it will result in a significant impact.  *No Oil, Inc., supra,* 13 Cal.3d at 83, fn 16; *Sundstrom v. City of Mendocino* (1988) 202 Cal.App.3d 296, 309.)  If any aspect of the project could result in a significant impact on the environment, an EIR must be prepared even if the overall effect of that project is beneficial.  (CEQA Guidelines § 15063(b)(1).)

A lead agency may elect not to prepare an EIR only when it finds there is no substantial evidence in the initial study, or elsewhere in the record, indicating the project may have a significant effect on the environment.  This standard sets a low threshold for requiring preparation of an EIR.  (*Citizens Action To Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748, 754; *Sundstrom, supra,* 202 Cal.App.3d at 310.)  If substantial evidence supports a "fair argument" that a project may have a significant environmental effect, the lead agency must prepare an EIR even if it also possesses other substantial evidence that indicates the project will have no significant effects. (CEQA Guidelines 15064(f)(1); *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1002.)  Substantial evidence includes facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.  (Pub. Res. Code § 21082.2(c).)  Under the Guidelines, substantial evidence means

enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.  Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. . . (CEQA Guidelines § 15384(a).)

Substantial evidence supporting a fair argument that a project may have significant environmental impacts can be provided by technical experts or members of the public. (CEQA Guidelines § 15063(a)(3); *Uhler v. City of Encinitas* (1991) 227 Cal.App.3d 795, 805; *Gabric v. City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 199.)

Under both CEQA and the Guidelines, an EIR must be prepared when certain types of environmental impacts could result from a project.  (Pub. Res. Code § 21083(a); CEQA Guidelines § 15065.)  In effect, a finding by the lead agency that such conditions exist makes the project's environmental effects "significant" as a matter of law.  Under the Guidelines, an agency *must* find that a project may have a significant environmental effect, and thus prepare and EIR, if, *inter alia*, the possible environmental effects of the project are cumulatively considerable.[2]  (Pub. Res. Code § 21083(b)(2); CEQA Guidelines § 15065(c).)

---

[2]     "'Cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects as defined in Section 15130."  (CEQA Guidelines § 15065(c).)

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

A. **THERE IS A FAIR ARGUMENT THAT THE VWR PROJECT MAY HAVE SIGNIFICANT ENVIRONMENTAL IMPACTS, REQUIRING AN EIR.**

Here, substantial evidence supports a fair argument that the Project will have significant environmental impacts on air quality and public health, hazardous materials, and other resources.

Toxic chemical expert Matt Hagemann has submitted expert analysis concluding that the VWR Project will have significant adverse air quality impacts related to greenhouse gas, nitrogen oxides and other chemicals.  He also concludes that the Project may have significant impacts related to the storage, handling, and shipment of highly toxic chemicals.   (See, Attachment)

Professional Traffic Engineer Tom Brohard, PE, concludes that based on Istitute for Traffic Engineers calculations, that the VWR Project may generate almost 10,000 truck trips per day, creating a potentially significant adverse traffic impact.  (See, Attachment)

For these reasons, the City should prepare an EIR for the Project.

B. **THE CITY FAILED TO PROVIDE THE 2007 NEGATIVE DECLARATION TO THE PUBLIC FOR REVIEW.**

The City Council packet for tonight's meeting has a section for "CEQA Review" that is entirely blank.  When I called the listed contact person for the agenda item today, he stated that he did not know whether any CEQA review had been conducted for the item, but forwarded me to planning staff.  Planning Staff informed me that the City was likely relying on a Negative Declaration prepared for the area in 2007 ("2007 Neg. Dec.").  When I requested a copy of the 2007 Neg. Dec., the staff person said that the document was in storage and not available to the public on line or in any other format.  I requested the document nonetheless.

If the City intends to rely on a prior CEQA document, it must make that document available to the public.  The City Council agenda item leads the public to believe that there is no CEQA document at all.

The California Supreme Court recently held:

"As we recently reaffirmed in the analogous case of an EIR: "The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. '[I]nformation "scattered here and there in EIR appendices," or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis." ' " *(EPIC v. CDF* (2008) 44 Cal.

7

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

4th 459, 494; quoting, *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 442.)

By failing to provide the 2007 Neg Dec. to the public for review, the public has no way of determining whether the prior CEQA analysis adequately analyzed the proposed project.

**C. THE CITY IMPROPERLY RELIES UPON A NEGATIVE DECLARATION RATHER THAN AN EIR BECAUSE THE PROPOSED PROJECT IS DIFFERENT FROM THE PROJECT REVIEWED IN THE 2007 NEG DEC.**

In this case, the City relies allegedly relies on a prior negative declaration prepared for the Project area in 2007 ("2007 Neg. Dec.")  The fundamental problem with the City's reliance on this prior document is that the proposed Project is different from the project analyzed in the prior 2007 Neg Dec.

A prior Neg. Dec. may only be used for a later project that is "***essentially the same project***" as was analyzed in the prior document, and minor changes are proposed.  *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1320; *American Canyon Community v. American Canyon*, 145 Cal.App.4th 1062.  The proposed VWR Project is not "essentially the same project" as was analyzed in the 2007 Neg. Dec. Although we have not analyzed the 2007 Neg. Dec. it is hard to believe that it analyzed a facility of this size, this magnitude of truck traffic, and posing risks from highly toxic chemicals that will be transported through and near a residential community.

Second, CEQA Guidelines section 15162 provides that when a prior EIR or negative declaration has been prepared for a project, a later EIR is required if one or more of the following conditions are met:

(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or Negative Declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time

8

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

the previous EIR was certified as complete or the Negative Declaration was
adopted, shows any of the following:

(A)  The project will have one or more significant effects not discussed in the
     previous EIR or negative declaration;

(B)  Significant effects previously examined will be substantially more severe
     than shown in the previous EIR;

(C)  Mitigation measures or alternatives previously found not to be feasible would
     in fact be feasible, and would substantially reduce one or more significant
     effects of the project, but the project proponents decline to adopt the
     mitigation measure or alternative; or

(D)  Mitigation measures or alternatives which are considerably different from
     those analyzed in the previous EIR would substantially reduce one or more
     significant effects on the environment, but the project proponents decline to
     adopt the mitigation measure or alternative.

Almost all of the conditions in 15162 are met in the instant case.  Any one of
them is sufficient to require preparation of an EIR rather than reliance on the 2007 Neg.
Dec.

**1.     The City may not rely on the 2007 Neg. Dec. because substantial
         changes are proposed in the project which will require major
         revisions of the previous negative declaration due to the involvement
         of new significant environmental effects or a substantial increase in
         the severity of previously identified significant effects.**

Section 15162 does not apply to the Project because "substantial changes are
proposed in the Project which will require major revisions of the previous negative
declaration due to the involvement of new significant environmental effects or a
substantial increase in the severity of previously identified significant effects."
Greenhouse gas impacts are now known to be far more severe than known in 2007.
Also, the VWR facility will be a major source of diesel particulate matter, a known
human carcinogen.  Diesel Particulate Matter is now known to be far more toxic than
was believed in 2007. Therefore the 2007 Neg. Dec. could not have adequately
analyzed these impacts.

**2.     The City may not rely on the 2007 Neg. Dec. because new
         information of substantial importance, which was not known and
         could not have been known with the exercise of reasonable diligence
         at the time the previous Negative Declaration was adopted, shows
         that the Project may have significant adverse impacts.**

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

City may not rely on a prior CEQA document when there is new information of substantial importance that was not known at the time of the prior document showing that significant effects of the Project will be substantially more severe than shown in the prior CEQA document.  (CEQA Guidelines § 15162(a)(3))  (*See*, *Sierra Club v. Gilroy* (1990) 222 Cal.App.3d 30, 34 (presence of rare species on project site identified after prior EIR certified necessitated preparation of new EIR).)

For example, when new scientific data indicates that toxic chemicals will pose greater health risks than believed at the time the prior EIR was certified, a new EIR is required to analyze the subsequent project and its health impacts.  In *Security Environmental Systems v. South Coast Air Quality Management District* ((1991) (*SES v. SCAQMD*) 229 Cal.App.3d 110, 124), an EIR was prepared for an incinerator.  After the EIR was prepared, new scientific information was published showing that dioxin emissions from the incinerator would be far more hazardous than previously believed.  The court held that a new EIR was required for re-permitting of the same incinerator to analyze the new toxicity data, and to evaluate whether any additional mitigation measures were appropriate in light of the new data.

In this case, the VWR facility will handle highly toxic chemicals.  Former Director of US EPA's Superfund program for the Western Region, Matt Hagemann, PG, has submitted comments concluding that the VWR facility will handle highly toxic chemicals that pose a risk of spills or releases.  In fact, VWR has experienced illegal spills and releases at its other existing facilities.   Mr. Hagemann writes:

**AIR EMISSIONS**

A warehouse project that is 500,000 square feet in size has the potential to generate emissions of Oxides of Nitrogen (NOx) at levels above the 10 tons/year threshold that has been established by the San Joaquin Valley Air Pollution Control District (SJVAPCD).[3]   According to the Bay Area Air Quality Management District, the construction of a light industrial facility greater than than 259,000 square feet will generate significant NOx emissions.[4]  (We note that the proposed facility is to be constructed in the SJVAPCD jurisdiction; however, the SJVAPCD has not published guidance on project size and thresholds of significance.)  At 259,000 square feet, the proposed project would exceed a threshold for project size; therefore, construction may result in a significant cumulative impact to air quality from NOx emissions.

---

[3] http://www.valleyair.org/transportation/ceqaanalysislevels.htm
[4] http://www.baaqmd.gov/~/media/Files/Planning%20and%20Research/CEQA/BAAQMD%20CEQA%20Guidelines_June%202010.ashx, Table 3-1.

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

Additionally, the project may result in significant greenhouse gas (GHG) emissions. The SJVAPCD has not established a strict threshold but requires an analysis of whether the project would reduce GHG by 29% over business as currently practiced. The location of the VWR distribution center in Visalia would likely increase GHG emissions over current practices. VWR warehouses are currently distributed across a multi-state region, placing each warehouse near its customers. The new warehouse would be centralized, requiring each truck trip to travel extremely long distances. This would appear to increase GHGs over business as usual.

An Environmental Impact Report (EIR) should be prepared to assess potentially significant impacts to air quality from NOx and GHG emissions. The EIR should include an analysis of the emissions, including any necessary emissions modeling, and identify any mitigation that would be necessary to address exceedences of the thresholds for NOx, GHGs and any other emissions, including Reactive Organic Gases (ROG), and particulate matter (PM-10), .

**POTENTIAL FOR RELEASES OF HAZARDOUS MATERIALS**

The company press release states that VWR supplies laboratory products to pharmaceutical and biotech companies, as well as industrial, educational and governmental organizations.[5] These products, which include hazardous materials, may be subject to release during storage, handling and transport to and from the facility.

Chemicals known to be handled and transported by VWR include laboratory chemicals and production chemicals, some of which are known to be highly toxic and carcinogenic.[6] For example, we note that benzene is available from VWR.[7] Benzene is a known human carcinogen[8] and a spill of benzene may put workers at risk and may pose a contamination threat to the environment.

We have noted that other VWR distribution facilities have been the subject of federal and state environmental oversight. For example, the VWR facility in

---

[5]

http://www.ci.visalia.ca.us/depts/housing_n_economic_development/economic_development/industrial_park.asp
[6] https://www.vwrsp.com/programs/chemicals/page.cgi?tmpl=chemicals
[7] https://www.vwrsp.com/psearch/ControllerServlet.do?spage=noresults&CurSel=Ntt&Nty=1&Ntx=mode%2Bmatchpartialmax&Ntk=ChemicalNameSynonym|All|MSDS&tmpl=msds&N=0&y=10&Ntt=benzene&x=12
[8] http://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=38&tid=14

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

Portland, used for bulk chemical packaging, storage, and distribution, is the
subject of an extensive cleanup effort to address chemical releases.[9]

An EIR should be prepared to describe the activities that will be conducted at the
proposed facility, including chemical storage and handling procedures, the types
of chemicals to be handled, and mitigation that is necessary to safeguard public
health and the environment from releases of hazardous materials.

In addition, traffic engineer, Tom Brohard, PE, concludes that the Project will
generate up to 10,000 truck trips per day, creating potentially significant traffic impacts.
He states:

Based on the information regarding the Proposed Project in Agenda Item 10h
and available on-line from the City's website, there is at least a "fair argument"
that the Proposed Project will have significant traffic impacts as follows:

1) Trip Generation for the Distribution Center Project – According to Agenda
Item 10h and other materials on the City's website, the VWR International
Distribution Center Project will be "approximately 500,000 square feet in size,
will enhance VWR's distribution network, and continue to provide a productive
supply chain solution for the Western United States."

The Institute of Transportation Engineers, ITE, publishes daily and peak hour
trip generation rates for a variety of different land uses. These rates are used
to forecast vehicle trips for development projects. As discussed below, the
Proposed Project is considered as a Truck Terminal.

In their most recent update of Trip Generation, 8th Edition published in 2008,
ITE Land Use 030 describes Truck Terminal as follows: "Truck terminals are
facilities where goods are transferred between trucks, between trucks and
railroads, or between trucks and ports."

Based on ITE Trip Generation, 8th Edition, daily and peak hour trips for the
use of this building as a Truck Terminal are forecast as follows:

➢ Weekday daily trips – 9.85 trips per thousand square feet times 500
thousand square feet equates to 4,925 daily trips.
➢ AM Peak Hour Trips – 0.90 trips per thousand square feet times 500
thousand square feet equates to 450 AM peak hour trips.
➢ PM Peak Hour Trips – 0.82 trips per thousand square feet times 500
thousand square feet equates to 410 PM peak hour trips.

---

[9]http://yosemite.epa.gov/R10/OWCM.NSF/72b5220edcd9cf5b88256500005decf3/2056
82cc5d8f6d3388256a0700077828/$FILE/Final%20VanWaters.pdf

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

2) <u>Distribution Center Truck Trips Have More Impacts Than Passenger Vehicles</u> – A number of large truck trips will be included within the trip forecasts provided above. Typically, large trucks are equivalent to three passenger vehicles in terms of their potentially significant traffic impacts on street segments and at intersections. If only 25 percent of the vehicles arriving at and departing from the distribution center involve large trucks, then the number of passenger car equivalent trips will be double the amount of trips forecast above. Therefore, the proposed VWR International Distribution Center Project could be expected to generate the equivalent of 9,850 daily trips including 900 trips in the AM peak hour and 820 trips in the PM peak hour.

3) <u>Peak Hour Trips Require a Traffic Impact Analysis</u> - The peak hour volumes forecast above for the VWR International Distribution Center Project are significant. The forecast AM and PM peak hour trip volumes are many times higher than the minimum threshold of 100 peak hour trips recommended by ITE in <u>"Transportation Impact Analyses for Site Development"</u> published in 2010. A traffic impact study must be conducted as part of an environmental analysis of the project to identify, evaluate, and mitigate potentially significant traffic impacts of the VWR International Distribution Center Project.

Further study must be undertaken to properly identify the traffic impacts of the proposed VWR International Distribution Center Project in the City of Visalia. As discussed in this letter, there is at least a "fair argument" that the Proposed Project will have adverse environmental impacts that have not been properly disclosed, analyzed, and mitigated. The Project will clearly have additional near-term and cumulative significant traffic impacts that should be studied through an EIR process. An EIR should be prepared and circulated for public comment to propose feasible and effective mitigation measures. If you have questions regarding these comments, please call me at your convenience.

None of these impacts were adequately analyzed in the 2007 Neg. Dec.

**D. AN EIR IS REQUIRED BECAUSE THE PROJECT WILL HAVE SIGNIFICANT ENVIRONMENTAL IMPACTS NOT ANALYZED OR PROPERLY MITIGATED IN THE 2007 NEG. DEC.**

A lead agency may only rely on a prior CEQA document if it actually considered the Project now under consideration and actually considered the Project's impacts. Any new significant impacts that were not analyzed in the prior CEQA document must be

13

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

considered and mitigated in a new EIR.[10]  For example, in *Eller Media v. Community Redev. A*gency,[11] a new EIR was required for a single billboard even though an EIR had been prepared for the billboard general plan for the area because the general plan EIR did not consider the impacts of the proposed billboard such as glare and view obstruction.  In *Mani Brothers v. Los Angeles* (2007) 153 Cal. App. 4th 1385, a building was converted from commercial to residential use in downtown Los Angeles.  The court held that a subsequent EIR was required to analyze the fact that the residential use would require more police services than the commercial use.  Due to the following impacts, there is more than a fair argument that the VWR Project may have significant adverse environmental impacts that are not mitigated to a level of insignificance.

### 1.     The 2007 NEG. DEC. Does not Adequately Analyze the Project's Impacts Related to Toxic Chemicals.

As discussed in detail in the expert comments of Matthew Hagemann, M.S., the former West Coast Regional director of the United States Environmental Protection Agency's ("USEPA") contaminated soil program, the Project may have significant impacts related to toxic chemicals that will be distributed from the site.  This impact was likely not analyzed in the 2007 Neg. Dec.

### 2.     The Project will have Significant Air Traffic Impacts Not Analyzed in the 2007 Neg Dec.

Traffic Engineer Tom Brohard, P.E., calculates that the VWR Project will generate up to approximately 5000 truck trips per year, using standard calculations of the Institute for Traffic Engineers.  He concludes that this may create significant adverse traffic impacts that should be analyzed in an EIR.

### 3.     The Project will have Significant Air Quality Impacts Not Analyzed in the 2007 Neg. Dec.

Environmental Consultant, Matt Hagemann calculates that the VWR Project will have highly significant air quality impacts.  He states:

A warehouse project that is 500,000 square feet in size has the potential to generate emissions of Oxides of Nitrogen (NOx) at levels above the 10 tons/year threshold that has been established by the San Joaquin Valley Air Pollution Control District (SJVAPCD).[12]   According to the Bay Area Air Quality

---

[10]In *Natural Resources Defense Council v. Los Angeles* (2002) 103 Cal.App.4th 268, a new EIR was required despite the fact that a prior EIR mentioned the project now under consideration because the prior EIR did not consider all of the current project's impacts.
[11] (2003) 108 Cal.App.4th 25.
[12] http://www.valleyair.org/transportation/cegaanalysislevels.htm

14

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

Management District, the construction of a light industrial facility greater than than 259,000 square feet will generate significant NOx emissions.[13]  (We note that the proposed facility is to be constructed in the SJVAPCD jurisdiction; however, the SJVAPCD has not published guidance on project size and thresholds of significance.)  At 259,000 square feet, the proposed project would exceed a threshold for project size; therefore, construction may result in a significant cumulative impact to air quality from NOx emissions.

Additionally, the project may result in significant greenhouse gas (GHG) emissions.  The SJVAPCD has not established a strict threshold but requires an analysis of whether the project would reduce GHG by 29% over business as currently practiced.   The location of the VWR distribution center in Visalia would likely increase GHG emissions over current practices.  VWR warehouses are currently distributed across a multi-state region, placing each warehouse near its customers.  The new warehouse would be centralized, requiring each truck trip to travel extremely long distances. This would appear to increase GHGs over business as usual.

An Environmental Impact Report (EIR) should be prepared to assess potentially significant impacts to air quality from NOx and GHG emissions.  The EIR should include an analysis of the emissions, including any necessary emissions modeling, and identify any mitigation that would be necessary to address exceedences of the thresholds for NOx, GHGs and any other emissions, including Reactive Organic Gases (ROG), and particulate matter (PM-10),  .

On information and belief, we contend that the 2007 Neg. Dec. did not adequately analyze these air quality impacts.  Moreover, in 2007, greenhouse gas emissions were generally not analyzed under CEQA.

### 4.      The Project may have Significant Urban Blight Impacts Not Analyzed in the 2007 Neg. Dec.

The 2007 Neg. Dec. is silent on the potentially significant impacts related to urban decay or urban blight.  The approval of the VWR Project could result in significant impacts regarding the creation of urban decay or deterioration.  The VWR Project will result in the closure of a major VWR facility in Brisbane and facilities in other areas. The Brisbane facility alone accounts for almost 25% of the tax base of the City of Brisbane.  Clearly, closing this facility may result in urban decay impacts in Brisbane.

In *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) (124 Cal.App.4th 1184) (*Bakersfield Citizens*), the court expressly held that urban decay

---

[13]http://www.baaqmd.gov/~/media/Files/Planning%20and%20Research/CEQA/BAAQMD%20CEQA%20Guidelines_June%202010.ashx, Table 3-1.

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

must be analyzed under CEQA.  The court pointed out that CEQA requires the project
proponent to discuss the project's economic and social impacts where "[a]n EIR may
trace a chain of cause and effect from a proposed decision on a project through
anticipated economic or social changes resulting from the project to physical changes
caused in turn by the economic and social changes."  (CEQA Guidelines §§ 15131(a)
and 15064(f).)

*Bakersfield Citizens* concerned a proposal to construct two WalMart Stores within
3 miles of each other.  Evidence was submitted that the stores could cause urban decay
by forcing local downtown stores to close.  The court held that this impact must be
analyzed in the EIR.  Most of the cases cited by the *Bakersfield Citizens* court
concerned other retail developments with alleged urban decay impacts.  (See, *Citizens
Assoc. for Sensible Dev. of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151,
170 171 (shopping mall threatens downtown businesses and urban decay); *Citizens for
Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 445-446 (shopping
mall may cause "business closures" in downtown area); *Friends of Davis v. City of
Davis* (2000) 83 Cal.App.4th 1004, 1019 (insufficient evidence that Borders bookstore
may threaten local bookstores); see also, *Anderson First Coalition v. City of Anderson*
(2005) 30 Cal.Rptr.3d 738 (shopping center); *American Canyon Community United for
Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1074
(urban decay impacts of supercenter must be analyzed); *Gilroy Citizens for Responsible
Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 920 (EIR adequately analyzed
urban decay impacts of supercenter).)

The *Bakersfield Citizens* court also cited an industrial and a prison project that
were alleged to have blighting impacts.  The court noted that in *Christward Ministry v.
Superior Court* (1986) (184 Cal. App. 3d 180, 197) (*Christward Ministry*) an agency was
required to analyze in the EIR the potential that odors, noise, and traffic from a garbage
dump could adversely impact a nearby religious retreat center.  The *Bakersfield Citizens*
court noted that this was a type of "urban blight" impact.  The court also noted that in
*City of Pasadena v. State of California* (1993) (14 Cal.App.4th 810) (City of Pasadena)
the "blighting" impact of a parole office on a nearby residential neighborhood was
recognized (however the court held that insufficient evidence had been presented to
establish that the parole office may have an urban blight impact).

Just as the WalMart stores in the Bakersfield case could have resulted in
oversupply of retail capacity, thereby causing blight, the proposed VWR Project may
contribute to urban decay in Brisbane and other areas.  This impact must be analyzed in
an EIR, and mitigation measures proposed.

**5.    The Project may have Significant Cumulative Impacts Not
Analyzed in the 2007 Neg. Dec.**

16

Comments on Visalia City Council Agenda Item 10h
APN-077-120-016
December 20, 2010

     The City has recently approved a number of major development projects in Visalia, and others are in the proposal stage.  The VWR Project will have cumulative impacts together with these projects in the areas of air pollution, traffic, greenhouse gas, and other factors.  These impacts were not adequately analyzed in the 2007 Neg. Dec. because the cumulative projects had not yet been proposed or approved by the City.  For example, the Visalia Southeast Area Plan would generate massive amounts of unmitigated substantial traffic and air pollution, which would have a cumulative impact with the VWR Project.  (See, Draft Environmental Impact Report, August 2010 (State Clearinghouse No.2009031017))

     Recognizing that several projects may together have a considerable impact, CEQA requires an agency to consider the "cumulative impacts" of a project along with other projects in the area.  (Pub. Resources Code §21083(b); CEQA Guidelines §15355(b))  If a project may have cumulative impacts, the agency must prepare an EIR, since "a project may have a significant effect on the environment if '[t]he possible effects of a project are individually limited but cumulatively considerable.'"  (*CBE v. Cal. Resources Agency*, 103 Cal.App.4th at 98, 114; *Kings County Farm Bur. v. City of Hanford* (1990) 221 Cal.App.3d 692, 721)  It is vital that an agency assess "'the environmental damage [that] often occurs incrementally from a variety of small sources . . .'" (*Bakersfield Citizens For Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1214 ("Bakersfield Citizens"))

**<u>Conclusion</u>**

     For the foregoing reasons, we respectfully request that the City prepare an Environmental Impact Report ("EIR") to analyze the potential impacts of the proposed VWR Project and to propose all feasible mitigation measures.  The VWR Project will generate significant air pollution, traffic and hazardous chemical impacts in the area.  These impacts have not been analyzed in any prior CEQA document.  Until an adequate CEQA document is prepared for the Project, the City should not approve any entitlements in furtherance of the Project.

                 Sincerely,

                 Richard T. Drury

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011


## **SERVICE LIST**


(By Certified Mail, return Receipt Requested)


Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Jared Blumenfeld, Regional Administrator
U.S. Environmental Protection Agency
Region 9
75 Hawthome Street
San Francisco, CA 94105

Mary D. Nichols, Chair of the Board
California Air Resources Board
1001 "I" Street
P.O. Box 2815
Sacramento, CA 95812

James N. Goldstene, Executive Officer
California Air Resources Board
1001 "I" Street
P.O. Box 2815
Sacramento, CA 95812

Governor Jerry Brown
State Capitol, Suite 1173
Sacramento, CA 95814

Eric Holder
US Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Mr. Ballbach, Mr. Cowan
Notice of Intent to File Suit Under the Clean Air Act
September 1, 2011


Attorney General of the State of California
Attn:  Lisa Trankley, Deputy Attorney General
Office of the Attorney General
1300 "I" Street
Sacramento, CA 95814

Counsel for VWR International, LLC:
Adam Thurston
Drinker, Biddle, Reath, LLP
1800 Century Park East, Suite 1400
Los Angeles, CA  90067