# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **COALITION FOR CLEAN AIR, a California nonprofit corporation; CENTER FOR ENVIRONMENTAL HEALTH, a California nonprofit Corporation; ASSOCIATION OF IRRITATED RESIDENTS, a California nonprofit organization; TEAMSTERS JOINT COUNCIL 7, an organized labor union; KEVIN LONG, an individual,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**VWR INTERNATIONAL, LLC, a Delaware corporation; and DOES 1-X, inclusive,**<br><br>**Defendants.** | **1:12-CV-01569-LJO-BAM**<br><br>**ORDER RE MOTION TO DISMISS (DOC. 17); CROSS MOTION FOR SUMMARY JUDGMENT (DOC. 23); AND STAYING CASE.** |

## I. **INTRODUCTION**

This case arises under the citizen suit provision of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a). Plaintiffs, a coalition of environmental and labor interests, allege that Defendant VWR International, LLC, ("VWR"), a laboratory supply distributor, violated San Joaquin Valley Air Pollution Control District ("District") Rule 9510, implemented and approved as part of California's State Implementation Plan ("SIP") under the CAA, by failing to apply for an Indirect Source Review ("ISR") permit prior to obtaining approval to open and/or operate a trucking distribution facility in Visalia, California. Before the Court for decision is Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Doc. 17, and Plaintiffs' cross motion for partial summary adjudication, Doc. 23.

Defendant filed its motion to dismiss on November 11, 2012, setting the motion for hearing on December 10, 2012. Doc. 17. The parties then stipulated to move the hearing date to December 20, 2012. Doc. 22. Plaintiffs filed an opposition to the motion, along with a cross-motion for partial summary adjudication on the issue of liability under the CAA, a statement of undisputed facts, and a

1

request for judicial notice. Doc. 23. Defendant filed an opposition to the motion for partial summary adjudication as well as a response to the statement of undisputed fact. Doc. 31. Upon preliminary review of the parties' filings, the hearing was vacated to permit time for the Court to review thoroughly the voluminous materials. Doc. 30. Having reviewed those filings, the Court requested a supplemental joint status report on a parallel state court action. Doc. 36. The joint status report was submitted January 30, 2012. In light of the entire record, the Court is now prepared to rule on the motion to dismiss and cross motion for partial summary adjudication. The Court does not believe oral argument is necessary to aid resolution of this request, and hereby rules on the papers pursuant to Local Rule 230(g).

## II. BACKGROUND

**A.     The Project.**

VWR is a global laboratory supply and distribution company that supplies a wide range of laboratory supplies and chemicals to pharmaceutical companies, biotech companies, and other industrial, education, and governmental facilities throughout California. Compl., Doc. 1, at ¶ 35. On or around September 2010, VWR submitted an application to the City of Visalia, seeking permission to construct a new distribution and shipping facility (the "Project") at 8711 W. Riggin Avenue, in the City of Visalia, California, which lies within the San Joaquin Valley Air Basin. *Id.* at ¶¶ 33-34, 45. On September 22, 2010, the City of Visalia Site Plan Review Committee ("SPRC") reviewed the project, directed VWR to make approximately 50 modifications to the Project, and instructed VWR to return for further review once the changes had been made. *Id.* at ¶ 45. Among other things, the Committee warned VWR:

> If your project requires discretionary action … Please note that the project is subject to SJVAPCD Rule 9510. The applicant is encouraged to do early indirect source modeling consultation with the Air District.

.

On October 14, 2010, VWR submitted a letter to the City Engineer proposing to construct 126 parking spots for the Project, requesting relief from the City's requirement of 1 parking space per 1,000

square feet, which would have required 500 parking spaces. *Id*. at ¶ 46. On that same date, VWR resubmitted revised Project plans to the City. *Id*. On November 16, 2010, the City approved the VWR Project. *Id*. at ¶ 49. On December 10, 2010, the Visalia City Council voted to give VWR up to $1.5 million to pay for major street improvements necessary for the Project. *Id*. at ¶ 50. At no point during this process did VWR apply to the Air District for an ISR permit. *Id*. at ¶ 52. Project construction began in January 2011. *Id*. at ¶ 53. VWR commenced operations in September 2012. *Id*. at ¶ 55.

Prior to initiating construction, VWR received a written determination from the City that no discretionary approval would be required for the Project. Request for Judicial Notice ("RJN"), Doc. 17-2, at Ex. A.[1] VWR also received a written determination from the District that because the City determined no discretionary approval was required, Rule 9510 would not apply to the Project. RJN, Ex. B.

**B.**    **Clean Air Act & State Implementation Plans.**

In California, air quality is regulated under the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401, *et seq*., and the California Clean Air Act ("CCAA"), Cal. Health & Safety Code, §§ 39000, *et seq*. Under the CAA, regulatory authority is bifurcated between the federal Environmental Protection Agency ("EPA") and states. EPA identifies pollutants to regulate and establishes national ambient air quality standards ("NAAQS"). EPA sets NAAQS for "criteria" pollutants, including coarse particulate matter ("PM 10"), fine particulate matter ("PM2.5"), ozone, carbon monoxide, nitrogen dioxide, sulfur dioxide, and lead, and designates regions as in "attainment" or "nonattainment" of the standards. 42

---

[1] Defendant requests judicial notice of thirteen documents, all of which are court documents or public records susceptible to judicial notice for their content, not the truth of the matters asserted therein. *See U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc*., 971 F.2d 244, 248 (9th Cir. 1992) (federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue"); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1031 (E.D. Cal. 2009) (taking judicial notice of public records published by administrative bodies). While the court may take judicial notice of these types of documents, those documents are judicially noticeable "only for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean." *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004).

U.S.C. §§ 7407, 7409. In areas designated as nonattainment for a pollutant, states are empowered to develop and submit for EPA approval state implementation plans ("SIPs") to provide attainment, maintenance and enforcement of NAAQS within the state. SIPs must include rules and measures to demonstrate that NAAQS will be attained by dates set in the CAA. *See* 42 U.S.C. §§ 7409, 7410(a). EPA reviews and approves SIPs, and after its approval, a SIP is enforceable by EPA and the state.

The CAA authorizes, but does not require, states to regulate indirect sources of emissions and to include indirect source review programs in their attainment plans. § 7410(a)(5)(A)(ii). Section 7410(a)(5)(C) defines "indirect source" as "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution." An "indirect source review program" is "the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution" that would contribute to exceeding, or prevent maintenance of, NAAQS. § 7410(a)(5)(D). "Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose" of an indirect source review program. § 7410(a)(5)(C).

In California, regulatory authority under the CCAA is bifurcated between the California Air Resources Board ("CARB") and 35 local air districts, including the District. *See* Cal. Health & Safety Code, § 39002. The CCAA authorizes CARB to set state ambient air quality standards and tailpipe emissions standard for vehicles. *Id*. Local air districts have "primary responsibility" to control other sources, including stationary sources (factories and oil refineries) and mobile sources through indirect and areawide source programs and transportation control measures. *See* Cal. Health & Safety Code, §§ 39002, 40716, 40717. The CCAA directs local air districts to consider the "full spectrum of emissions sources" to develop attainment plans and to "focus particular attention on reducing emissions from transportation and areawide emission sources." Cal. Health & Safety Code, §§ 40910.

**C.     Rule 9510.**

District Rule 9510 "is designed to achieve reductions in air pollution attributable to development

projects." *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 2008

WL 4330449, *4 (E.D. Cal. Sept. 19, 2008) aff'd, 627 F.3d 730 (9th Cir. 2010). The Rule applies "to any

applicant that seeks to gain a final discretionary approval" for certain large development projects,

including any project that will include industrial space in excess of 100,000 square feet. Rule 9510 § 2.1.

> When Rule 9510 was adopted, the San Joaquin Valley was classified as nonattainment
> under federal and state standards for PM10, PM2.5 and ozone. PM10 and PM2.5 can be
> directly-emitted geologic material, including entrained road and other dust. PM10 and
> PM2.5 can [also] be formed when precursor emissions, such as oxides of Nitrogen
> ("NOx") and volatile organic compounds ("VOCs") are emitted as a gas and form PM10
> and PM2.5 through chemical processes. [N]ew residential and commercial development
> indirectly causes air pollution by attracting mobile sources and contributing increased
> energy use.
>
> [] Rule 9510 targets indirect sources of air pollution.... [by] set[ting] target reductions for
> emissions associated with construction ("construction emissions") and future operation of
> development projects ("operational emissions"). For construction, Rule 9510's target is to
> reduce PM10 emissions by 45 percent and NOx by 20 percent as compared to emissions
> generated using "average" construction equipment in California. For future operation,
> Rule 9510's target is to incorporate mitigation measures into project design to reduce
> emissions that would be otherwise indirectly caused by the project (e.g., increased traffic)
> over a 10-year period. The PM 10 target is to reduce unmitigated operational emissions
> by 50 percent. The NOx target is to reduce emissions by 33.3 percent.
>
> [U]nder Rule 9510, a computer model is used to calculate emissions attributable to
> "construction" and "operational" phases of a development project, and the project
> developer is responsible to mitigate a portion of those emissions. The District notes that
> under Rule 9510, mitigation may be achieved: (1) "on-site" by incorporating design
> features and other pollution mitigation measures into the project; (2) "off-site" by paying
> a mitigation fee which the District uses to "buy" requisite amount of emissions reductions
> through its emissions reduction incentive program ("ERIP"); or (3) by a combination of
> "on-site" and "off-site" measures.

*Id*. at *5.

**D.     Plaintiffs' State Lawsuit.**

On December 28, 2010, the Teamsters Joint Council 7 and one of its members, Kevin Long, both

Plaintiffs in this action, filed a complaint and petition for a writ of mandamus against the City, the

District, and VWR, alleging, among other things, that VWR and the Air District were in violation of Rule 9510. RJN, Ex. C.

Plaintiffs filed a first amended petition ("FAP") on February 1, 2011, adding the Coalition for Clean Air, the Center for Environmental Health, and the Association of Irritated Residents as plaintiffs, each of which is also a Plaintiff in this action. RJN, Ex. D. The FAP named as defendants the City of Visalia, along with its City Council and Site Plan Review Committee; Chris Young, the Community Development Director; and the District; as well as VWR and an affiliated company, Midstate Hayes 184 Distribution Center, LLC ("Midstate Hayes"), as real parties in interest. *Id*. The FAP alleged:

> (1) all defendants violated the California Environmental Quality Act ("CEQA") by classifying approval of the Project as a ministerial act exempt from CEQA;
>
> (2) all defendants failed to comply with provisions of the Visalia Municipal Code requiring a planned development permit for any development in the Planned Heavy Industrial Zone;
>
> (3) real parties in interest VWR and Midstate Hayes violated Rule 9510 by failing to apply for an ISR permit, and the District violated the Rule by refusing to enforce the permit requirement;
>
> 4) VWR and Midstate Hayes' violation of Rule 9510 constituted unfair business practice under California Business and Professions Code § 17200;
>
> (5) VWR's related violation of California's Hazardous Materials Response Plans and Inventory Act also constituted an unfair business practice under § 17200;
>
> (6) the City of Visalia defendants were illegally expending funds to support the Project;
>
> (7) the District violated CEQA by failing to conduct any review of the Project under that statute; and
>
> (8) VWR and Midstate Hayes would create a public and private nuisance.

6

*Id.*

VWR filed a demurrer to the FAP in February 2011, arguing:

(a) the CEQA claims are time barred;

(b) there is no private right action permitting challenges under either the Visalia Municipal Code or Rule 9510 and petitioners lacked the beneficial interest necessary to prosecute a mandamus action;

(c) the unfair business practices allegations fail because they do not allege an actual economic injury that is concrete and specific and seek inappropriate judicial intervention into the permit process administered by local agencies, requiring judicial abstention;

(d) the illegal expenditure of funds claim fails because petitioners allege the expenditure was a discretionary act and because the expenditure was expressly authorized by the Visalia Municipal Code;

(e) the nuisance claim is barred as a matter of law because defendants' commercial enterprise operates in a manner consistent with zoning restrictions and there is no allegation that they employed unnecessary and injurious methods of operation.

RJN, Ex. E at 2-3.

While the demurrer was still pending, the petitioners dismissed the fourth and fifth (§ 17200) claims, as well as the seventh (one of the CEQA claims) and eighth (nuisance) claims. Petitioners also entered into a stipulated judgment with the District that fully resolved their claim against the District for enforcement of Rule 9510. RJN, Ex. M. Under the terms of that agreement, the District denied liability, but consented to the entry of a judgment providing:

If the Court finds that any governmental entity was or is required to issue a discretionary approval with respect to the VWR Project, then the Air District shall require VWR to comply with [] Rule 9510 prior to the commencement of construction of the VWR Project, or within ten (10) days of the date of the ruling of the Court, whichever date is later.

7

*Id.* at 3. The Stipulated Judgment further provided that:

> Except for the obligations under this Stipulated Judgment, Petitioners, on behalf of themselves and in the public interest, hereby release and discharge the Air District from any and all claims asserted, or that could have been asserted, arising out of the facts alleged in the operative Petition and Complaint in this action.

*Id.* at 4. The Superior Court for the County of Tulare retained jurisdiction to enforce the terms of the stipulated judgment. *Id.*

The Tulare County Superior Court sustained the demur to the first cause of action, concluding that the CEQA cause of action was time-barred. RJN, Ex. F, at p. 3 of 5. It also sustained the demurrer to the second and third causes of action, concluding that a California Code of Civil Procedure § 1085 cause of action for a writ of mandate could not be maintained because petitioners had not established the existence of any right or duty that compelled the governmental defendants to act in a certain manner, nor had they demonstrated § 1085 could be used to compel a private party (namely, VWR) to obtain a permit from a governmental agency. *Id.* at p. 4-5 of 5.  Finally, the demurrer was sustained as to the sixth cause of action under California Code of Civil Procedure § 526a for unlawful expenditure, because the challenged funding decision was discretionary in nature. *Id.* at p. 5 of 5.

Petitioners appealed the ruling. RJN, Ex. G. On September 14, 201, the California Court of Appeal for the Fifth Appellate District reversed the judgment, finding:  (1) that a notice of exemption filed before the final approval of the proposed project was invalid and therefore did not trigger CEQA's 35-day statute of limitations; and that (2) leave to amend was warranted as to the illegal expenditure of government funds claim. Plaintiff's Request for Judicial Notice in Support of Request for Preliminary Injunction ("PIRJN"), Ex A at 2-3.[2] The California Court of Appeal (in the only part of the decision NOT certified for publication) also reversed in part the trial court's conclusion regarding standing to pursue a writ of mandate. The Court of Appeal agreed with the trial court that plaintiffs could not seek a writ of mandate to compel VWR to obtain a permit, because mandamus may only be used to compel

---

[2] Plaintiffs' request for judicial notice of the Court of Appeals' decision is appropriate. *See supra*, note 1.

official acts of government agencies. *Id*. at 28. The Court of Appeals turned next to plaintiffs' argument that a writ of mandamus should issue against the City because the City violated its municipal code by failing to issue a planned development permit and findings for the VWR project. *Id*. at 29. The Appellate Court concluded that "the decision to issue a planned development permit [is] discretionary, not ministerial" so any decision <u>not</u> to issue such a permit and/or related findings was not subject to mandamus. *Id*. However, the Court of Appeals acknowledged that the "second cause of action mentions another duty that might be subject to enforcement by writ of mandate." *Id*. at 30. Specifically, plaintiffs alleged "[n]o building permits may be issued until after a planned development permit is obtained." *Id*. This allegation was based upon Visalia Municipal Code ("VMC") § 17.28.070, which provides in part:

> Once the applicant receives a planned development permit, building permits may be issued. No permits may be issued for the erection or enlargement of building or structures and no persons shall perform any development or construction of work on the site except within full compliance of this section.

This amounted to a "ministerial duty" to refrain from issuing building permits without a planned development permit, thereby satisfying the ministerial duty element of a cause of action for a writ of mandate. *Id*.

The California Supreme Court denied VWR's petition for review on December 9, 2012. *See* Doc. 38.

## III. DISCUSSION

**A.    Motion to Dismiss.**

Defendant moves to dismiss the Complaint on numerous grounds. Defendant argues that: (1) Plaintiffs lack Article III standing to sue because the "mitigate-or-pay" nature of Rule 9510" renders it impossible for this Court to redress Plaintiffs' injuries; and (2) Plaintiffs cannot maintain their citizen suit under 42 U.S.C. § 7604 because (a) Rule 9510 is not an "emission standard or limitation"; (b) Plaintiffs cannot allege a violation of an "objective standard" under California's SIP; and (c) Plaintiffs

cannot establish continuing harm.

Defendant also argues that Plaintiff's CAA claim must be dismissed for failure to state a claim because, as a matter of law, the issuance of a Planned Development Permit ("PDP") is not a discretionary approval that would trigger application of Rule 9510. Defendant also moves to dismiss Plaintiffs' prayer for a "permanent injunction… to require VWR to cease and desist from any further construction or operation of the VWR project unless and until it fully complies with Rule 9510," arguing that because of the mitigate-or-pay nature of Rule 9510, such relief is unavailable as a matter of law.

Alternatively, Defendant argues that the Court should abstain from hearing this action under either *Burford v. Sun Oil Co*., 319 U.S. 315 (1943), and/or *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976).

As jurisdiction is a prerequisite to any action, including abstention on the basis of comity, and to narrow the issues should the case return to federal court, the jurisdictional issues are discussed first. Discussion of the abstention doctrines follows. Because the Court finds that a *Colorado River* stay is appropriate, the additional merits arguments are not addressed.

     **1.**     <u>**Jurisdictional Issues.**</u>

        **a.**     <u>**Standard of Decision: Rule 12(b)(1.**</u>

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968–69 (9th Cir. 1981).

A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir. 2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

"If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan*, 719 F. Supp. 899, 903 (E.D. Cal. 1989), rev'd on other grounds, 963 F.2d 229 (9th Cir. 1992). "The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Id.*; *see also Cassirer v. Kingdom of Spain,* 580 F.3d 1048, 1052 n. 2 (9th Cir. 2009), *rev'd on other grounds en banc*, 616 F.3d 1019 (9th Cir. 2010) (applying *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), to a facial motion to dismiss for lack of subject matter jurisdiction).

Here, Defendant does not offer any evidence in support of its jurisdictional arguments. These are facial Rule 12(b)(1) attacks.

## b. Standing.

Defendant's standing argument is straightforward. VWR maintains that Plaintiffs cannot establish Article III standing because the mitigate-or-pay nature of rule 9510 means that Plaintiffs' alleged injury cannot be redressed.

### (1) General Legal Standard Re: Standing.

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits

of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To have standing, a

plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a

case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id*. at 561.

### (2)   Redressability.

To satisfy the final requirement of Article III standing, "it must be likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61.

Plaintiffs expressly allege that they have been and will be injured because Defendant's conduct has and

will cause them to breathe air that is less pure than it otherwise would be. *See* Doc. 1 at ¶¶ 15-20. While

the Court rejected Plaintiffs' contention that Defendant's conduct is presently causing them irreparable

harm warranting preliminary injunctive relief because Plaintiffs failed to demonstrate that VWR's

immediate compliance with Rule 9510 would likely produce emissions reductions before this case could

be resolved on the merits, Doc. 34 at 6, this does not mean that Plaintiffs lack standing to bring this suit

in the first place. If Plaintiffs succeed on the merits of their CAA claim, VWR would be required to comply with Rule 9510 and, assuming the truth of the allegations in the Complaint, would likely be required either to reduce emissions on site or pay a fee to the District. If VWR chose to pay the fee, the record does establish that the District is required to use such moneys to accomplish emissions reductions in the region. Rule 9510 § 10.2. Just because the timetable of such reductions is unclear does not mean they are unlikely to happen, thereby eventually providing redress to Plaintiffs.

Defendants do not address the other elements of Article III standing, but they are clearly satisfied for pleading purposes. Being compelled to breathe air less pure than that which otherwise would be mandated by the CAA is a valid injury in fact for standing purposes. *Natural Res. Def. Council, Inc. v. U.S. E.P.A.*, 507 F.2d 905, 910 (9th Cir. 1974). The alleged injury is also directly traceable to Defendant's alleged non-compliance with Rule 9510.

Defendants' motion to dismiss for lack of standing is DENIED.

c.      **Emissions Standard or Limitation.**

Defendant argues that Plaintiffs' suit must be dismissed because Rule 9510 is not an "emission standard or limitation" within the meaning of the CAA's citizen suit provision, which provides that a person may bring a suit against any other person "who is alleged to ... be in violation of an emission standard or limitation...." 42 U.S.C. § 7604(a)(1). The Act defines "emission standard or limitation," to include:

> (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,
>
> (2) a control or prohibition respecting a motor vehicle fuel or fuel additive, or
>
> (3) any condition or requirement of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment),[] section 7419 of this title (relating to primary nonferrous smelter orders), any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 7545(e) and (f) of this title (relating to fuels and fuel additives), section 7491 of this title (relating to visibility protection), any

13

condition or requirement under subchapter VI of this chapter (relating to ozone protection), or any requirement under section 7411 or 7412 of this title (without regard to whether such requirement is expressed as an emission standard or otherwise); or

(4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations.

which is in effect under this chapter (including a requirement applicable by reason of section 7418 of this title) or under an applicable [state] implementation plan.

42 U.S.C. § 7604(f).

Although generally, the term "emission standard or limitation" is broadly construed to include "any type of control to reduce the amount of emissions into the air," *NRDC v. EPA*, 489 F.2d 390, 394, n. 2 (5th Cir.1974), rev'd on other grounds sub nom. *Train v. NRDC*, 421 U.S. 60 (1975); *see also City of Santa Rosa v. EPA*, 534 F.2d 150, 154 (9th Cir.1976), remanded on other grounds sub nom. *Pacific Legal Foundation v. EPA*, 429 U.S. 990 (1976), a court must still identify the applicable statutory language.[3]

Rule 9510 is obviously not "a control or prohibition respecting a motor vehicle fuel or fuel additive." 42 U.S.C. § 7604(f)(2). Nor does it appear to be classifiable as a § 7604(f)(1) "schedule or

---

[3] Plaintiffs make no effort to identify what portion of the statutory definition they believe applies here. Instead, Plaintiff cites 42 U.S.C. § 7502(c)(6), for the proposition that an "emission standard or limitation" includes "economic incentives such as fees, marketable permits, and auctions of emission rights." Doc. 23. This is a gross misrepresentation of the statutory language. In general, § 7502(c) lists the elements required in a SIP in a non-attainment area. Subsection (c)(6) specifically provides:

Other measures

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

(Emphasis added.) No objective reader of this language could conclude that it defines an emission standard or limitation to include economic incentives such as fees. If anything, it supports an argument for their exclusion from the definition of "emission standard and limitation," as it expressly delineates "enforceable emissions limitations" from "other control measures, means or techniques (including economic incentives...)...." But, it is not at all clear how the term "enforceable emissions limitation" used in § 7502(c) relates to the term "emission standard or limitation" in § 7604. The EPA discusses the former at length in its Revisions to the California State Implementation Plan, San Joaquin Valley Unified Air Pollution Control District, 76 Fed. Reg. 26,609-01, 26,612 (May 9, 2011), ultimately concluding that Rule 9510 is an enforceable emissions limitation.

14

timetable of compliance, emission limitation, standard of performance or emission standard," as it does

not necessarily impose any specific emissions limitation, because the applicant may pay a fee to the air

district in lieu of limiting emissions. Likewise, the Rule is not a § 7604(f)(4) "other standard, limitation,

or schedule established under … any applicable State implementation plan," because the fee-payment

option arguably rules out its classification as a "standard, limitation, or schedule." It is less clear whether

Rule 9510 is a "requirement to obtain a permit as a condition of operations," described in the latter part

of § 7604(f)(4). The text of the Rule does require submission of an "Air Impact Assessment" by covered

applicants, but does not describe this as a "permitting" process, nor has the Court been able to locate any

authority suggesting how to interpret the term "permit" as it is used in § 7604(f)(4).

Even if § 7604(f)(4) does not apply, the lengthy language in § 7406(f)(3) includes: "any

condition or requirement under an applicable implementation plan relating to transportation control

measures [or] air quality maintenance plans…." Several cases suggest that measures adopted as part of

an indirect source review program, of which Rule 9510 is one, are included in § 7406(f)(3)'s reference

to "transportation control measures." *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164,

1168-70 (9th Cir. 1979) (citing *Envt'l Study & Protection v. Pac*, 464 F. Supp. 143, 145 (D. Conn.

1978)). *League to Save Lake Tahoe* concerned a Nevada ISR program, included in Nevada's SIP,

requiring proponents of certain large new development projects to submit an environmental report

evaluating the impact on air quality of the additional automobile traffic attracted by the project. If the

measure at issue in *League to Save Lake Tahoe* triggered jurisdiction under § 7604, so does Rule 9510.

Defendant's motion to dismiss on this ground is DENIED.

### d.     **Objective Strategy or Commitment.**

"Plaintiffs seeking to bring a citizen suit for violation of an emission standard or limitation

contained in a SIP must allege a violation of a specific strategy or commitment in the SIP." *Communities*

*For A Better Env't v. Cenco Ref. Co.,* 180 F. Supp. 2d 1062, 1077 (C.D. Cal. 2001) (internal citation and

quotation omitted). "[S]uit may not be maintained solely to force regulators to attain the NAAQs or to modify or amend a SIP to conform to a plaintiff's own notion of proper environmental policy." *Id*. SIP rules that "involve purely subjective standards" do not qualify, while those that "announce concrete, objective permitting requirements" do. *Id*. In *Cenco*, for example, the district court found that alleged violations of "procedural permitting requirements" were satisfactory. *Id*. at 1081.

Here, Defendant argues that Rule 9510 does not constitute a challengeable "objective standard" because "whether the project required a discretionary approval is – at best – a matter of interpretation of the planned development permit ordinance and the manner in which the City has applied it to this particular project." Doc. 17-1 at 10. Defendant is improperly attempting to tie the relevant "objective standard" inquiry to the threshold test of whether Rule 9510 applies in the first place. This misses the point of the allegation in the Complaint. Plaintiffs allege that Rule 9510 applies to VWR's activities, an allegation that must be assumed true for purposes of this facial jurisdictional attack. The relevant question here is whether Rule 9510 itself imposes objective standards. It indisputably does. It requires either that the applicant reduce emissions by a certain amount or pay a fee to be calculated according to pre-determined formulae. This is a "concrete, objective permitting requirement" not a "purely subjective" test.

Defendant's motion to dismiss on this ground is DENIED.

### e. **Continuing Violation.**

The CAA's citizen suit provision also requires either that the alleged violation be currently ongoing at the time of suit or, if purely based upon past conduct, that the violation has been repeated. *See* 42 U.S.C. § 7604(a)(1) ("any person may commence a civil action on his own behalf…against any person … who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of [] an emission standard or limitation under this chapter…."). Defendant argues that because the only alleged violation in this case arises out of VWR's purported failure to

16

submit a Rule 9510 permit application, "this establishes nothing more than a single past violation, the only consequence of which was the failure to pay a one-time Off-Site Fee to the Air District." Doc. 17-1 at 12.

In support of this argument, Defendant cites two district court cases concerning the failure of polluters to obtain required permits under the CAA: *Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1561, 1564 (N.D. Ga. 1994); *New York v. Niagra Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003). *Satterfield* examined, among other things, whether the citizen suit provision provided jurisdiction to hear a claim that an entity had at one time failed to obtain a proper pre-construction permit. *Id.* at 1564. The *Satterfield* court reasoned that this alleged violation could not be repeated because "[a] defendant can only fail to obtain a permit once" and construction was completed years before the suit was brought. *Id.* Alternatively, because the defendant subsequently received a permit, the citizen suit provision was inapplicable because "the requirement that the violation be repeated indicates that the courts will not allow citizens to file suits based on violations that have been corrected." *Id.* at 1565.

In *Niagra Mohawk*, the State of New York sought to use subsection (a)(3) of the citizen suit provision, 42 U.S.C. 7604(a)(3), to sue a power company for failing to obtain preconstruction permits prior to constructing and/or modifying its power plants. 263 F. Supp. 2d at 658-59. Because the relevant language in § 7604(a)(3) does not contain any requirement that past violations be repeated, the district court rejected *Niagra Mohawk's* argument that the claims against it must be dismissed because the preconstruction permit violations were all in the past. *Id.* Because this aspect of the holding in *Niagra Mohawk* concerned an inapplicable subsection of the citizen suit provision, it is not relevant here, because § 7604(a)(1) requires any past violation to be repeated. However, the *Niagra Mohawk* decision does contain some relevant reasoning concerning the statute of limitations. New York alleged that Niagra Mohawk modified its facilities more than fifty times between 1982 and 1999 without obtaining the proper preconstruction permits. *Id.* at 660. Niagra Mowhawk argued that the 5-year statute of

limitations barred those claims outside the limitations period. *Id.* New York rejoined that the statute of

limitations should be tolled because a violation of a permitting requirement constitutes an ongoing and

continuing violation. *Id*. The court disagreed, reasoning:

> A given construction or modification project occurs only once. If a permit is not obtained
> for that particular project, then the preconstruction permit requirement of the Clean Air
> Act has been violated. However, the requirement to secure a preconstruction permit
> applies prior to construction or modification. Once the construction or modification is
> complete, the window in which to apply for and obtain a preconstruction permit is gone.
> Thus, a violation of the Clean Air Act's preconstruction permit requirement is singular in
> nature, and does not constitute an ongoing violation.

*Id*. at 661.

As seems to be a pattern in the briefing in this case, the parties have glossed over the complexity

of the legal landscape. Numerous other Courts have addressed the question of whether the failure to

obtain a preconstruction permit constitutes a "singular" event or an "ongoing violation." After

examining the specific programs in question in detail, the Eighth and Eleventh Circuits found that the

failure to obtain a required permit under the CAA is a "singular" event. *Sierra Club v. Otter Tail Power

Co*., 615 F.3d 1008, 1018 (8th Cir. 2010) (CAA's provision that "[n]o major emitting facility ... may be

constructed" without first obtaining a preconstruction permit under the prevention of significant

deterioration ("PSD") program occurs at the time of construction or modification and is not ongoing);

*Nat'l Parks & Conservation Assn. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1323–25 (11th Cir. 2007)

(finding no ongoing obligations in Alabama's SIP provisions regarding preconstruction permits under

the PSD program). The Sixth Circuit, in contrast, rejected a statute of limitations defense, concluding

that Tennessee's SIP imposed an ongoing requirement to obtain a permit, even after construction was

completed. *Nat'l Parks Conservation Assn. v. Tenn. Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007).

Apart from *Satterfield* and *Niagra Mohawk*, discussed above, a number of other district courts

have examined similar questions, looking closely at the relevant regulatory regime for guidance. *See,

e.g*., *United States v. Missouri*, 2012 WL 262655, *7-8 (E.D. Mo. Jan. 27, 2012) (failure to obtain

preconstruction permit under Missouri SIP constituted a singular violation); *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 443–44 (D. Md. 2001) (same under Maryland's SIP); *United States v. EME Homer City Generation L.P.*, 823 F. Supp. 2d 274, 286 (W.D. Pa. 2011) (same directly interpreting CAA PSD provisions); *United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1008–9 (N.D. Ill. 2010) (same); *United States v. Cinergy Corp.,* 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) (same applying permitting requirements for major sources in non-attainment areas); *United States v. Murphy Oil, USA, Inc.*, 143 F.Supp.2d 1054, 1083 (W.D. Wisc. 2001) (same applying Wisconsin regulations); *United States v. Louisiana–Pacific Corp.*, 682 F. Supp. 1122, 1130 (D. Colo. 1987) (finding that EPA's PSD regulation providing no major stationary source "shall begin actual construction without a permit" "makes it clear that the violation occurs when the actual construction is commenced, and not at some later point in time"); *United States v. Campbell Soup Co.*, 1997 WL 258894, *1–2 (E.D. Cal. Mar.11, 1997) (rejecting argument that violation of Sacramento Metropolitan Air Quality Management District Rule requiring permit before "building, erecting, altering or replacing" certain types of machines "continues as long as the machine still exists or is operated.").

A few district courts have determined that PSD permit requirement violations can be ongoing for statute of limitations purposes. *E.g., Sierra Club v. Portland General Electric Co.*, 663 F. Supp. 2d 983, 993 (D. Or. 2009) (finding Oregon SIP's requirements apply to both the construction and operation of the source); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) (because SIPs of both North and South Carolina integrate preconstruction permits with operating permits, the requirement of obtaining a preconstruction permit amounts to a condition of operation rendering any violation a continuing one), vacated on other grounds, *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007); *United States v. Ohio Edison Co.*, 2003 WL 23415140, *5–6 (S.D. Ohio Jan.17, 2003) (finding the PSD provisions contemplate "not only certain preconstruction obligations but also subsequent operation after modification" and reasoning that "*Westvaco*, *Murphy Oil*, and *Coastal Lumber* are

premised on an oversimplified reading of the CAA provisions"); *United States v. American Electric Power Service Corp.*, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001) (finding it "illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the permit requirements"); *United States v. Cemex, Inc.*, 864 F. Supp. 2d 1040, 1047-48 (D. Colo. 2012) ("Given that the CAA is a statute intended to prevent emission of air pollution, the continued emission of pollutants that would otherwise be limited had the source complied with the PSD and NNSR programs could be considered a repeated injury."). As a recent district court summarized:

> These courts concluded that the "preconstruction" and "operating" requirements under the Clean Air Act are not separated exclusively into either the PSD program or Title V program, but are intertwined. In other words, the PSD program contemplates not only preconstruction requirements, but also ongoing operational requirements. Although the PSD program is titled "preconstruction requirements," this title refers to the timing of the initial application for a PSD permit and not whether its requirements are one-time or ongoing for statute of limitations purposes.

*Club v. Dairyland Power Co-op.*, 2010 WL 4294622 (W.D. Wis. Oct. 22, 2010) (following *Ohio Edison*'s reasoning).

It is important to keep in mind that <u>none</u> of the above-mentioned cases concerns Rule 9510, which, although not labeled a "permitting" program, requires submission of an Air Impact Assessment ("AIA") prior to commencement of construction. Nevertheless, lessons can be gleaned from these authorities. The key appears to be that the court must engage in a close examination of the relevant "permitting" scheme. Even if the program facially requires only a "preconstruction" permit, if it also contains ongoing operational requirements that are inseparable from the preconstruction permitting process, then a violation should be considered "continuing."

An examination of Rule 9510 reveals that the AIA procedure is a hybrid process. For any project covered by the Rule, the proponent of the project (the "applicant") must submit an AIA application no later than the date on which the applicant applies for final discretionary approval with the relevant public

agency. Rule 9510 § 5.0. Based upon the calculations contained in the AIA application, the District or the applicant produces a final AIA that quantifies both construction and operational NOx and PM10 emissions associated with the proposed project and the reductions required by the Rule. § 5.6. Once a final AIA is produced, the applicant may choose from several courses of action. The applicant may reduce construction and operational emissions on site by certain pre-determined percentages. § 6.0 Alternatively, the applicant may choose to pay an off-site emission fee calculated according to formulae set forth in the Rule. § 7.0. In addition, the applicant may choose to implement some on-site reductions to reduce the amount of the fee owed. § 6.3. If any on-site emissions reductions are planned, the applicant must include a monitoring and reporting plan in its AIA application. § 5.4

If on-site emissions reductions were the only option, the Court would not hesitate to find that Rule 9510 imposes operational requirements such that a failure to comply with Rule 9510 would constitute an ongoing violation. The issue becomes significantly more difficult to resolve, however, in light of the fact that an applicant has the option of satisfying its obligations under Rule 9510 entirely by paying an up-front fee. That procedure, standing alone, would likely not constitute an ongoing obligation.[4] The parties have not offered any authority to help resolve how the jurisdictional statute applies in such a hybrid situation. Because this case warrants a stay under *Colorado River*, and because the state court's activities may effectively resolve the parties' dispute, the Court will hold its ruling on this issue in abeyance until the *Colorado River* stay is lifted, at which time further briefing may be requested.

---

[4] Plaintiffs argue that whether or not Rule 9510 imposes an ongoing or singular obligation is irrelevant because Defendant commenced construction (i.e. failed to comply with the preconstruction requirements of Rule 9510) within the applicable 5-year statute of limitations. It is true that many of the cases above were discussing claims that would fall outside the 5-year statute of limitations were they not "continuing" claims. However, some of the cases also dealt with the citizen suit provision's separate requirement that where alleged CAA violations are purely based upon past conduct, the plaintiff must present evidence that the violation has been repeated. Yet, Plaintiffs offer no allegations of repeated violations. The only way they could possibly satisfy the citizen suit provision's "repeated" past violation requirements is to present an ongoing violation.

**B.**     **Abstention.**

Federal courts have a "virtually unflagging" obligation to adjudicate claims within their jurisdiction. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *United States v. Morros*, 268 F.3d 695, 703 (9th Cir.2001). As such, "abstention is permissible only in a few carefully defined situations with set requirements." *Morros*, 268 F.3d at 703 (internal quotation marks omitted); *see also Colo. River*, 424 U.S. at 813 (noting that abstention is proper only in "exceptional circumstances"). Here, Defendant invokes the abstention doctrines set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and/or *Colorado River*, 424 U.S. at 817.

**1.**     **Substantial Similarity.**

There is some authority to suggest that a threshold determination must be made before any of the specific abstention doctrines are applied. *See Commercial Cas. Ins. Co. v. Swarts, Manning & Associates, Inc.*, 616 F. Supp. 2d 1027, 1032-33 (D. Nev. 2007). Specifically, for abstention to ever be appropriate, there must be a parallel or substantially similar proceeding in state court. *Security Farms v. Int'l Broth. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1009 (9th Cir.1997) ("[I]nherent in the concept of abstention is the presence of a pendent state action in favor of which the federal court must, or may, abstain."). An exact parallel is not required; "[i]t is enough if the two proceedings are substantially similar." *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989). "Suits are parallel if substantially the same parties litigate substantially the same issues in different forums." *Commercial*, 616 F. Supp. 2d at 1032-33 (quoting *New Beckley Min. Corp. v. Int'l Union, United Mine Workers of America*, 946 F.2d 1072 (4th Cir. 1991)).

Here, all of the parties to the federal action are involved in the state action. The Plaintiffs are identical and VWR is a real party in interest in the state action.

As to the subject matter of the two cases, some additional discussion is required. In the state

case, at least two claims remain to be tried by the trial court:[5] (1) the CEQA claim against VWR and the City; and (2) the petition for a writ of mandate directing the City to comply with VMC § 17.28.040.A. In fact, both of these claims arguably implicate VMC § 17.28.040.A.

The VMC requires all projects the Planned Heavy Industrial ("PIH") Zone to obtain a planned development permit ("PDP"). VMC § 17.22.030C. In order to obtain a PDP, an applicant must submit a site plan to the Visalia Planning Department. § 17.28.030. Within thirty (30) days of submission, the site plan review committee, made up of "staff representatives of the fire, engineering, traffic, building, planning, solid waste, police, park and recreation departments," shall "approve, conditionally approve, or disapprove the proposed site plan." §§ 17.28.020, 17.28.040A. Section 17.28.040A provides in pertinent part:

> The site plan review committee shall have the power to apply conditions to a planned development permit which the committee finds are in keeping with current city ordinances and to protect the public health, safety and general welfare. In approving the site plan, the site plan review committee shall make the following specific findings….

The CEQA claim presents the question of whether the issuance of a PDP pursuant to VMC § 17.28.040.A is a discretionary approval triggering CEQA. Doc. 38 at 2. Plaintiffs contend that the Court of Appeals' decision is law of the case on this question; Defendants assert that the Court of Appeals has only ruled on the sufficiency of the allegations in the FAP and has not issued a final decision on the merits. *Id*. at 2-3.

The claim requesting a writ of mandate specifically alleges that the City failed to issue a PDP in compliance with § 17.28.040A, and raises the issue of what form and format requirements, if any, are imposed by that language. *See* Doc. 38 at 3. Plaintiffs contend that no such permit was issued because the administrative record does not contain a document purporting to be a PDP and does not contain any of the written findings Plaintiffs allege were required. *Id*. Defendants expect the City will argue that a PDP was in fact issued along with the relevant findings. *Id*.

---

[5] The Parties dispute whether a third claim for illegal expenditure of funds remains to be tried in the state case. Doc. 38. But, that claim indisputably does not implicate issues relevant to the federal action.

Although the federal case is brought under the federal CAA, deciding that claim will also require inquiry into the meaning of language in VMC § 17.28.040A. The critical dispute in the CAA claim is whether Rule 9510 applies to VWR's project. Defendant contends it does not apply because VWR did not seek to gain a final discretionary approval for a development project from a public agency. The critical language is found in Rule 9510 § 2.1, which provides:

> This rule shall apply to any applicant that seeks to gain a <u>final discretionary approval for a development project</u>, or any portion thereof...."

Section 3.13 defines a "development project" as "any project, or portion thereof, <u>that is subject to a discretionary approval by a public agency</u>, and will ultimately result in the construction of a new building, facility, or structure, or reconstruction of a building, facility, or structure for the purpose of increasing capacity or activity." Section 3.14 further defines "discretionary approval" as:

> a decision by a public agency that requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular development project, as distinguished from situations where the public agency merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations.

If the federal CAA claim were to be resolved on the merits, a critical question would be whether, under VMC § 17.28.040, the City retains discretion of a sort that would trigger liability under Rule 9510.

An almost identical question will be answered in the context of the state court CEQA claim. The distinction between discretionary and ministerial actions under CEQA is remarkably similar to the distinction drawn in Rule 9510. CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies.... Cal. Pub. Res. Code § 21080. Under CEQA, discretionary projects include, but are not limited to "the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits, and the approval of tentative subdivision maps...." *Id*. CEQA expressly does not apply to "ministerial projects proposed to be carried out or approved by public agencies." *Id*.

Litigating the CAA claim in federal court would require the same parties to litigate a nearly

identical key issue in both forums. Moreover, the original state court complaint contained a claim based upon Rule 9510 itself. Plaintiffs correctly point out that their state claims based upon Rule 9510 were dismissed as to VWR. However, Plaintiffs reached a settlement with the District on that claim which provides:

> If the Court finds that any governmental entity was or is required to issue a discretionary approval with respect to the VWR Project, then the Air District shall require VWR to comply with [] Rule 9510 prior to the commencement of construction of the VWR Project, or within ten (10) days of the date of the ruling of the Court, whichever date is later.

RJN, Ex. M at 3. VWR concedes that if the state court makes a finding that triggers this provision of the settlement, VWR will be required to comply with Rule 9510. *See* Doc. 17-1 at 2, 19 n.2. This adds another parallel between the state and federal actions. The cases are substantially similar for purposes of abstention.

## 2.  **Burford Abstention.**

The Ninth Circuit has concisely summarized the *Burford* abstention doctrine:

> Burford abstention [] arose from a case involving the Texas Railroad Commission. In Burford, an oil company filed suit in federal court to attack the validity of a permit [] the Commission [] granted to Burford. The permit allowed Burford to drill four wells in an East Texas oilfield. The Supreme Court held that although the federal court had diversity jurisdiction over this "thorny" regulatory controversy, it properly declined to rule on the merits. After a long exegesis on the complexities of Texas oil law, the Court concluded that "[a]s a practical matter, the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide" and that "[d]elay, misunderstanding of local law, and needless federal conflict with the State policy[] are the inevitable product of this double system of review."

> Burford allows courts to "decline to rule on an essentially local issue arising out of a complicated state regulatory scheme." Its application requires

>> first, that the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court; second, that federal issues could not be separated easily from complex state law issues with respect to which state courts might have special competence; and third, that federal review might disrupt state efforts to establish a coherent policy.

*United States v. Morros*, 268 F.3d 695, 704-05 (9th Cir. 2001) (footnotes and citations omitted).

Defendant argues that *Burford* abstention applies here because California has adopted a

comprehensive scheme for suits brought under CEQA. It is true that California concentrates suits brought under CEQA before specially designated judges with specialized expertise in the statute, and that special procedures apply, including shortened statutes of limitations, fast-tracked case management, and limited appellate review. *See* Cal. Pub. Res. Code § 21167, *et seq*. Defendant argues that the federal issues presented in this case cannot be separated from California's complex CEQA regulatory scheme because "they are precisely the same issue." Doc. 1701 at 23. Specifically, in resolving the CEQA claim, the state court must determine whether or not project approval was a discretionary or ministerial action. Likewise, in resolving the CAA claim in this case based upon Rule 9510, this Court would have to determine whether or not project approval was a discretionary act. But, Defendants gloss over the fact that both the state and federal claim really turn on an interpretation of <u>VMC § 17.28.040A</u>, not so much on the meaning of the term "discretionary" under either CEQA or Rule 9510. Accordingly, although resolution of the federal claim may turn on an interpretation of state law, it is not intertwined with any aspect of CEQA in which state courts have special competence.

Defendant's motion for abstention under *Burford* is DENIED.

### 3.   *Colorado River* **Abstention.**

The Ninth Circuit has also recently summarized the *Colorado River* doctrine and related Circuit jurisprudence:

> [I]n *Colorado River* ... the federal government brought suit against water users in federal court, seeking a declaration of water rights in certain rivers and tributaries in Colorado. [424 U.S.] at 805. Colorado had previously established seven water districts to adjudicate water rights in ongoing state court proceedings. *Id*. at 804. After the government filed its suit in federal court, several of the defendants in that case filed an application joining the government as a party in the state court proceedings for the relevant water district. *Id*. at 806. The district court then dismissed the government's federal suit in light of the ongoing state court proceedings. On appeal, the Supreme Court held that although none of the traditional abstention doctrines applied, "considerations of [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," justified dismissal of the federal suit. *Id*. at 817 (alteration in original) (internal quotation marks omitted). The Court noted several factors that supported dismissal, relying particularly on the "highly interdependent" relationship between the claims in the state and federal proceedings and the federal policy, embodied in the McCarran Amendment, of avoiding piecemeal adjudication of water rights. *Id*. at

819–20.

The Court has carefully limited *Colorado River*, emphasizing that courts may refrain from deciding an action for damages only in "exceptional" cases, and only "the clearest of justifications" support dismissal. *Id*. at 818–19. In M*oses H. Cone Memorial Hospital v. Mercury Construction Corp*., the Court held that no exceptional circumstances justified the district court's stay of an action to compel arbitration under the Federal Arbitration Act. 460 U.S. 1, 19 (1983). The Court noted that although a state court suit involving the underlying claims was pending when the federal suit was filed, the federal suit did not increase the risk of piecemeal litigation; substantial progress had already been made in the federal suit; federal law provided the rule of decision on the merits of the case; and there was substantial doubt as to whether the state court could issue the remedy sought in federal court. *Id*. at 19–26.

To decide whether a particular case presents the exceptional circumstances that warrant a Colorado River stay or dismissal, the district court must carefully consider "both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise." *Colorado River*, 424 U.S. at 818. Drawing from *Colorado River*, *Moses H. Cone* and subsequent Ninth Circuit cases, we have recognized eight factors for assessing the appropriateness of a Colorado River stay or dismissal: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court. *Holder [v. Holder]*, 305 F.3d [854,] 870 [(9th Cir. 2002)].

*R.R. St. & Co. Inc. v. Transp. Ins. Co*., 656 F.3d 966, 978-79 (9th Cir. 2011) (footnotes omitted).[6]

"These factors are to be applied in a pragmatic and flexible way, as part of a balancing process rather than as a mechanical checklist." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1257 (9th Cir. 1988). Yet, "[a]ny doubt as to whether a factor exists should be resolved against a stay." *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).

The first factor is not relevant in this case because the dispute does not involve a specific piece of property. *See id*. Nor is the second of any particular importance. Although the state forum is in Visalia, the City in which all parties arise, the federal forum is located in Fresno, less than an hour away.

//

//

---

[6] Although a court may either stay or dismiss a case or claims under *Colorado River*, the Ninth Circuit generally requires a stay rather than a dismissal. *R.R. St. & Co.*, 656 F.3d at 978 n. 8.

### a.   Piecemeal Litigation

"Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." *Am. Int'l Underwriters*, 843 F.2d at 1258. "The mere possibility of piecemeal litigation does not constitute an exceptional circumstance." *R.R. St. & Co.*, 656 F.3d at 979. "Instead, the case must raise a 'special concern about piecemeal litigation,'" *id.* (quoting Travelers, 914 F.2d at 1369), which "can be remedied by staying or dismissing the federal proceeding," *id.* (citing *Moses H. Cone*, 460 U.S. at 20–21).

In *R.R. Street & Co.*, for example, the Ninth Circuit focused on several facts: (1) deciding the state and federal action in separate courts "would result in duplication of efforts"; (2) the federal action sought to adjudicate issues implicated in a "vastly more comprehensive state action"; and (3) there was a highly interdependent relationship between the federal and state cases. *Id.* at 979-80. Under those circumstances, the avoidance of piecemeal litigation weighed significantly against the exercise of jurisdiction by the federal court. *Id.* at 980.

Likewise, here, adjudication of the federal claim would result in duplication of efforts in deciding the key issue: whether the City of Visalia exercised discretion when the SPRC approved the Project under VMC § 17.28.040A. That issue is but one piece of a far more complicated state action, involving multiple claims. Additionally, the two cases are interdependent, as a decision regarding interpretation of § 17.28.040A in either case would likely impact the outcome of the other.

### b.   Order in Which the Forums Obtained Jurisdiction.

As to the order in which the forums obtained jurisdiction, the Supreme Court has instructed that instead of taking a mechanical approach, courts must apply this factor "in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone*, 460 U.S. at 21. In *R.R. Street & Co.* even though the federal court was the first to exercise jurisdiction over the specific <u>claims</u> in that case, the state court was the first to exercise jurisdiction over the <u>subject matter</u> involved in the federal action.

656 F.3d at 980. This weighed against jurisdiction. *Id*.

Here, the facts weigh even more heavily in favor of a stay. The state court was the first to exercise jurisdiction over the dispute regarding the Project, that case has progressed past the demur stage, and the state court was first to issue any ruling touching upon interpretation of § 17.28.040A. This factor weighs in favor of a stay.

        **c.**      **Source of Law.**

The next issue is whether federal law or state law provides the rule of decision on the merits. At the highest level of generalization, federal law, namely the CAA, provides the rule of decision on the merits in this action. But, the CAA incorporates regulations that are enforceable under either federal or state law. The present situation is similar to that presented in *Kopacz v. Hopkinsville Surface & Storm Water Utility*, 714 F. Supp. 2d 682, 687 (W.D. Ky. 2010). There, a state court action sought enforcement of a Kentucky Air Regulation under state law. *Id*. A parallel federal claim that sought enforcement of the same air regulation through the CAA's enforcement provisions was stayed under *Colorado River*. *Id*.

Here, the CAA claim is based upon a District rule that is equally enforceable under state law. The original complaint in the state action contained several claims attempting to enforce Rule 9510. Although those claims have been settled, as discussed above, the settlement looks forward to a decision by the state court interpreting VMC § 17.28.040A. If the state court finds Visalia exercised discretion, the settlement provides that Rule 9510 will be applied to the Project.[7]

This factor weighs in favor of a stay.

//

//

---

[7] Plaintiffs cite several cases which discuss the fact that the CAA permits overlapping enforcement mechanisms, including *Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111 (9th Cir. 1996) and *Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532 (2d Cir. 2004). But, the only case concerning abstention cited by Plaintiffs on this point is *Moses H. Cone*, which generally holds that the "presence of federal-law issues must always be a major consideration weighing against surrender" of jurisdiction. 460 U.S. at 25-26.

### d.    Adequacy of State Court.

Next, this Court must examine whether the state court proceedings can adequately protect the rights of the federal litigants. "[I]f there is a possibility that the parties will not be able to raise their claims in the state proceeding, a stay or dismissal is inappropriate." *R.R. St. & Co*., 656 F.3d at 981. Here, Plaintiffs correctly point out that their state claims based upon Rule 9510 were dismissed as to VWR. However, Plaintiffs are incorrect that "there is no relief as to VWR." VWR concedes that if a finding is made that triggers the District to apply Rule 9510 under the terms of the settlement, VWR will comply with Rule 9510. VWR is a real party in interest in the state court action. If VWR fails to comply, Plaintiffs can see relief from the state court. If that is insufficient, they may petition this Court to lift the any stay imposed under *Colorado River*.

### e.    Forum Shopping.

Forum shopping refers to "[t]he practice of choosing the most favorable jurisdiction or court in which a claim might be heard*." R.R. St. & Co*, 656 F.3d at 981 (quoting Black's Law Dictionary 726 (9th ed. 2009)). To avoid forum shopping, courts may consider "the vexatious or reactive nature of either the federal or the state litigation." *Moses H. Cone*, 460 U.S. at 17 n. 20. The Ninth Circuit has approved *Colorado River* stays or dismissals when it was "readily apparent that the federal plaintiff was engaged in forum shopping." *R.R. St. & Co*., 656 F.3d at 981 (citing *Nakash*, 882 F.2d at 1417 (plaintiff brought claims in federal court after three and a half years of litigating in state court); *Am. Int'l Underwriters*, 843 F.2d at 1255–56 (after filing in state court, plaintiff brought suit in federal court to avoid the state court's unfavorable evidentiary rules)).

Here, although Plaintiffs did file this suit after an unfavorable ruling by the state trial court, that ruling dismissed any Rule 9510 claim against VWR for lack of standing. PIRJN, Ex. A at 9. It was entirely proper for Plaintiffs to then bring suit in federal court against VWR under the CAA, which does provide standing to sue a polluter. This factor does not weigh in favor of a stay.

### f.    Resolution of Federal Issues.

The final *Colorado River* factor asks whether the state court proceedings will resolve all issues before the federal court. In the Ninth Circuit, "the existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes" a *Colorado River* stay or dismissal. *R.R. St. & Co.*, 656 F.3d at 982.

> When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all....

*Intel Corp. v. Adv. Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993). Here, although there is no CAA claim in the state case, the Court is convinced that resolution of the state court action is likely to completely resolve the CAA claim.

In sum, most of the *Colorado River* factors weigh in favor of a stay. In particular, the Court is concerned about duplicating the state courts' efforts to interpret VMC § 17.28.040A. The state court was the first to address that subject matter and its resolution of the dispute over that provision will control the District's application of Rule 9510 to VWR and will likely obviate any need for action by this Court.

## IV. CONCLUSION

For the reasons set forth above:

(1) Defendant's motion to dismiss is:

(a) DENIED as to the argument that Plaintiffs lack Article III standing to sue;

(b) DENIED as to the argument that Plaintiffs cannot maintain their citizen suit under 42 U.S.C. § 7604 because Rule 9510 is not an "emission standard or limitation"; and/or because Plaintiffs cannot allege a violation of an "objective standard" under California's SIP; and

31

(c) HELD IN ABEYANCE as to whether Plaintiffs can establish continuing

harm;

(2) Defendant's motion for abstention under *Burford* is DENIED; and

(3) Defendant's motion for abstention under *Colorado River* is GRANTED.

This case is stayed until the state court resolves the pending disputes over the meaning of VMC § 17.28.040A. The Parties shall submit joint status reports on the progress of the state court litigation every 90 days, starting 90 days from entry of this order. The stay shall automatically lift upon entry of judgment on all claims in which VMC § 17.28.040A is an issue, after which time the Parties shall have thirty (30) days to submit a joint status report setting forth a schedule for resolution of the federal action.

IT IS SO ORDERED.

Dated:   **February 5, 2013**            **/s/ Lawrence J. O'Neill**
                                        UNITED STATES DISTRICT JUDGE